UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | : : : : | Civil Action No. 1:09-cv-08633-JGK |
| Plaintiff, | : : | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF |
| vs. | : : | FEDERAL SECURITIES LAWS |
| ENERGY*SOLUTIONS*, INC., et al., | : : | |
| Defendants. | : : | DEMAND FOR JURY TRIAL |
| ———————————————— x | | |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ............................................................................1

JURISDICTION AND VENUE .....................................................................3

BASIS OF ALLEGATIONS ..........................................................................4

CONFIDENTIAL SOURCES ........................................................................4

PARTIES .........................................................................................................6

CLASS ACTION ALLEGATIONS ...............................................................10

SUBSTANTIVE ALLEGATIONS ................................................................12

    The Company and its Business ...............................................................12

    ENV Holdings ..........................................................................................13

    The Offerings ...........................................................................................14

    The Decommissioning of Nuclear Power Plants....................................16

    The Company's Prospects Were Not as  Lucrative as Portrayed by Defendants ............18

    The Company's License Stewardship Program ...................................19

    The Zion Decommissioning Project .......................................................23

    The Petition to the NRC..........................................................................25

    The NRC Repeatedly Rejected  Proposals Similar to the Company's Petition ...............27

    The NRC Rejects the Petition and Reiterates Its Longstanding Policies ........................33

    Energy*Solutions* Experienced Problems Due to the Economy .......................................34

THE REGISTRATION STATEMENTS AND PROSPECTUSES CONTAINED
INACCURATE STATEMENTS OF MATERIAL FACT AND OMITTED MATERIAL
INFORMATION REQUIRED TO BE DISCLOSED THEREIN................................................34

The IPO and July 2008 Registration Statements Omitted Known Trends, Events and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results ............................................................................................. 43

The IPO and July 2008 Registration Statements Omitted to Include Significant Factors that Made the Offering Risky ............................................................ 45

The IPO and July 2008 Registration Statements Omitted to Include a Description of the Petition as a Material Legal Proceeding ............................................ 46

The Company's Stock Declines .................................................................. 47

COUNT I

Violations of Section 11 of the Securities Act Against All Defendants .......................... 50

COUNT II

Violations of Section 12(a)(2) of the Securities Act Against All Defendants ................. 52

COUNT III

Violation of Section 15 of the Securities Act Against the Individual Defendants and ENV Holdings ................................................................................. 55

ADDITIONAL ALLEGATIONS IN SUPPORT OF CLAIMS UNDER THE EXCHANGE ACT ......................................................................................... 55

EnergySolutions Manipulated the Cost Estimates for the Zion Project ......................... 56

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ....................................................................................... 57

ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 79

LOSS CAUSATION/ECONOMIC LOSS .................................................................. 84

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ............................................................................................. 85

NO SAFE HARBOR .......................................................................................... 86

## COUNT IV

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Energy*Solutions*, the Individual Defendants and ENV Holdings ..................................................................................................... 86

## COUNT V

Violation of Section 20(a) of the Exchange Act Against the Individual Defendants and ENV Holdings ........................................................................................... 90

PRAYER FOR RELIEF ....................................................................................... 91

JURY DEMAND .................................................................................................. 91

Lead Plaintiffs New England Carpenters Guaranteed Annuity and Pension Funds, Building Trades United Pension Trust Fund and City of Roseville Employees' Retirement System (collectively, "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Amended Complaint for Violation of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Lead Plaintiffs' counsel as detailed below.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants, who acquired the common stock or depository shares of Energy*Solutions* in or traceable to the Company's initial public offering on or about November 14, 2007 (the "IPO") and the Company's offering of securities on or about July 24, 2008 (the "July 2008 Offering") (collectively, the "Offerings"), as well as purchasers of the Company's common stock or depository shares between November 14, 2007 and October 14, 2008, inclusive (the "Class Period"), under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Energy*Solutions*, Inc. ("Energy*Solutions*" or the "Company") was formed through a combination of several different entities in the nuclear services and disposal business. Prior to its IPO, 100% of the shares of the Company were owned by ENV Holdings LLC ("ENV Holdings"). As discussed below, ENV Holdings was owned and controlled by most of the senior executives and directors of the Company. Through the IPO, ENV Holdings sold 20.1 million shares of the Company's stock and cashed out more than $463 million. Nine months after the IPO, on July 24, 2008, Energy*Solutions* conducted the July 2008 Offering. ENV Holdings sold 100% of the

40.25 million shares in the July 2008 Offering and cashed out another $764 million. The Registration Statements for the IPO and July 2008 Offerings discussed the Company and its strong business prospects, including: (i) its opportunities in the $2.9 to $3.1 billion decommissioning and decontamination market of shut-down nuclear reactors; (ii) its $870 million decommissioning project at two nuclear facilities in Zion, Illinois, that were owned by Exelon Corp. ("Exelon") (the "Zion Project"); and (iii) its opportunities to dispose of nuclear waste at facilities that are still in operation.

      3.     Plaintiffs allege that Defendants are liable under the Securities Act because the IPO and July 2008 registration statements contained inaccurate statements of material fact when made because, among other reasons: (i) the opportunities in the shut-down nuclear reactor market were much smaller than represented; (ii) the decommissioning trust fund for the Zion Project was inadequate to cover the expenses for that project; (iii) the funds for the Company's services were contained in trust funds at shut-down facilities that were inadequate to cover decommissioning costs or would not be available for many years; (iv) a significant portion of the Company's decommissioning business (and future prospects) was entirely dependent upon the Company convincing the Nuclear Regulatory Commission (the "NRC") to change a longstanding and entrenched rule against releasing trust funds from facilities that were still in operation (the "Petition"); and (v) it was probable that the NRC would deny the Petition.

      4.     Furthermore, Plaintiffs allege that the Individual Defendants (defined below), and Defendants Energy*Solutions* and ENV Holdings, are liable under the Exchange Act because throughout the Class Period, these Defendants issued materially false and misleading statements about, among other things: (i) the revenue and earnings prospects of the Company; (ii) the ability of the Company to access decommissioning trust funds; and (iii) the likelihood of the Company to obtain a favorable ruling from the NRC on the Petition. As alleged herein, Defendants issued these

materially false and misleading statements to make it appear to investors that the Company had strong growth prospects to enable Defendants to dispose of more than $1.2 billion worth of stock in the Company during the Class Period at artificially inflated prices.

5.    On October 14, 2008, two months after the July 2008 Offering (by which time Defendants, through ENV Holdings, had disposed of 80% of their shares in the Company's stock), the Company revealed, among other things, that: (i) the trust fund at Zion had significantly declined in value and the Company was not moving forward with the Zion Project at that time; (ii) the NRC had denied the Company's Petition; and (iii) the revenues and earnings estimates provided by the Company throughout most of the Class Period would need to be significantly reduced.  In response to the Company's announcement on October 14, 2008, shares of the Company's stock fell $4.50 per share, or 44%, from a close of $10.14 per share before the announcement, to close at $5.64 per share, on extremely heavy trading volume of 9.4 million shares.

## JURISDICTION AND VENUE

6.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

7.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

8.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District, and the IPO and the July 2008 Offering were marketed in this District.  The Company's shares are traded on the New York Stock Exchange

("NYSE"), which is based in this District, and the Underwriter Defendants (defined below) maintain executive offices in this District.

9.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE.

## BASIS OF ALLEGATIONS

10.    The allegations herein are based upon the investigation conducted by and under the supervision of Lead Plaintiffs' counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LexisNexis®, Dow Jones and Bloomberg, Inc.) – including, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead Lead Plaintiffs' claims with particularity where necessary.  In the course of their investigation of the underlying claims, a number of former Company employees and other individuals who possessed direct knowledge of the wrongdoing alleged herein were interviewed.  Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## CONFIDENTIAL SOURCES

11.    The allegations made herein are based upon information and belief and are supported by the first-hand knowledge of eight (8) confidential witnesses ("CWs").  These informants have direct first-hand knowledge about Energy*Solutions*' business and operations and facts alleged herein.

12.    Confidential Witness 1 ("CW1") worked as a senior cost accounting professional for the Zion Project during the Class Period.  CW1 was directly involved with the decommissioning

- 4 -

plan for Zion and was involved with cost accounting issues for the Zion Project. CW1 worked closely with Pat Daily, a senior executive at the Company and the head of the Zion Project.

13.    Confidential Witness 2 ("CW2") worked at Energy*Solutions* during the Class Period as a project controls manager in the engineering and technology division at the Company. CW2's responsibilities included budget and forecast work on projects.

14.    Confidential Witness 3 ("CW3") worked at Energy*Solutions* during the Class Period as a manager of procurement for the Company. CW3 traveled to the Zion plants to perform various functions in connection with the Zion Project. CW3 also purchased materials and set up service contracts and housing contracts for employees in connection with the Zion Project.

15.    Confidential Witness 4 ("CW4") worked at the NRC Office of Nuclear Regulation during the Class Period and was the primary NRC employee that worked on the review of the Petition submitted by the Company and also worked as a staff member on the application by the Company to the NRC concerning the Zion Project.

16.    Confidential Witness 5 ("CW5") worked at Energy*Solutions* during the Class Period as a regional manager.

17.    Confidential Witness 6 ("CW6") worked at Energy*Solutions* during the Class Period as a Vice President of Business Development. CW6 was directly involved with the Zion Project and the forecasts for the Zion Project, including cost estimates.

18.    Confidential Witness 7 ("CW7") worked at Energy*Solutions* during the Class Period as a Vice President of Fuel Management Services. CW7 was directly involved with the Zion Project and the forecasts for the Zion Project, including cost estimates. CW7, along with several colleagues, invented the Company's License Stewardship Program and worked extensively on this program.

19.    Confidential Witness 8 ("CW8") worked at EnergySolutions during the Class Period as a cost accounting manager and financial analyst. CW8 worked directly on the IPO Prospectus and worked alongside others who also worked on the IPO Prospectus. CW8 attended regular meetings throughout the entire Class Period that were attended by Defendant Creamer and other senior Company executives. At these meetings, Creamer and other senior Company executives set estimates for the Company on its various projects and pressured employees to set unrealistic estimates that made the Company's opportunities appear better than they actually were.

## PARTIES

20.    Lead Plaintiff City of Roseville Employees' Retirement System acquired the common stock of EnergySolutions as set forth in the certification previously filed with the Court and incorporated by reference herein pursuant or traceable to the IPO and was damaged thereby.

21.    Lead Plaintiff Building Trades United Pension Trust Fund acquired the common stock of EnergySolutions as set forth in the certification previously filed with the Court and incorporated by reference herein during the Class Period and pursuant and/or traceable to the July 2008 Offering, and was damaged thereby.

22.    Lead Plaintiff New England Carpenters Guaranteed Annuity and Pension Funds acquired the common stock of EnergySolutions as set forth in the certification previously filed with the Court and incorporated by reference herein during the Class Period and pursuant or traceable to the IPO and July 2008 Offering and was damaged thereby.

23.    Defendant EnergySolutions is a provider of specialized, technology-based nuclear services to government and commercial customers.

24.    Defendant R. Steve Creamer ("Creamer") served as Chairman of the Board and Chief Executive Officer ("CEO") of EnergySolutions at all times relevant herein until his resignation on February 19, 2010. Defendant Creamer signed or authorized the signing of the IPO Registration

- 6 -

Statement (defined below) and the July 2008 Offering Registration Statement (defined below). Defendant Creamer is a founder of Creamer Investments, Inc., which owned shares in ENV Holdings. Creamer owned 10.29% of ENV Holdings during the Class Period.

25.    Defendant Philip O. Strawbridge ("Strawbridge") served as Executive Vice President and Chief Financial Officer ("CFO") of Energy*Solutions* at all relevant times herein and until his resignation effective December 31, 2009. Defendant Strawbridge signed or authorized the signing of the IPO Registration Statement and the July 2008 Offering Registration Statement. Strawbridge owned .39% of ENV Holdings during the Class Period.

26.    Defendant Jean I. Everest, II ("Everest") has served as Vice Chairman and a member of the Board of Directors of Energy*Solutions* since July 2007. Previously, Everest served as Executive Vice President and CFO of the Company from 2005 until August 2007. Defendant Everest signed or authorized the signing of the IPO Registration Statement and the July 2008 Offering Registration Statement. Everest was affiliated with Creamer Investments during the Class Period, which owned shares in ENV Holdings. Everest owned 5.37% of ENV Holdings during the Class Period.

27.    Defendant Mark C. McBride ("McBride") was Senior Vice President and Corporate Controller of Energy*Solutions* from January 2007 through December 2009. Defendant McBride signed or authorized the signing of the IPO Registration Statement.

28.    Defendant David B. Winder ("Winder") has been a director of Energy*Solutions* since November 2007. Winder signed or authorized the signing of the July 2008 Offering Registration Statement.

29.    Defendant Alan E. Goldberg ("Goldberg") was a director of Energy*Solutions* from 2005 until his resignation on October 1, 2008. Defendant Goldberg signed or authorized the signing

of the IPO Registration Statement and the July 2008 Offering Registration Statement. At times relevant herein, Goldberg was a co-founder of Lindsay Goldberg & Bessemer L.P. ("Lindsay Goldberg"), which owned shares in ENV Holdings.

30.    Defendant Lance L. Hirt ("Hirt") has been a director of Energy*Solutions* since 2005, and served as Chairman of the Board until November 2007. Defendant Hirt signed or authorized the signing of the IPO Registration Statement and the July 2008 Offering Registration Statement. At times relevant herein, Hirt was a partner at Lindsay Goldberg, which owned shares in ENV Holdings.

31.    Defendant Jordan W. Clements ("Clements") has been a director of Energy*Solutions* since 2005. Defendant Clements signed or authorized the signing of the IPO Registration Statement and the July 2008 Offering Registration Statement. At times relevant herein, Clements was a managing partner at Peterson Partners, which owned shares in ENV Holdings.

32.    Defendant Robert D. Lindsay ("Lindsay") has been a director of Energy*Solutions* since 2005. Defendant Lindsay signed or authorized the signing of the IPO Registration Statement and the July 2008 Offering Registration Statement. At times relevant herein, Lindsay was a co-founder of Lindsay Goldberg, which owned shares in ENV Holdings.

33.    Defendant Robert J.S. Roriston ("Roriston") was a director of Energy*Solutions* from November 2007 until his resignation from the Company on October 1, 2008. Defendant Roriston signed or authorized the signing of the July 2008 Offering Registration Statement. At times relevant herein, Roriston was a partner at Lindsay Goldberg, which owned shares in ENV Holdings.

34.    Defendant E. Gail de Planque ("de Planque") has been a director of Energy*Solutions* since November 2007. Defendant de Planque signed or authorized the signing of the July 2008 Offering Registration Statement.

35.    Defendant Andrew S. Weinberg ("Weinberg") served as a director of Energy*Solutions* since 2005.  Weinberg signed or authorized the signing of the IPO Registration Statement and the July 2008 Offering Registration Statement.  At times relevant herein, Weinberg was a partner at Lindsay Goldberg, which owned shares in ENV Holdings.

36.    The Defendants referenced above in ¶¶24-35 are referred to herein as the "Individual Defendants."

37.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an investment bank in the United States with its principal executive offices located in New York, NY.  Credit Suisse acted as a lead underwriter and served as a representative for the underwriters for the IPO and the July 2008 Offering and helped to draft and disseminate the Prospectuses for the two Offerings.

38.    Defendant J.P. Morgan Securities Inc. ("JP Morgan") operates as an investment bank and financial service firm with its principal executive offices located in New York, NY.  JP Morgan acted as a lead underwriter and served as a representative for the underwriters for the IPO and the July 2008 Offering and helped to draft and disseminate the Prospectuses for the two Offerings.

39.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm and underwriter with its principal executive offices and world headquarters located in New York, NY.  Morgan Stanley acted as a lead underwriter and served as a representative for the underwriters for the IPO, served as an underwriter for the July 2008 Offering, and helped to draft and disseminate the Prospectuses for the two Offerings.

40.    The other underwriters for the IPO and the July 2008 Offering include, UBS Securities LLC, Citigroup Global Markets Inc., Banc of America Securities LLC, UBS Securities LLC, D.A.

Davidson & Co., Lazard Capital Markets LLC, Friedman, Billings, Ramsey Group Inc., Piper Jaffray & Co., and Wedbush Morgan Securities Inc.

41.    The Defendants referenced above in ¶¶37-39 are referred to herein as the "Underwriter Defendants."  The Underwriter Defendants and the entities referenced in ¶40 are collectively referred to herein as the Underwriters.  The Underwriters were paid over *$41.4 million* in connection with the IPO and were paid over *$28.2 million* in connection with the July 2008 Offering.  The Underwriter Defendants failed to perform adequate due diligence in connection with their role as Underwriters for the IPO and the July 2008 Offering and were negligent in failing to ensure that the Registration Statement and Prospectus for the Offerings were prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

42.    Defendant ENV Holdings owned 100% of Energy*Solutions* prior to the IPO, sold shares of Energy*Solutions* to investors in the IPO, and sold shares to investors in the July 2008 Offering.

## CLASS ACTION ALLEGATIONS

43.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons or entities who acquired the common stock or depository shares of Energy*Solutions* in or traceable to the Company's initial public offering on or about November 14, 2007 and the Company's offering of securities on or about July 24, 2008, as well as purchasers of the Company's common stock or depository shares during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a

controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

44.    The members of the Class are so numerous that joinder of all members is impracticable. Energy*Solutions* stock is actively traded on the NYSE. Energy*Solutions* sold more than 30 million shares in the IPO and more than 40 million shares were sold in the July 2008 Offering. The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Energy*Solutions* or its transfer agent or the underwriters to the Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

45.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

46.    Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

47.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that

will be encountered in the management of this litigation that would preclude its maintenance as a class action.

48.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the Prospectuses and Registration Statements issued by Defendants to the investing public in connection with the IPO and the July 2008 Offering negligently omitted and/or misrepresented material facts about Energy*Solutions* and its business;

(c)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of the Company;

(d)    whether the price of Energy*Solutions* common stock was artificially inflated during the Class Period; and

(e)    the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Business

49.    Energy*Solutions* is a provider of specialized, technology-based nuclear services to government and commercial customers.  The Company's range of nuclear services includes engineering, in-plant operations, outsourced specialty services, spent nuclear fuel management, decontamination and decommissioning ("D&D"), logistics, transportation, processing and disposal. It also owns and operates facilities that complement its services.  The Company derives almost all of its revenues from the provision of nuclear services.

50.   The Company provided its services through three segments: Federal Services; Commercial Services; and Logistics, Processing and Disposal ("LP&D").   According to the Company, commercial nuclear services primarily consist of specialized nuclear fuel cycle services provided to the 104 operating nuclear reactors in the United States, as well as D&D services provided to the nuclear reactors that have been shut-down.  The commercial nuclear services market also includes non-utility customers such as hospitals, pharmaceutical companies, research laboratories, universities or research reactors, industrial facilities and other commercial facilities.

**ENV Holdings**

51.   In January 2005, Energy*Solutions*' predecessor company was acquired by affiliates of Lindsay Goldberg, Peterson Partners L.P. and Creamer Investments, Inc., (collectively, the "Sponsors") as well as certain of the Company's senior employees.  Lindsay Goldberg, together with its affiliated investment partnerships and investment manager, is a private equity investment fund based in New York.  Lindsay Goldberg was formed in 2001 by Defendants Goldberg and Lindsay.

52.   Peterson Partners L.P. provides private equity and venture capital to companies across the United States with a focus in the Western United States.  Defendants Creamer and Everest were affiliated with Creamer Investments, Inc.

53.   The Sponsors and certain of the Company's senior employees, including Raul Deju (President and Chief Administrative Officer of the Company) and Alan M. Parker (Executive Vice President and Chief Operating Officer of the Company), owned all of the members' interests in ENV Holdings.  ENV Holdings owned 100% of the Company's outstanding common stock immediately prior to the completion of the IPO.  Upon completion of the IPO, the Sponsors, through ENV Holdings, indirectly owned a majority of the Company's outstanding common stock and remained in control of the Company.  As stated in the IPO Prospectus:

- 13 -

Upon completion of this offering, the Sponsors will have the ability to effectively control all matters requiring stockholder approval, including the nomination and election of directors and the determination of the outcome of any corporate transaction or other matter submitted to our stockholders for approval, including amendments to our certificate of incorporation, potential mergers or acquisitions, asset sales and other significant corporate transactions.

54.    The percentage of beneficial ownership interests in ENV Holdings held by affiliates of the Sponsors or certain members of senior management of the Company depended on the value of the Company's stock price at any particular time.  Based on the IPO price of $23.00 per share and a sale or liquidation of the Company at an implied equity valuation based on such price, an affiliate of Lindsay Goldberg, Peterson Partners and certain members of the Company's senior management team held 71.4%, 5.7% and 22.9%, respectively, of the economic interest in ENV Holdings prior to the IPO.  These entities and individuals held 69.3%, 5.6% and 25.1%, respectively, of the economic interest in ENV Holdings as of the completion of the IPO.

**The Offerings**

55.    On or about March 29, 2007, Energy*Solutions* filed a Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") and filed 8 amendments to the Registration Statement on Form S-1/A thereafter for the IPO (the "IPO Registration Statement").

56.    On or about November 14, 2007, the Prospectus with respect to the IPO (the "IPO Prospectus"), which forms part of the IPO Registration Statement, became effective and 30 million depositary shares, representing 30 million shares of common stock of Energy*Solutions* at $23 per share were sold to the public, thereby raising $690 million.  The 30 million shares that were sold included 11,850,000 shares of common stock sold by the Company and 18,150,000 shares of common stock sold by the selling stockholder, Defendant ENV Holdings.

57.    In addition to the above-referenced 30 million shares, the IPO included an overallotment option granted to the Underwriters to purchase up to an additional 4.5 million shares

of common stock and on December 7, 2007 the Underwriters exercised this option for an additional 3.3 million shares. In total, 33.3 million shares were sold in the IPO at $23 per share, thereby raising approximately $765.90 million. ENV Holdings sold 1,996,500 shares included in the overallotment option granted to the Underwriters.

58.     All of the shares of common stock sold in the IPO were sold in the form of depositary shares. Each depositary share represents an ownership interest in one share of common stock. On December 19, 2007, each holder of the depositary shares was credited with a number of shares of common stock equal to the number of depositary shares held by such holder on that date, and the depositary shares were cancelled. Until the cancellation of the depositary shares on December 19, 2007, holders of the depositary shares were entitled to all proportional rights and preferences of the shares of common stock.

59.     Following completion of the IPO, ENV Holdings owned approximately 61.1% of the Company's outstanding common stock after full exercise of the over-allotment option. ENV Holdings received net proceeds of $417.4 million from the sale of its shares in the IPO before the exercise of the over-allotment by the Underwriters and $463 million after the Underwriters exercised their over-allotment option.

60.     On or about July 7, 2008, Energy*Solutions* filed a Form S-1 Registration Statement with the SEC and filed 2 amendments to the Registration Statement on Form S-1/A thereafter for the July 2008 Offering (the "July 2008 Registration Statement").

61.     The IPO Registration Statement and July 2008 Registration Statement are collectively referred to herein as the "Registration Statements."

62.     On or about July 24, 2008, the Prospectus with respect to the July 2008 Offering (the "July 2008 Prospectus"), which forms part of the July 2008 Registration Statement, became effective

and 35 million shares of common stock of Energy*Solutions* at $19 per share were sold to the public, thereby raising $665 million.

63.    In addition to the above-referenced 35 million shares, the July 2008 Offering included an overallotment option granted to the Underwriters to purchase up to an additional 5.25 million shares of common stock and the Underwriters fully exercised this option on August 4, 2008.  All of the shares of common stock sold in the July 2008 Offering were sold by the selling stockholder, ENV Holdings.  In total, ENV Holdings sold 40.25 million shares in the July 2008 Offering at $19 per share, thereby pocketing approximately $764.75 million.

64.    Prior to the IPO, ENV Holdings owned 100% of the shares of Energy*Solutions*.  After the IPO and prior to the July 2008 Offering, ENV Holdings owned approximately 62.3% of the Company's outstanding common stock.  Following the completion of the July 2008 Offering, ENV Holdings owned approximately 16.7% of the Company's outstanding stock.  On February 13, 2009, ENV Holdings distributed all its shares in the Company to its members on a pro rata basis for no consideration.  As a result, ENV Holdings was no longer the beneficial owner, directly or indirectly, of any shares of the Company's common stock.

## The Decommissioning of Nuclear Power Plants

65.    The NRC has developed a process for the decommissioning of nuclear facilities.  The United States NRC ("USNRC") published a "Fact Sheet" in January of 2008 titled *Decommissioning Nuclear Power Plants* which describes the decommissioning of facilities.  This Fact Sheet stated in part:

> When a power company decides to close its nuclear power plant permanently, the facility must be decommissioned by safely removing it from service and reducing residual radioactivity to a level that permits release of the property and termination of the operating license.  The Nuclear Regulatory Commission has strict rules governing nuclear power plant decommissioning, involving cleanup of radioactively contaminated plant systems and structures and removal of the radioactive fuel.

- 16 -

These requirements protect workers and the public during the entire decommissioning process and the public after the license is terminated.

66.    Under the NRC's rules, when a reactor is safely shutdown and removed from service there are three options that the owner may pursue: (i) immediate dismantlement (called "DECON"); (ii) putting the plant in safe storage while the residual radioactivity decays (called "SAFSTOR"); or (iii) entombment (called "ENTOMB"). The plant owner may also use a combination of the first two options by putting the plant into safe storage for a period of time until the residual radioactivity becomes low enough to make dismantlement safer to perform.

67.    The time allowed for completion of decommissioning is up to 60 years. According to the NRC Fact Sheet:

> In August 1996, a revised rule went into effect that redefined the decommissioning process and required owners to provide the NRC with early notification of planned decommissioning activities. The rule allows no major decommissioning activities to be undertaken until after certain information has been provided to the NRC and the public.

68.    There are three phases to decommissioning a reactor: (a) initial activities; (b) major decommissioning and storage activities; and (c) license termination activities.

**Initial Decommissioning Activities**

69.    When a nuclear power plant licensee shuts down the plant permanently, it must submit a written certification of permanent cessation of operations to the NRC within 30 days. When radioactive nuclear fuel is permanently removed from the reactor vessel, the owner must submit another written certification to the NRC, surrendering its authority to operate the reactor or load fuel into the reactor vessel. This eliminates the obligation to adhere to certain requirements needed only during reactor operation.

70.    Within two years after submitting the certification of permanent closure, the licensee must submit a post-shutdown decommissioning activities report ("PSDAR") to the NRC. This

report provides a description of the planned decommissioning activities, along with a schedule for accomplishing them, and an estimate of the expected costs. The PSDAR must discuss the reasons for concluding that environmental impacts associated with the site-specific decommissioning activities have already been addressed in previous environmental analyses. Otherwise, the licensee must request a license amendment for approval of the activities and submit to the NRC a report on the additional impacts of decommissioning on the environment.

**Major Decommissioning Activities**

71.    Ninety days after the NRC receives the PSDAR, the owner can begin major decommissioning activities. These activities could include permanent removal of major components such as the reactor vessel, steam generators, large piping systems, pumps, and valves. Decommissioning activities, however, conducted without specific prior NRC approval must not:

(a)    prevent release of the site for possible unrestricted use;

(b)    ***result in there being no reasonable assurance that adequate funds will be available for decommissioning***; or

(c)    cause any significant environmental impact not previously reviewed.

**The Company's Prospects Were Not as
Lucrative as Portrayed by Defendants**

72.    In the Registration Statements, Defendants represented that there was a significant opportunity for the Company to perform D&D services for: (i) "the 104 operating reactors"; and (ii) the 13 nuclear reactors in the U.S. in various stages of shut-down, with total funds of more than $2.9 billion available for D&D Services. Defendants represented that the Company was in the unique position to capitalize on two primary areas: (i) decommissioning services of shut-down reactors; and (ii) decontamination services of radioactive materials for facilities that were still in operation. An integral part of the Company's business plan was to be compensated for services

through trust funds that were set up to pay for decommissioning and decontamination. Prior to and during the Class Period, however, decommissioning trust funds were often inadequate to fund decommissioning. This was due, in part, to a decline in the value of the trust funds and decreased contributions to trust funds. Thus, there were strict regulations preventing access to their trust fund, and even if accessed, would not be as profitable for the Company as represented.

73.    According to Duff & Phelps, the trustee that oversees most decommissioning trust funds for U.S. reactors, between December 31, 2007 and December 31, 2008, the trust funds for all reactors that had not commenced major decommissioning activities decreased by 20.3%. Defendants knew, or had reason to know, about the decline in the value of the decommissioning trust funds during the Class Period. There was a real and substantial risk that adequate decommissioning funds would not be available to generate revenues and earnings for the Company as portrayed by Defendants during the Class Period.

74.    Additionally, prior to and during the Class Period, contributions to decommissioning trust funds experienced significant declines resulting in inadequate trust fund balances. The following table shows the decline in gross contributions to trust funds by facilities that Defendants characterized as its target market:

| YEAR | Trust Fund CONTRIBUTIONS ($ millions) |
|------|----------------------------------------|
| 2008 | 562 |
| 2007 | 562 |
| 2006 | 664 |
| 2005 | 800 |
| 2004 | 1,000 |
| 2003 | 1,200 |
| 2002 | 1,600 |

**The Company's License Stewardship Program**

75.    One of the Company's stated primary business strategies was to focus on the decommissioning of shut-down U.S. reactors in connection with its License Stewardship Initiative.

76.    The Company described its "License Stewardship Initiative" as a means to obtain a major share of the market for decommissioning U.S. nuclear reactors. As described by the Company at a conference during February 24-28, 2008:

> The approach involves the transfer of the assets and liabilities of a shutdown nuclear power plant (including management of spent nuclear fuel), the 10 CFR 50 License, and the decommissioning fund from the plant's owner to a company with a core competency in nuclear decommissioning. It is then the contractor's responsibility to decontaminate and decommission (D&D) the plant and terminate the License, or modify the License to cover only the on-site storage location of the spent nuclear fuel . . . The upside for decommissioning contractors is that it allows them to control the work, the schedule, and management of the trust fund.

77.    The License Stewardship Program is supposed to take place when major decommissioning activities commence. This purported lucrative business for the Company, however, is based in large part on the adequacy of the decommission trust funds to ensure that there will be no shortfall in the funding.

78.    In the IPO Prospectus and July 2008 Offering Prospectus, Defendants listed its current customers that may be eligible for the License Stewardship Program and represented that these customers created an attractive opportunity for the Company. As stated by Defendants, these customers include "many of the largest owners and operators of nuclear power plants in the United States, such as Constellation Energy Group, Inc., Duke Energy Corporation, Entergy Corporation, Exelon Corporation and Florida Power & Light Company." ***Defendants, however, failed to disclose to investors that Exelon, Entergy, Florida Power & Light Company, and Constellation Energy Group, Inc. had substantial Trust Fund shortfalls of hundreds of millions of dollars at the time of the IPO and a combined shortfall of approximately $1 billion by the time of the July 2008 Offering***.

79.    Furthermore, an examination of the 13 nuclear reactors in shut-down that were characterized by the Company as more than a $2.9 to $3.1 billion market reveals that many of these

facilities were a long way from any major decommissioning activities, were under the control of an owner-operator that had deficient trust funds, were already under the control of the existing owner-operator for decommission activities and therefore would not be interested in the License Stewardship program, or would not generate significant decommissioning revenues. Additionally, if a facility had multiple nuclear power plants or "Units," each of the Units needed to be ready for decommissioning before any Units would be ready. Defendants knew, or had reason to know, of the below facts during the entire Class Period:

| Dresden Nuclear Power Station, Unit 1 | <ul><li>SAFSTOR until 2027.</li><li>This unit will not be decommissioned until approximately 2020 at the earliest.</li><li>Significantly underfunded trust fund.</li><li>Estimated NRC date for closure in 2036.</li></ul> |
|---|---|
| GE VBWR (Vallecitos) | <ul><li>**License had already been transferred to GE-Hitachi Nuclear Energy Americas, LLC to handle any decommissioning activities.**</li><li>This is a very small, old research and test facility shutdown in 1963 (*i.e.*, not a power reactor). There are other facilities on site that are not going to be decommissioned in the near or medium term so this facility will not generate revenues to the Company for the foreseeable future. In addition, the revenue from this decommissioning is going to be very low.</li><li>Estimated NRC date for closure in 2019.</li></ul> |
| Humboldt Bay Power Plant, Unit 3 | <ul><li>Revenue from this decommissioning is going to be very low as it only operated at 65 MWe as opposed to modern day reactors that are over 800 MWe so full trust fund balance disclosed by the Company misrepresents the size of the revenue opportunity.</li><li>Other non-nuclear units are on site and the nuclear unit will not be decommissioned until all other units are shut down.</li><li>Had not submitted license termination plan at time of IPO or July 2008 Offering. Has still not submitted plan as of the date of this Complaint.</li><li>**Estimated NRC date for closure in 2013**.</li></ul> |

- 21 -

| Indian Point Unit 1 | <ul><li>Will not be decommissioned until the other 2 units on site (units 2 & 3) are ready for decommissioning.</li><li>A license extension has been applied for so that decommissioning of that this facility will not occur, and revenues likely not generated, until **after 2035**.</li><li>There are regulatory problems involving this site that may not be resolved for some time.</li><li>**Estimated NRC date for closure in 2026.**</li></ul> |
|---|---|
| LaCrosse Boiling Water Reactor | <ul><li>The amount of funds available are deficient and small ($66.3 million is the estimate).</li><li>Estimated NRC date for **closure in 2026**.</li></ul> |
| Millstone Nuclear Power Station, Unit 1 | <ul><li>This facility will not be decommissioned until the other two nuclear units on the site are ready for decommissioning.</li><li>The funding for decommissioning will likely not be available until **after 2045**.</li><li>Estimated NRC date for **closure in 2056**.</li></ul> |
| San Onofre Nuclear Generating Station, Unit 1 | <ul><li>Southern California Edison operates two other nuclear units on the same site.</li><li>**Decommission will not occur until the other two units are ready for decommissioning, which will not occur until after 2022**.</li></ul> |
| Three Mile Island Nuclear Station, Unit 2 | <ul><li>This plant will not be decommissioned until Unit 1 is ready to be decommissioned which was not scheduled during Class Period and still not scheduled.</li><li>The funding for decommissioning will likely not be available until approximately **2034**.</li><li>Estimated NRC date for **closure in 2036**.</li></ul> |
| Peach Bottom Unit 1 | <ul><li>There are two other reactors that must be shut down before decommissioning can start</li><li>Revenues not likely until **after 2034**.</li></ul> |
| Zion Nuclear Power Station, Units 1 and 2 | <ul><li>Potential License Stewardship program with the Company.</li><li>Trust Funds inadequate to cover decommissioning (*see* below).</li></ul> |

80.    Accordingly, contrary to Defendants' representations about the strong potential of the License Stewardship Program, at the time of the IPO, July 2008 Offering and during the Class Period, cumulative decommissioning trust funds available for the License Stewardship Program had,

and were continuing to, rapidly decrease in value and it was likely that there would not be adequate funds available to perform decommissioning services without substantial contributions. In addition, the number of reactors in shut-down that were potentially available to the Company as prospects for its License Stewardship Program in the short or medium term was considerably less than the 13 nuclear reactors represented by Defendants.

<h3 align="center">The Zion Decommissioning Project</h3>

81.    As disclosed in the IPO Registration Statement, July 2008 Registration Statement and other Company statements and filings, the Company's first attempt at the License Stewardship Program was in connection with two nuclear facilities that were owned by Exelon in Zion, Illinois. The two Zion facilities (Zion Units 1 and 2) are collectively referred to herein as Zion and the Company's License Stewardship Program with Zion is referred to herein as the Zion Project. In connection with the Zion Project, Energy*Solutions* and Exelon set up a joint venture referred to as Zion Solutions.

82.    As described below, since before the IPO and throughout the entire Class Period, Defendants knew or had reason to know, that the decommissioning trust fund at Zion (the "Zion Trust Fund") was not sufficient to fund the cost of decommissioning, which would prevent the Company from moving forward on that project.

83.    Throughout the Class Period, Defendants closely monitored the value of the Zion Trust Fund balance. As stated by the Company in a presentation during a conference on February 24-28, 2008, in Phoenix, AZ, the Company performed due diligence on Zion in connection with the License Stewardship Program. In connection with this due diligence, Energy*Solutions* interviewed key "knowledgeable individuals from Exelon" and "gathered sufficient information" to "make the determination to proceed with the license stewardship approach." Additionally, correspondence between Energy*Solutions* and the NRC indicates that Energy*Solutions* monitored the Zion Trust

Fund closely during the Class Period. An October 23, 2008 letter to the NRC, from Patrick R. Simpson (Manager – Licensing, Exelon Generation Company) and Patrick Daly (SVP and General Manager of Zion Solutions) states that both Exelon and Zion Solutions have been monitoring the market value of the existing assets held in the decommissioning trust funds for Zion Nuclear Power Station, Units 1 and 2. Thus, Defendants knew, or had reason to know, the value of the Zion Trust Fund during the Class Period, that the Zion Trust Fund declined significantly, and that it was not adequate to cover the estimated decommissioning costs for the Zion Project.

84.    Defendants represented the balance of the Zion Trust Fund to be between $860 to $870 million throughout the Class Period. Defendants stated that the Zion Trust Fund was worth $858 million in the IPO Registration Statement and $860 million in the July 2008 Registration Statement. Defendants also represented that the Zion Trust Fund was worth $870 million as of December 31, 2007. Unbeknownst to investors, however, the Zion Trust Fund had declined significantly during 2008 and was worth considerably less than the $860 million represented by the Company in the July 2008 Registration Statement. Indeed, according to documents submitted by Exelon to the NRC, the Zion Trust Fund balance as of November 30, 2008, was approximately $727 million, $133 million less than reported by the Company in the July 2008 Registration Statement, only several months earlier.

85.    CW1, a former employee of Energy*Solutions* who worked in cost accounting on the decommissioning project for Zion, knew that the Zion Trust Fund had declined in value by May 2008 and CW1 had discussed this decline with Pat Daly, an Executive Vice President at Energy*Solutions* and the head of the Zion Project.

86.    Further, Defendants stated during the Class Period that through the License Stewardship Program with Zion, the Company was in position to receive the Zion Trust Fund

balance (and generate significant revenues for the Company) and would generate significant earnings from those revenues. Unbeknownst to investors, however, the Zion Trust Fund balance was not as represented by Defendants.

87.    Defendants also failed to disclose that the balance of the Zion Trust Fund was not adequate to cover the expenses for the Zion Project. According to estimates provided by Exelon, as of December 31, 2007, the decommissioning cost estimate was approximately $1.091 billion, $221 million more than the value of the Zion Trust Fund as represented by the Company. According an Exelon presentation containing this estimate, "Additional time [was] required for [Zion Trust] funds to grow before decommissioning can commence."

88.    The Company also computed its own cost estimates for the Zion Project as $978 million. As discussed below, these cost estimates were inaccurate because they were too low. Even using the cost estimates provided by the Company, however, the Zion Trust Fund was more than $100 million deficient since the time of the IPO and $250 million deficient around the end of the Class Period.

### The Petition to the NRC

89.    Defendants represented in the IPO Registration Statement, July 2008 Registration Statement and other Company statements that one of its largest and most lucrative business opportunities involved performing decommissioning activities for facilities while they were in operation. Energy*Solutions* sought to remove and dispose of large radioactive materials in operating facilities and get paid by decommissioning trust funds. Defendants, however, failed to disclose that this business opportunity was dependent upon the Company convincing the NRC to change a long-standing rule which prevents access to the same funds sought by the Company. Defendants also failed to disclose the risks to that opportunity and the probable rejection of the Petition by the NRC.

90.     On or about May 29, 2007, the Company filed a Petition for Rulemaking to Amend 10 CFR 50.82 with the Nuclear Regulatory Commission (the "Petition").  According to CW3, a former manager at Energy*Solutions*, a favorable ruling by the NRC on the Petition was "crucial to Energy*Solutions*' financial success."  According to a research report by analyst firm Sterne Agee, the NRC rule change represented a $500M revenue opportunity for the Company over the next 5 years at 50% operating margins.

91.     The thrust of the Petition was to allow decommissioning funds to be used for the cost of removing and disposal of "major radioactive components" ("MRC") that had been removed from an operating reactor prior to permanent cessation of operations.  Without such approval, Energy*Solutions* would have to convince reactor owners to provide the funding for decommissioning activities through operating funds, which was unlikely to occur.  There was no incentive for reactor owners to use operating funds for decommissioning activities when the items could be stored at little to no cost.

92.     Until the time of the Petition, all such activities were consistently and repeatedly classified by all regulators as "operating expenses" to be borne by the licensee and its ratepayers – not decommissioning funds.  As such, most of these MRCs have been stored on site awaiting the approval of a decommissioning plan by the NRC and the initiation of actual decommissioning activities as provided by current law and regulations. Such storage also allows the latent radioactivity of these components to slowly diminish.  The Company sought to change the longstanding NRC rule that prevented access to trust funds prior to shut-down.

93.     As discussed below, Defendants knew, or had reason to know, that it was likely that the NRC would reject the Petition.  According to CW4, an employee at the NRC Office of Nuclear Reactor Regulation that worked directly on the Company's Petition, the "NRC has a long-standing

policy against using decommissioning trust funds as a 'checkbook' for activities concerning nuclear plants remaining in operation."

94.    The IPO Prospectus, July 2008 Offering Prospectus and other statements made by Defendants during the Class Period, failed to disclose the difficulty of obtaining the rule change, contained untrue statements about the rule change and/or misrepresented the progress of the Company's efforts in obtaining the rule change. Indeed, Defendants had no reasonable basis to expect that the Petition for rulemaking would be approved. Further, even if the Petition were granted and a rulemaking proceeding were initiated, it was unlikely that the proceeding would have resulted in a favorable result and Defendants did not have a reasonable basis to expect a favorable result.

**The NRC Repeatedly Rejected
Proposals Similar to the Company's Petition**

95.    At all times relevant herein, the NRC had a longstanding and strict rule that prohibited access to decommissioning trust funds while a facility was still in operation. Throughout the Class Period, Defendants failed to describe the difficulty in obtaining such funds, the strong policy considerations of the NRC in opposition to the Company's strategy, and the extent of the risks that its plan would fail. Indeed, contrary to Defendants' representations, the Company was seeking a rule change to a longstanding rule set by the NRC that had withstood numerous challenges in the past and each challenge failed. Additionally, there was no reasonable basis for Defendants to expect that this time things would be different and the NRC would change its rule to permit Energy*Solutions* to gain access to decommissioning trust funds while facilities were in operation.

96.    The rules against using decommissioning trust funds for operating facilities were initially promulgated in 1983 in response to public concern that nuclear power plants would not be retired and the sites remediated in a competent manner. The NRC repeatedly raised issues

associated with the availability of adequate funding in a succession of rulemaking activities and consistently concluded that a very conservative approach was warranted.

97.    A principal concern of the NRC was, and continued during the Class Period to be, the availability of adequate funds to complete decommissioning and remediation. The NRC was clear in early rulemaking about the requirement of the termination of the reactor owner's license to operate. Further, the NRC stated that decommissioning will be considered on an individual case basis, not on a blanket basis as sought in the Energy*Solutions* Petition.

98.    After the initial rulemaking, there were a number of subsequent rulemaking activities that reinforced the original rule and provided that decommissioning activities must be fully funded and competently carried out. In its 1988 rulemaking, the NRC made it clear that the public had concerns about the adequacy of decommissioning funding.

> Comments received on the issue of assuring the availability of funds for decommissioning included questions regarding costs of decommissioning, use of certification of a specified amount and funding plans for reactors, acceptable funding methods, submittal of funding plans, specific comments on funding for material licensees, funding for Federal licensees, and general questions concerning need for funding requirements and relationship of the rule to the functions of other regulatory agencies.

99.    The issue of appropriate costs was addressed using analyses by U.S. national laboratories of prior decommission activities. However, a major consideration was the issue of how adequate funding may be protected to insure the public health and safety of the public. Initially the use of an internal fund maintained by the owner of the nuclear power plant was considered but ultimately rejected. This rejection was in substantial part based on the comments filed by intervenors:

> (1) There may be problems with liquidity of the internal reserve if the acquired assets and investments do not preserve value over time and there may be problems in issuing bonds against these assets to pay for decommissioning. In particular, funds could be used for new nuclear construction or other uses such as accident cleanup. With this method one cannot insure that money taken from

- 28 -

customers will be available in the future for decommissioning. This could cause serious cash flow problems at the time of decommissioning, especially if utilities are replacing old plants with new ones at the same time decommissioning takes place.

(2) The future financial viability of utilities cannot be assured and the potential exists for utility instability and insolvency. The commenters expressed concern that the utilities could not raise funds for decommissioning if they were having severe financial problems or were facing insolvency. Commenters cited examples of potential situations.

(3) The level of assurance provided is inadequate and the generation of insufficient funds could compromise safety, cause delays, and cause rate boosts. Nuclear power should pay its way fairly. In addition, by not requiring external funds NRC has not responded to the petition for rulemaking made by the Public Interest Research Group in 1977 or to GAO's concern that decommissioning costs be paid by current beneficiaries, not future generations. One commenter's analysis indicated that internal reserve costs exceed external reserve costs when they are adjusted to equalize relative risk with respect to the availability of funds.

100.   In 1988, the NRC tightened restriction on funds used to pay for decommissioning:

For the above reasons, the Commission concludes that the internal reserve does not provide reasonable assurance that funds will be available when needed to pay the costs of decommissioning and hence does not provide reasonable assurance that decommissioning will be carried out in a manner which protects public health and safety. Accordingly, the proposed rule has been modified to eliminate the internal reserve as a possible method of providing funds for decommissioning.

101.   Importantly, the NRC then concluded that it had exclusive jurisdiction to proscribe

rules concerning the adequacy and assurance that decommissioning funds will be available:

*The NRC has also determined that the public health and safety can best be protected if its regulations require licensees to use methods which provide reasonable assurance that, at the time of termination of operations, adequate funds are available so that decommissioning can be carried out in a safe and timely manner and that lack of funds does not result in delays that may cause potential health and safety problems.*[1]   Although the Atomic Energy Act and the Energy Reorganization Act do not permit the NRC to regulate rates or to supersede the decisions of State or Federal agencies respecting the economics of nuclear power, they do authorize the NRC to take whatever regulatory actions may be necessary to

---

[1]   All emphasis is added unless otherwise indicated herein.

- 29 -

protect the public health and safety, including the promulgation of rules prescribing allowable funding methods for meeting decommissioning costs.

102.   In 1994, the NRC reiterated that: "The fund trustee should only release funds upon certification: 'that the decommissioning is proceeding pursuant to an NRC approved plan.'"

103.   In a 1995 rulemaking, the NRC again expressed that sufficient funds are required to fund the entire decommissioning process and receipt of funds is subject to NRC approval:

> Currently, a set amount of money is required in advance that must be available through the end of decommissioning and could result in an unnecessary burden on the licensee. This modification permits a reduction in these funds provided the radioactive contamination has been reduced at the site. ***Because the licensee must obtain approval from the Commission to reduce funds, there will be adequate assurance that the licensee has sufficient funds available to cover the cost of complete decommissioning of the facility***.

104.   Energy*Solutions* sought blanket approval through the Petition for removal of major radioactive components by accessing the decommissioning fund in operating facilities. The policy set forth by the NRC above is a clear indication that such a blanket approval is not favored by the NRC and highly unlikely.

105.   In 1995, the NRC further strengthened this approach and enacted additional restrictions on the use of funds:

> Once the NRC has received the licensee's certification of permanent cessation of operations, decommissioning trust funds could be used by the licensee. However, the withdrawal of funds would be subject to the following criteria: (1) The withdrawals are for expenses for legitimate decommissioning activities consistent with the definition of decommissioning in §50.2; (2) The expenditure would not reduce the value of the decommissioning trust below an amount necessary to place and maintain the licensee's reactor in a safe storage condition if unforeseen conditions or expenses arise and; (3) The withdrawals would not inhibit the ability of the licensee to complete funding of any shortfalls in the decommissioning trust needed to ensure the availability of funds to ultimately release the site and terminate the license. The proposed rule would permit, under §50.82(a)(7), that 3 percent of the generic decommissioning cost amount, specified in §50.75, could be used by the licensee initially for decommissioning planning. Following the 90-day waiting period after the NRC has received the licensee's PSDAR and upon certification of permanent removal of fuel from the reactor vessel, an additional 20 percent could be used to commence major decommissioning activities. Finally, the proposed rule would

- 30 -

require a site-specific cost analysis to be submitted to the NRC prior to the licensee being permitted to use any funding in excess of 23 percent of the generic cost estimate, and, in any case, within 2 years of permanent cessation of operations."

106.    In 1995, the NRC rejected an approach very similar to what Defendants were seeking in the Petition.  The NRC, in its July 20, 1995 rulemaking, responded to several comments made by two licensees and the Nuclear Energy Institute that the Commission: "should allow licensees to withdraw decommissioning trust fund withdrawals to dispose of structures and equipment no longer being used for operating plants."  The NRC flatly rejected this request and responded in a straightforward and forthright manner:

>  ***The NRC has concluded that allowing decommissioning trust fund withdrawals for disposal by nuclear power plants that continue to operate is not warranted.  These activities are more appropriately considered operating activities and should be financed in that way***.

107.    Further, in 1996 the NRC stated in its rulemaking that:

>  as a [further] conservatism built into the rule, the NRC decided not to allow licensees to take credit for earnings on their trust funds while their reactors were in extended safe storage

108.    It was clear that from the start the NRC took a very conservative approach to protecting decommissioning funds and making sure enough funds were available to complete the entire project, and that any requests for early disbursements (or crediting decommissioning accounts in shutdown reactors with interest income) would be rejected.

109.    In a second rulemaking in 1996 the NRC stated that:

>  Before the decommissioning plan is approved, the licensee cannot perform major decommissioning activities.  If a licensee desires a reduction in requirements because of the permanent cessation of operation, it must obtain a license amendment for possession-only status.  ***This is usually granted after the licensee indicates that the reactor has permanently ceased operations and fuel has been permanently removed from the reactor vessel***.

>  ***A licensee is required to provide assurance that at any time during the life of the facility, through termination of the license, adequate funds will be available to complete decommissioning***.  For operating reactors, the amount of decommissioning

funding required is generically prescribed in 10 CFR 50.75. Five years before license expiration or cessation of operations, a preliminary decommissioning plan containing a sitespecific decommissioning cost estimate must be submitted and the financial assurance mechanism must be appropriately adjusted. Finally, the decommissioning plan, submitted within 2 years after permanent cessation of operations, must provide a sitespecific cost estimate for decommissioning and a correspondingly adjusted financial assurance mechanism. For delayed dismantlement of a power reactor facility, an updated decommissioning plan must be submitted with the estimated cost of decommissioning and the licensee must appropriately adjust the financial assurance mechanism. Before approval of the decommissioning plan, licensee use of these funds would be determined on a case-specific basis for premature closure, when accrual of required decommissioning funds may be incomplete. ***Before the decommissioning plan is approved, the licensee cannot perform major decommissioning activities***. If a licensee desires a reduction in requirements because of the permanent cessation of operation, it must obtain a license amendment for possession-only status. This is usually granted after the licensee indicates that the reactor has permanently ceased operations and fuel has been permanently removed from the reactor vessel. ***A licensee is required to provide assurance that at any time during the life of the facility, through termination of the license, adequate funds will be available to complete decommissioning***.

110.   Furthermore, in the 1996 rulemaking referenced above, the NRC stated that major radioactive components, such as those sought to be removed by Energy*Solutions* through the Petition, were not "major decommissioning activities" and could be funded by routine operating funds:

It is necessary to have definitions of "major radioactive components" and "major decommissioning activities" to clarify what decommissioning activities may not occur before the end of the 90-day waiting period. However, the definition of "major radioactive components" in the final rule has been clarified so that large components, other than those named, are not prohibited §50.59 activities if they contain small amounts of radioactivity. ***Dismantlement of these components is considered part of routine operating nuclear power reactor activities***.

111.   In 2001, the NRC reiterated its position that decommissioning funds be protected from use for normal operating expenditures. In the 2001 rulemaking, the NRC considered tests that would be used to assure the adequacy and availability of decommissioning trust funds. In describing the NRC's stance on the sanctity of the decommissioning trust funds the NRC stated:

- 32 -

Test (2) Do the terms of the instrument ensure that funds can be used only for certain key activities – reactor decommissioning and specified administrative costs of the trust – rather than a broad range of potentially conflicting uses?

Answer: "This test is to ensure that the trust contains provisions that use of the decommissioning trust funds is reserved for decommissioning and routine and minor administrative expenses."

112.    Based upon the history of rulemaking and the policy considerations behind the rule requiring that a facility be shut-down prior to accessing decommissioning trust funds, it was extremely unlikely if not entirely improbable that the Petition would be successful.  Defendants did not have a reasonable basis to make positive statements about the likelihood of approval of the Petition.  Furthermore, Defendants failed to disclose the difficulty of gaining approval of the Petition or the strong public policies against approval.

### The NRC Rejects the Petition and Reiterates Its Longstanding Policies

113.    Energy*Solutions* advanced several arguments in support of the Petition.  There was no reasonable basis, however, for Defendants to believe that these arguments would be accepted by the NRC.

114.    The Petition asserts that as a result of granting the Petition (and assuming a positive result of the rulemaking proceeding) that: (i) radioactivity would be reduced; (ii) site workers would experience less radiation exposure; (iii) storage costs for MRCs would be reduced; (iv) overall decontamination costs would be lessened; and (v) more trust funds would be available when decommissioning commences.

115.    The NRC rejected each of the arguments raised by Defendants and reiterated the longstanding and strong public policy concerns for the rule.  The NRC stated in part:

*the NRC views decommissioning funding assurance policies and rules as of the utmost importance in ensuring that there will be sufficient funds to decommission a reactor upon permanent cessation of operations*.  Accordingly, the NRC expects that there would have to be *extraordinary circumstances* before any exemption request to withdraw funds early would be granted, particularly if there is no

- 33 -

demonstration that there are no other sources of funds available to licensees to dispose of MRCs while a plant is operating.

## Energy*Solutions* Experienced Problems Due to the Economy

116.    Shortly after the IPO, declining economic conditions were negatively impacting the Company's Federal contracts side of the business.  According to CW2, economic conditions had deteriorated by January and February 2008, resulting in delays (measured in years) and cancellations of federal projects to Energy*Solutions*.  According to CW5, there was a decline in Energy*Solutions*' business in the 2007-08 timeframe.

117.    As described herein, declining economic conditions also negatively impacted the potential of the Company's License Stewardship program in general due to a decline in decommissioning trust funds and negatively impacting the Zion Trust Fund in particular.

## THE REGISTRATION STATEMENTS AND PROSPECTUSES CONTAINED INACCURATE STATEMENTS OF MATERIAL FACT AND OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN

118.    The IPO Registration Statement and the July 2008 Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

### IPO Registration Statement

119.    The IPO Prospectus discussed the strong growth opportunities for the Company in connection with its License Stewardship Program by focusing on decommissioning of shut-down nuclear reactors and accessing decommissioning trust funds, and stated, in pertinent part, as follows:

#### Our Business Strategy

Our objective is to be a leading provider of specialized, technology-based nuclear services worldwide by capitalizing on significant near- and long-term growth opportunities in the nuclear services industry. We intend to pursue this objective through the following strategies:

> • *Focus on Decommissioning of Shut-down U.S. Reactors*.  We are actively marketing our D&D services for shut-down reactors to nuclear power and utility companies.  ***There are currently 13 nuclear reactors in the United States in various stages of shut-down, including SAFSTOR*** (an acronym for "safe storage" whereby nuclear facilities are maintained and monitored in a condition that allows radioactivity to decay over a period of several decades before undergoing final D&D), ***with total dedicated decommissioning funds of more than $2.9 billion***.  Our unique license stewardship initiative for shut-down reactors allows us to potentially accelerate D&D activities by several years.  ***Under a license stewardship, we would obtain our own Nuclear Regulatory Commission, or NRC, license for a reactor site and enter into a turn-key contract with a utility through which we would acquire the plant.  We then would be compensated for the work performed from the decommissioning trust funds transferred from the existing owner.***  After we have completed the D&D of the plant, we would return the restored site to its original owner.  This approach offers our customers cost certainty and the advantage of near-term site restoration.  We believe that we are well-positioned to compete for this D&D outsourcing work because our integrated service platform, together with our on-site D&D experience, enables us to efficiently and cost-effectively complete decommissioning and disposal of the radioactive materials at these shut-down sites.

120.   The IPO Prospectus stressed that the Company was "well-positioned" to capitalize on "Significant D&D Services Opportunit[ies]" comprising of contracts from 13 shut-down nuclear reactors with total potential contracts of $2.9 billion.  The IPO Prospectus stated in pertinent part as follows:

> ***Significant D&D Services Opportunity.***  In addition to operations and maintenance services requirements for the 104 operating nuclear reactors in the United States, there is also a significant need for fully-integrated D&D services for the commercial nuclear power plants that have been shut down and, ultimately, for the 104 operating reactors and any new reactors.  ***The regulations regarding decommissioning strategy, policies and funding are promulgated by the NRC, which requires nuclear plant owners and operators to establish and fund a decommissioning fund for each reactor based upon engineering studies and budget cost estimates***.  The size of the fund is adjusted periodically to account for changes in the cost of labor, technology, energy and nuclear waste disposal.  Owners and operators of shut-down nuclear reactors have the option of maintaining their reactors in SAFSTOR or monitored storage indefinitely, thus allowing their decommissioning trust funds to grow until such time in the future that they decide to pursue a D&D program.  ***There are currently 13 nuclear reactors in the United States in various stages of shut-***

- 35 -

**down with total current dedicated decommissioning funds of more than $2.9 billion**. Under SAFSTOR, nuclear facilities are generally maintained and monitored in a condition that allows radioactivity to decay over a period of several decades before undergoing final D&D.

The following table details the U.S. nuclear power reactors currently shut down and awaiting D&D, with associated decommissioning funding as of the most recent date for which such funding information is available. Although contracts for the D&D of these reactors have not yet been awarded, we have established relationships with some of the owners of these reactors and believe that we are well-positioned to pursue these contracts when they are made available.

| Reactor | Location | Shutdown | Decommissioning Trust Fund Balance (in millions of dollars) |
|---|---|---|---|
| Dresden 1(a) | Morris, IL | 10/31/78 | $210 |
| Fermi 1(a) | Newport, MI | 09/22/72 | 32 |
| GE VBWR | Pleasanton, CA | 12/09/63 | N/A |
| Humboldt Bay 3(a) | Eureka, CA | 07/02/76 | 266 |
| Indian Point 1(b) | Buchanan, NY | 10/31/74 | 227 |
| LaCrosse(a) | Genoa, WI | 04/30/87 | 77 |
| Millstone 1(a) | Waterford, CT | 07/21/98 | 285 |
| Peach Bottom 1(a) | Peach Bottom, PA | 10/31/74 | 30 |
| Rancho Seco(c) | Herald, CA | 06/07/89 | 83 |
| San Onofre 1(d) | San Clemente, CA | 11/30/92 | 362 |
| Three Mile Island 2(a) | Middletown, PA | 03/28/79 | 494 |
| Zion 1(e) | Zion, IL | 02/21/97 | 384 |
| Zion 2(e) | Zion, IL | 09/19/96 | 474 |
| Total | | | $  2,924 |

(a)   Source: NRC.
(b)   Source: Entergy Corporation.
(c)   Source: Sacramento Municipal Utility District.
(d)   Source: Public Utilities Commission, State of California.
(e)   Source: Exelon Corporation.

121.   The statements referenced above in ¶¶119-20 were each inaccurate statements of material fact when made because of the following adverse facts which existed at the time:

(a)      There were real and substantial risks that adequate decommissioning trust funds would not be available for the Company for the foreseeable future;

- 36 -

(b)     Prior to and during the Class Period, contributions to decommissioning trust funds experienced significant declines;

(c)     The Company's existing customers had substantial shortfalls in decommissioning trust funds of hundreds of millions of dollars by the time of the IPO;

(d)     Most of the 13 nuclear reactors in shut-down characterized by Defendants as a $2.9 billion target market would not produce revenues for the Company in the foreseeable future because they were: (i) under the control of an owner-operator that had deficient trust funds; (ii) were already under the control of an owner-operator that would provide decommissioning services instead of Energy*Solutions*; or (iii) were numerous years away from likely commencement of any decommissioning activities;

(e)     Economic problems in the United States and internationally were adversely affecting the Company's ability to secure projects which would adversely affect its future results; and

(f)     Energy*Solutions* was not well situated in the near term to benefit from those opportunities.

122.    The IPO Prospectus discussed the Company's business strategy of expanding existing commercial business, based in large part on the Company's ability to access decommissioning trust funds, and stated, in pertinent part, as follows:

> ***Expand Existing Commercial Business***.  We believe that the breadth of our nuclear services, our technological expertise and our proprietary processing and disposal facilities will enable us to ***deepen our relationships with existing commercial customers and pursue new commercial customers***.  Many of the specialized nuclear services that we offer are not core competencies of nuclear power and utility companies.  ***As we deepen our relationships with these companies, we believe that they will increasingly outsource these services to us***.  For example, we have signed life-of-plant contracts with commercial customers representing 82 of the 104 operating nuclear reactors in the United States, pursuant to which we have agreed to process and dispose of substantially all operating LLRW generated by these plants,

and ultimately their D&D waste materials. *In addition, the NRC is reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for disposal of large components that have been retired from use in nuclear reactors. We believe the adoption of this proposal would be a significant opportunity for us to expand our business in our Commercial Services and LP&D segments.*

123.    The statements referenced above in ¶122 were each inaccurate statements of material fact when made because of the reasons set forth in ¶121 above.

124.    Furthermore, the statements referenced above in ¶122 that the "NRC is reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for disposal of large components" and that the "adoption of this proposal would be a significant opportunity to expand our business" were inaccurate statements of material fact when made because of the following adverse facts that existed at the time:

(a)    The NRC had a longstanding and well entrenched rule preventing access to decommissioning trust funds prior to the shut-down of a nuclear facility that was enacted to protect the health and interests of the public;

(b)    The NRC had rejected proposals similar to the Petition on numerous occasions and it was highly probable that the NRC would reject the Petition;

(c)    The business prospects of the Company was heavily dependent upon a favorable ruling from the NRC on the Petition;

(d)    There were significant risks that the NRC would reject the Petition which would eliminate a significant portion of the Company's growth prospects; and

(e)    There was no reasonable basis to expect that the Petition would be granted by the NRC.

- 38 -

**The July 2008 Registration Statement**

125.   The July 2008 Prospectus stressed that the decommissioning of shut-down nuclear reactors through the License Stewardship Program was a primary the growth opportunity for the Company and stated, in pertinent part, as follows:

> Our objective is to be a leading provider of specialized, technology-based nuclear services worldwide by capitalizing on significant near- and long-term growth opportunities in the nuclear services industry.  We intend to pursue this objective through the following strategies:
>
> •     *Focus on Decommissioning of Shut-down U.S. Reactors*.  We are actively marketing our D&D services for shut-down reactors to nuclear power and utility companies.  There are currently 13 nuclear reactors in the United States in various stages of shut-down, including SAFSTOR (an acronym for "safe storage" whereby nuclear facilities are maintained and monitored in a condition that allows radioactivity to decay over a period of several decades before undergoing final D&D), with total dedicated decommissioning funds of more than $3.1 billion.  Our unique license stewardship initiative for shut-down reactors allows us to potentially accelerate D&D activities by several years.  Under a license stewardship, we would obtain our own Nuclear Regulatory Commission, or NRC, license for a reactor site and enter into a turn-key contract with a utility through which we would acquire the plant.   We then would be compensated for the work performed from the decommissioning trust funds transferred from the existing owner.  After we have completed the D&D of the plant, we would return the restored site to its original owner.  This approach offers our customers cost certainty and the advantage of near-term site restoration.  We believe that we are well-positioned to compete for this D&D outsourcing work because our integrated service platform, together with our on-site D&D experience, enables us to efficiently and cost-effectively complete decommissioning and disposal of the radioactive materials at these shut-down sites.
>
> *             *             *
>
> The following table details the U.S. nuclear power reactors currently shut down and awaiting D&D, with associated decommissioning funding as of the most recent date for which such funding information is available.  We have established relationships with some of the owners of these reactors and believe that we are well-positioned to pursue these projects.  These trust fund balances are subject to market risk and may also fluctuate according to ratepayer contributions and consumption.

| Reactor | Location | Shutdown | Decommissioning Trust Fund Balance |
|---|---|---|---|
| | | | (in millions of dollars) |
| Dresden 1(a) | Morris, IL | 10/31/78 | $ 276 |
| Fermi 1(a) | Newport, MI | 09/22/72 | 7 |
| GE VBWR | Pleasanton, CA | 12/09/63 | N/A |
| Humboldt Bay 3(a) | Eureka, CA | 07/02/76 | 317 |
| Indian Point 1(b) | Buchanan, NY | 10/31/74 | 271 |
| LaCrosse(a) | Genoa, WI | 04/30/87 | 63 |
| Millstone 1(a) | Waterford, CT | 07/21/98 | 317 |
| Peach Bottom 1(a) | Peach Bottom, PA | 10/31/74 | 43 |
| Rancho Seco(c) | Herald, CA | 06/07/89 | 70 |
| San Onofre 1(d) | San Clemente, CA | 11/30/92 | 298 |
| Three Mile Island 2(a) | Middletown, PA | 03/28/79 | 601 |
| Zion 1(e) | Zion, IL | 02/21/97 | 382 |
| Zion 2(e) | Zion, IL | 09/19/96 | 478 |
| Total | | | $ 3,123 |

126.   The statements referenced above in ¶125 were each inaccurate statements of material fact when made because of the following adverse facts which existed at the time:

(a)    Trust funds for decommissioning activities decreased significantly during 2008;

(b)    There were real and substantial risks that adequate decommissioning trust funds would not be available for the Company for the foreseeable future;

(c)    Prior to and during the Class Period, contributions to decommissioning trust funds experienced significant declines;

(d)    The Company's existing customers had substantial shortfalls in decommissioning trust funds of more than $1 billion by the time of the July 2008 Offering;

(e)    Most of the 13 nuclear reactors in shut-down characterized by Defendants as a $3.1 billion target market would not produce revenues for the Company in the foreseeable future because they were: (i) under the control of an owner-operator that had deficient trust funds; (ii) were

- 40 -

already under the control of an owner-operator that would provide decommissioning services instead of Energy*Solutions*; or (iii) were numerous years away from likely commencement of any decommissioning activities;

(f)    Economic problems in the United States and internationally were adversely affecting the Company's ability to secure projects which would adversely affect its future results; and

(g)    Energy*Solutions* was not well situated in the near term to benefit from those opportunities.

127.    The July 2008 Registration Statement discussed the strong opportunity for the Company in connection with the Zion Project, with $860 million in available trust funds, and stated, in pertinent part, as follows:

> In December 2007, we entered into a license stewardship agreement with Exelon Corporation, under which we will become the licensee for Exelon's nuclear reactors in Zion, Illinois. Pursuant to this agreement and subject to NRC and other regulatory approvals, we will assume full responsibility for the decommissioning and site restoration at the Zion plant and will be compensated from the decommissioning trust fund for our work at the Zion plant.

128.    The statements referenced above in ¶127 were each inaccurate statements of material fact when made because of the following adverse facts which existed at the time:

(a)    The Zion Trust Fund balance declined and was less than represented during the Class Period;

(b)    The Zion Trust Fund was not adequate to fund the cost of decommissioning, which would prevent the Company from moving forward on the Zion Project or render it much less profitable than anticipated; and

(c)    The Zion Project was not just "subject to NRC and other regulatory approvals" but was also subject to the Zion Trust Fund increasing and becoming adequate to cover the cost of the Zion Project.

129.    The July 2008 Prospectus discussed the Company's business strategy of expanding existing commercial business, based in large part on the Company's ability to access decommissioning trust funds, and stated, in pertinent part, as follows:

•    ***Expand Existing Commercial Business***.  We believe that the breadth of our nuclear services, our technological expertise and our proprietary processing and disposal facilities will enable us to deepen our relationships with existing commercial customers and pursue new commercial customers.  Many of the specialized nuclear services that we offer are not core competencies of nuclear power and utility companies.  As we deepen our relationships with these companies, we believe that they will increasingly outsource these services to us.  For example, we have signed life-of-plant contracts with commercial customers representing 82 of the 104 operating nuclear reactors in the United States, pursuant to which we have agreed to process and dispose of substantially all operating LLRW generated by these plants, and ultimately their D&D waste materials.  ***In addition, the NRC is reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for disposal of large components that have been retired from use in nuclear reactors.   We believe the adoption of this proposal would be a significant opportunity for us to expand our business in our Commercial Services and LP&D segments***.

130.    The statements referenced above in ¶129 were each inaccurate statements of material fact when made because of the reasons set forth in ¶126 above.

131.    Furthermore, the statements referenced above in ¶129 that the "NRC is reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for disposal of large components" and that the "adoption of this proposal would be a significant opportunity to expand our business" were inaccurate statements of material fact when made because of the following adverse facts that existed at the time:

(a)    The NRC had a longstanding and well entrenched rule preventing access to decommissioning trust funds prior to the shut-down of a nuclear facility that was enacted to protect the health and interests of the public;

(b)    The NRC had rejected proposals similar to the Petition on numerous occasions and it was highly probable that the NRC would reject the Petition;

(c)    The business prospects of the Company were heavily dependent upon a favorable ruling from the NRC on the Petition;

(d)    There were significant risks that the NRC would reject the Petition which would eliminate a significant portion of the Company's growth prospects; and

(e)    There was no reasonable basis to expect that the Petition would be granted by the NRC.

**The IPO and July 2008 Registration Statements
Omitted Known Trends, Events and Uncertainties that Were
Impacting, and Would Impact, the Company's Financial Results**

132.    The Registration Statements failed to disclose: (i) that the target market of shut-down nuclear reactors was not as represented by the Company and was much smaller than the $2.9-$3.1 billion opportunity represented by Defendants; (ii) that the Zion Trust Fund was inadequate to cover the expenses for the Zion Project; (iii) that Zion Trust Fund declined between the IPO and July 2008 Offering; and (iv) it was probable that the NRC would reject the Company's Petition.  These omitted facts would have been viewed by investors as substantially altering the total mix of information available to investors.

133.    Pursuant to Item 10 of Form S-11, registrants are required to provide the information required by Item 303 of Regulation S-K [17 C.F.R. §229.303], including any known trends, events or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  The problems with the License

Stewardship Program, the Zion Project and the probability that the NRC would reject the Petition were known uncertainties that were having and were reasonably likely to have an impact on the Company's continuing operations and therefore were required to be disclosed in the IPO and July 2008 Registration Statements, but were not.

134.    In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation.  *See* Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. . . .  A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

135.    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id*. at *6.

- 44 -

**The IPO and July 2008 Registration Statements Omitted to
Include Significant Factors that Made the Offering Risky**

136.    Pursuant to Item 3 of Form S-11, the IPO and July 2008 Offering Registration
Statements were required to furnish the information pursuant to Item 503 of Regulation S-K [17
C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that
make the offering risky or speculative."

137.    First, the IPO and July 2008 Registration Statements failed to describe the extent of the
risk that the NRC would reject the Company's Petition.  Defendants failed to describe the fact that
the Company was seeking a reversal of a longstanding and fundamental rule adopted by the NRC to
protect the health and welfare of the public and that the NRC had already rejected numerous times
and for many years other attempts similar to the Company's Petition.  Furthermore, the Registration
Statements failed to disclose the importance of the rule change to the Company's business prospects
in the large waste disposal business.

138.    Second, the Registration Statements failed to disclose that the market for the
Company's License Stewardship Program was not as represented and that no revenues could be
generated at most of the shut-down nuclear reactors for the foreseeable future.  Third, the
Registration Statements failed to disclose that the Zion Trust Fund was inadequate to cover the cost
of the Zion Project which would result in significant delays on that project and would render it much
less profitable than represented.  Fourth, the Registration Statements failed to disclose that the Zion
Trust Fund had been, and was continuing to decline in value, and was extremely vulnerable to a
downturn in the stock market.  Finally, the Registration Statements failed to disclose the negative
impact that the slowing economy was having on Energy*Solutions*' business and prospects going
forward.

**The IPO and July 2008 Registration Statements Omitted to
Include a Description of the Petition as a Material Legal Proceeding**

139.   Pursuant to Item 103, the IPO Registration Statement and Prospectus and the July 2008

Offering Registration Statement and Prospectus were required to:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.  Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. . . .

140.   The Instructions to Item 103 state:

> Notwithstanding the foregoing, an administrative or judicial proceeding (including, for purposes of A and B of this Instruction, proceedings which present in large degree the same issues) arising under any Federal, State or local provisions that have been enacted or adopted regulating the discharge of materials into the environment or primary for the purpose of protecting the environment shall not be deemed "ordinary routine litigation incidental to the business" and shall be described if:

> •Such proceeding is material to the business or financial condition of the registrant.

141.   The Decommissioning of Nuclear Power Plants is regulated by the NRC.  The NRC

was created as an independent agency by Congress in 1974 to enable the nation to safely use

radioactive materials for beneficial civilian purposes while ensuring that people and the environment

are protected.  The NRC regulates commercial nuclear power plants and other uses of nuclear

materials, such as in nuclear medicine, through licensing, inspection and enforcement of its

requirements.  The NRC is headed by five Commissioners appointed by the President and confirmed

by the Senate for five-year terms.

142.   The Petition was a proceeding filed by the Company with the NRC and arose under,

and sought modification of, 10 CFR 50.82.  The Petition sought approval by the NRC of the

Company's request to access decommissioned trust funds.  Therefore the Petition should have been

described as a Material Legal Proceeding.

- 46 -

143.   The IPO Prospectus stated: "Legal Proceedings . . . We are not currently involved in any material legal proceedings." The July 2008 Registration Statement under the Legal Proceedings section discussed several items but made no reference to the Petition. Both the IPO Registration Statement and July 2008 Registration Statement failed to adequately describe the Petition as a material legal proceeding. Furthermore, the statement in the IPO Prospectus that the Company was not "involved in any material legal proceedings" was untrue because the Petition was a material legal proceeding.

<strong>The Company's Stock Declines</strong>

144.   Following the July 2008 Offering, the price of Energy*Solutions* stock declined in price over the next several months.

145.   On September 25, 2008, Defendants Goldberg, Lindsay and Roriston resigned from the Company's Board of Directors, effective October 1, 2008.

146.   Two weeks later, on October 14, 2008, Energy*Solutions* issued a press release entitled *Accelerated Decommissioning Projects Delayed by Nation's Financial Crisis*, which stated in part:

> The financial crisis that is impacting the United States and world markets will delay Energy*Solutions*' ability to accelerate the decommissioning of identified nuclear power plant assets, a key growth initiative of the company.
>
> The company is now estimating net income in the range of $0.50 to $0.60 per share, based on 88.3 million fully diluted shares outstanding. Net income before the non-cash impact of the amortization of intangibles is estimated to be in the range of $0.70 to $0.80 per share. Amortization expense of intangible assets is expected to be $28 million, or $18 million net of related income tax expense. The company estimates EBITDA for fiscal 2008 to be in the range of $165 million to $180 million. Estimates for net income before the non-cash impact of the amortization of intangible assets and for EBITDA exclude the costs of approximately $1.8 million from the secondary offering in July 2008 and any special charges. The company anticipates that the financial performance for fiscal 2009 to be similar to 2008. Further information will be provided in the company's third quarter earnings call in November.
>
> The Nuclear Regulatory Commission (NRC), which maintains oversight for the use of decommissioning trust funds, informed Energy*Solutions* last week that it denied

the company's petition for a rulemaking change that would allow the use of decommissioning trust funds for the processing and disposal of major radioactive components ("large components") that have been removed from operating nuclear reactors. The NRC indicated, however, that it would consider, on a case-by-case basis, exemptions from its guidance against using decommissioning trust funds for disposing of large components.

Energy*Solutions* will continue to work with the NRC and its nuclear utility customers to seek appropriate exemptions and pursue NRC rulemaking changes. The Commission has indicated that it believes that the early removal and disposal of large components is important and it will continue to work on alternative methods to accomplish this objective. Energy*Solutions* continues to explore other innovative funding options with a number of utilities to secure the decommissioning of these large components in the near future.

Energy*Solutions* and Exelon have an agreement under which Energy*Solutions* would accelerate the decommissioning of Exelon's Zion Nuclear Power Station in Zion, Illinois, which stopped operating in February 1998. The NRC approval for the transfer of the license from Exelon to the company's decommissioning subsidiary, Zion*Solutions*, is expected by mid-December.

However, Energy*Solutions* does not believe that it is in the best interests of its stakeholders to finalize the transfer of the Zion Nuclear Power Station assets until after the financial markets stabilize and the company reaffirms that there is sufficient value in the Zion decommissioning trust funds to ensure adequate funds for the accelerated decommissioning of the plant. Exelon officials have informed Energy*Solutions* that they are supportive of this strategy. Pursuant to their agreement, Energy*Solutions* and Exelon have until December 2009, to close the transaction. Energy*Solutions* remains committed to its license stewardship program.

Despite the financial challenges that are impacting the United States and markets around the world, our base business is very solid and we continue to generate significant cash flow," said Steve Creamer, CEO and Chairman of Energy*Solutions*. "Our core customers, the governments of the United States and United Kingdom and the domestic nuclear industry, continue to require the unique services provided by Energy*Solutions*.

147. Following the Company's October 14, 2008 announcement, the price of Energy*Solutions*' stock collapsed from $10.14 per share on October 13, 2008 to close at $5.64 per share on October 14, 2008 – a one day decline of $4.50 per share or 44% – on extremely heavy trading volume of 9.4 million shares. The Company's stock price continued to decline on extremely heavy volume and by mid-November 2008 was trading below $4 per share.

- 48 -

148.   An analyst report on the Company by Renaissance Capital dated October 15, 2008,

stated in pertinent part as follows:

STOCK DROPS 44% ON DENIAL OF KEY RULEMAKING CHANGE;
MAJOR GROWTH DRIVER PUSHED OUT INDEFINITELY, LEADING
TO SIGNIFICANTLY LOWER EARNINGS POWER

● Before the market opened on 10/14, Energy*Solutions* announced that the Nuclear
Regulatory Commission (NRC), in response to the current financial crises, has
denied ES' request for access to decommissioning trust funds for the processing and
disposal of major radioactive components. These funds had been targeted as a key
driver of growth in its commercial and LP&D segments and their absence will have a
major impact on the company's prior revenue and profit targets.

● Accordingly, Energy*Solutions* cut its full-year 2008 estimates and now sees
EBITDA of $165-$180 million (was $195-$205 million) and adjusted EPS of $0.70-
$0.80 (was $0.89-$0.95). It also expects 2009 results to be flat with 2008, which is
30-40% below our prior expectations.   While existing contracts seem to be
unaffected, we are concerned that anticipated federal projects (another key growth
area) may not materialize given the current state of the financial markets and its
impact on the federal budget. We now project cash EPS of $0.78 in 2009 (was
$1.20) and EBITDA of $178 million (was $255 million).

● While ES should continue to generate strong free cash flow ($60-$70mm per year
by our estimate; implies a 15.7% yield at the current price) and its long-term market
opportunity is sizeable, current funding issues have dealt a major blow to the
company's growth story and management's credibility, causing most investors to
jump ship.

149.   On November 11, 2008, the Company reported its financial results for the third quarter

of 2008 for the period ended on September 30, 2008 and discussed the Company's outlook:

Outlook for 2008

In these unprecedented times for the financial markets, utilities around the country
are finding the level of funds that they have accumulated for the eventual clean up
and decommissioning of their reactor sites have diminished to a significant extent.
This is causing what we expect to be a temporary slowdown in the completion and
approval of license stewardship and large component opportunities," said Mr.
Creamer. "While this is unfortunate, we believe it will be temporary. We believe
that the highest degree of expertise applied to the disposal of nuclear waste is still the
standard to which utilities and regulators around the world aspire and regard as best
practice.

Energy*Solutions* will continue to work with the NRC and its nuclear utility customers to seek appropriate exemptions, pursue NRC rulemaking changes and assist in developing alternative funding solutions for both the disposal of large components and the establishment of license stewardship programs.

***Under these assumptions, the Company's outlook contains no revenues from license stewardship contracts in 2008 or 2009, and a small number of large component contracts in 2009***.

The Company reaffirms the outlook for full year 2008, and the preliminary outlook for 2009 provided in October. That outlook estimates net income for 2008 in the range of $0.50 to $0.60 per share, based on 88.3 million fully diluted shares outstanding. Net income before the non-cash impact of the amortization of intangibles is estimated to be in the range of $0.70 to $0.80 per share. Amortization expense of intangible assets is expected to be $28 million, or $18 million net of related income tax expense. The company estimates EBITDA for 2008 to be in the range of $165 million to $180 million. Estimates for net income before the non-cash impact of the amortization of intangible assets and for EBITDA exclude the costs of approximately $1.8 million from the secondary offering in July 2008 and any special charges that may arise during the remainder of 2008. ***The Company anticipates that the financial performance for fiscal 2009 will be similar to 2008, again assuming no special charges***.

150. The Company has still not commenced the Zion Project as of the date of this Complaint. On November 30, 2009, the Company announced that Defendant Strawbridge was resigning from the Company effective December 31, 2009 and was being replaced by Defendant McBride as CFO. On February 19, 2010, the Company announced that Defendant Creamer resigned that same day from his positions as CEO and Chairman of the Board of Directors of the Company and the Company's board immediately replaced him with Val John Christensen.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

151. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

152. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all Defendants.

- 50 -

153.  The Registration Statements for the IPO and the July 2008 Offering were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

154.  Energy*Solutions* is the registrant for IPO and the July 2008 Offering.  As issuer of the shares, Energy*Solutions* is strictly liable for the materially inaccurate statements contained in the Registration Statements and the Prospectuses and the failure of the Registration Statements and Prospectuses to be complete and accurate.

155.  The Individual Defendants each signed the Registration Statements either personally or through an Attorney-in-Fact and/or caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statements.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statements and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading.  As such, the Individual Defendants are liable to the Plaintiffs and the Class.

156.  Defendant ENV Holdings held 100% of the Company's shares prior to the IPO and more than 67% of the Company's shares prior to the July 2008 Offering and controlled the Company and its management and caused the issuance of the IPO and July 2008 Offering Registration Statements and the statements contained therein.  ENV Holdings also sold millions of shares in the IPO and July 2008 Offering.

157.    The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the IPO and the July 2008 Offering and the Company's securities were sold through the Registration Statements.  The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts.   None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statements and Prospectuses, were true, were without omission of any material facts, and/or were not misleading.

158.    By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

159.    Plaintiffs and putative Class members acquired Energy*Solutions* securities in the IPO and the July 2008 Offering, and in reliance on, the Registration Statements and without knowledge of the untruths and/or omissions alleged herein.  Plaintiffs and the Class sustained damages when the price of Energy*Solutions* securities declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

160.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

161.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiffs and the Class, against all Defendants.

162.    Defendants were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the IPO Prospectus and the July 2008 Offering Prospectus.  Defendants issued,

caused to be issued, and/or signed the Registration Statements in connection with the IPO and the July 2008 Offering. The Registration Statements contained a Prospectus which was used to induce investors, such as Plaintiffs and the other members of the Class, to purchase Energy*Solutions* securities.

163.    The IPO Prospectus and July 2008 Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectuses and in "Road Shows" to promote the IPO and the July 2008 Offering. ENV Holdings, Energy*Solutions* and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectuses. Additionally, ENV Holdings sold millions of shares in the IPO and July 2008 Offering.

164.    The Underwriter Defendants participated in the preparation and dissemination of the false and misleading Prospectuses for their own financial benefit. But for their participation in the IPO and the July 2008 Offering, including their solicitation as set forth herein, those Offerings could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the IPO and the July 2008 Offering and do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Prospectuses. The Prospectuses were calculated to create interest in Energy*Solutions* securities and were widely distributed by or on behalf of these Defendants for that purpose;

(b)    finalized the Prospectuses and caused them to become effective; and

(c)    conceived and planned the IPO and the July 2008 Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing

securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

165.  As set forth more specifically above, the Prospectuses contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

166.  Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectuses.

167.  The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectuses were accurate and complete in all material respects.  Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

168.  By reason of the conduct alleged herein, these Defendants violated §12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and members of the Class who hold Energy*Solutions* securities purchased in the IPO and the July 2008 Offering have the right to rescind and recover the consideration paid for their Energy*Solutions* securities and hereby elect to rescind and tender their Energy*Solutions* securities to the Defendants sued herein.  Plaintiffs and Class members who have sold their Energy*Solutions* securities are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants and ENV Holdings

169.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants and ENV Holdings.

171.    Each of the Individual Defendants and ENV Holdings acted as controlling persons of EnergySolutions within the meaning of Section 15 of the Securities Act by virtue of this position as a director and/or senior officer of EnergySolutions and/or equity interest in control of the Company. By reason of their senior management positions, directorships at the Company, or stock ownership, as alleged above, the Individual Defendants and ENV Holdings, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause EnergySolutions to engage in the conduct complained of herein.  By reason of such conduct, the Individual Defendants and ENV Holdings are liable pursuant to Section 15 of the Securities Act.

172.    Each of the Individual Defendants and ENV Holdings was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the Offerings to be successfully completed.

### ADDITIONAL ALLEGATIONS IN SUPPORT
### OF CLAIMS UNDER THE EXCHANGE ACT

173.    For purposes of the allegations under the Exchange Act set forth herein, "Defendants" refers to the Individual Defendants, EnergySolutions and ENV Holdings.

**Energy*Solutions* Manipulated the**
**Cost Estimates for the Zion Project**

174.    According to former employees of Energy*Solutions*, the Company had wide discretion when determining the Zion Project cost estimates, and Energy*Solutions* manipulated those cost estimates, making it appear that the Zion Project would be more profitable than it actually was. Defendants manipulated the cost estimates for two reasons: (i) to support inflated estimates for investors; and (ii) to report lower cost estimates to the NRC in an effort to achieve approval of the Zion Project.  These estimates were fabricated to benefit Defendants and inflate Energy*Solutions*' stock price.

175.    The Zion Project involved different types of services and related expenses, including: (i) license termination; (ii) spent fuel management; and (iii) decontamination and disposal.  For purposes of NRC approval, it was critical that the Zion Trust Fund was adequate to cover decontamination and this was the most significant component in terms of cost.

176.    As discussed above, the Zion Trust Fund declined in value during the Class Period. Since the Zion Trust Fund balance declined, Defendants manipulated the costs of the Zion Project to make it appear that sufficient funds existed to complete the project and generate substantial profits for the Company.

177.    Defendants provided cost estimates for the Zion Project that were submitted to the NRC.  According to a March 31, 2007 Decommissioning Funding Report submitted to the NRC in connection with the Zion Project, as of December 31, 2006, $792.5 million was required for radiological decommissioning activities.  According to a March 28, 2008 Decommissioning Funding Report submitted to the NRC in connection with the Zion Project, as of December 31, 2007, $620.1 million was required for radiological decommissioning activities.  Thus, between December 31,

2006 and December 31, 2007 (at the time of the IPO), there was a reduction in the cost estimate for radiological decommissioning activities of $172.4 million (or 28%).

178.    According to a March 31, 2009 Decommissioning Funding Report submitted to the NRC in connection with the Zion Project, as of December 31, 2008, $473.5 million was required for radiological decommissioning activities.  Thus, between December 31, 2007 and December 31, 2008 (at the time of the end of the Class Period), there was a reduction in the cost estimate for radiological decommissioning activities of $146.6 million (or 24%).  This cost estimate was inaccurate and was not founded upon a reasonable basis.

179.    The nuclear waste disposal price for Zion was often set by Energy*Solutions'* employee, Al Rafati ("Rafati").  According to CW6, during the Class Period, Rafati was in charge of these pricing decisions and cost estimates, and was in a position to exercise discretion in pricing and the resultant cost estimate for the Zion Project.  Sanctioned by Company Senior Executives, including Defendant Creamer, Rafati manipulated the cost estimates for the Zion Project.  According to CW7, Rafati manipulated the estimated per-cubic-foot cost of waste disposal on the Zion decommissioning, and changed the cost numbers to make them fit changes in the asset values comprising the trust fund estimates.  According to CW7, Rafati was "dishonest" and engaged in unethical business practices involving other projects, including the pricing of nuclear waste disposal.  CW7 participated in meetings every 2-3 months where Rafati would change waste disposal prices to manipulate project costs.

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

180.    The statements referenced in ¶¶119-31 from the IPO and July 2008 Offering Registration Statements are incorporated herein by reference.  These statements were materially false and misleading when made for the reasons set forth above.

181.   On December 11, 2007, the Company announced that it entered into an asset purchase agreement with Exelon regarding the decommissioning of the Zion nuclear facility.  According to the press release announcing the asset purchase agreement:

> Completion of the transactions contemplated by the Asset Sale Agreement is subject to the satisfaction of a number of closing conditions, including the accuracy of the parties' representations and warranties, the performance of covenants, the receipt of regulatory approvals, and the receipt of a private letter ruling from the Internal Revenue Service.  The Company does not expect that conditions to the completion of the transactions will be satisfied before the second half of 2008.

182.   After the IPO, analysts that followed Energy*Solutions* viewed the License Stewardship Program, including the Zion Project, as a key growth driver for the Company going forward.  A December 27, 2007 research report by D.A. Davidson & Co. stated in part:

> Beyond the ongoing operations support, the eventual decommissioning of nuclear power plants represents a particularly attractive opportunity for Energy*Solutions*. The decontamination and decommissioning costs associated with nuclear power plants is often in excess of hundreds of millions of dollars.  The NRC requires nuclear utility operators to set aside reserve funds to pay for these end-of-life costs. Currently an estimated $2.9 billion is held in decommissioning trust funds for 13 reactors in the United States in various stages of shutdown.
>
> *         *         *
>
> Energy*Solutions* recently announced an agreement to take temporary possession of the Zion Nuclear Power Station owned by Exelon Corporation (EXC – NOT RATED – $81.86).  As temporary owner of the site, Energy*Solutions* will utilize the $900 million of trust funds to decommission the facility, remove and dispose of waste and construct a dry storage facility for spent fuel, before returning the site to Exelon. This agreement is subject to NRC and other approvals, expected during the second half of 2008, with actual work extending for 8-10 years.
>
> The company hopes to use the Exelon agreement as a model for additional turnkey agreements with owners of closed reactors.  As shown in Diagram I, the U.S. reactor fleet is nearing the end of its expected life.  While some reactors are expected to defer closure with 20-year extensions to their original 40-year licenses, the opportunities for Energy*Solutions*, including re-licensing upgrades are expected to increase.  Additionally, proposed new reactors are likely to provide potential customers for long-term service agreements.

183.    An analyst report dated December 31, 2007 from Credit Suisse initiated coverage of the Company with an "Outperform" rating and discussed the Company's License Stewardship Program and access to trust funds prior to shut-down of facilities:

> **\* License stewardship opportunities**.  There are currently 13 nuclear reactors undergoing decommissioning in various stages, in which ES self-performs the decommissioning as an owner and takes over the NRC license over the life of the project.  This is estimated to be a $3 billion opportunity with funding already in place.  ES potentially accelerates the D&D of nuclear power plants, providing greater cost certainty and accelerated site restoration.  At the same time, the utility has demonstrated increased commitment to environmental responsibility.  ES is the only company capable of providing this solution, again leveraging its disposal assets.

> **\* Large component renewal**.  Replacement of large components exceeding their useful life is often a key step before new construction or license extension.  This is an estimated $1 billion opportunity.  NRC rulemaking in late 2008 could accelerate efforts by permitting access to D&D funds.  ES is the only company capable of providing this solution, again leveraging its disposal assets.

184.    On March 17, 2008, the Company announced its financial results for the fourth quarter and fiscal year ended December 31, 2007 ("FY 2007") in a press release (the "3/17/08 Press Release"), which stated, in pertinent part, as follows:

> **Full Year Results**

> Revenues for the year ended December 31, 2007 were $1.1 billion, compared to $427.1 million for the same period in 2006.  The increase in revenues was primarily the result of the acquisitions of Reactor Sites Management Company Limited ("RSMC") and Duratek, Inc. ("Duratek") in June 2007 and June 2006, respectively. Net loss for the year ended December 31, 2007 was $8.9 million, compared to net income of $26.9 million for the same period in 2006.

> \*    \*    \*

> "We are pleased with our financial results for 2007.  They confirm a strong year across our businesses and exceeded our expectations at the time of our initial public offering," said R Steve Creamer, the Company's Chief Executive Officer.  "The advantages of our increased size, breadth and geographic scope have significantly strengthened our strategic position as a leading supplier of specialized technology-based nuclear services worldwide.  Together with financial strength from reduced leverage following our initial public offering, and our wider access to capital that comes with a listing on the NYSE, we are positioned well for future organic and acquisition-based growth."

- 59 -

\*    \*    \*

Commercial Services pro forma revenues were $137.4 million, and segment pro forma income from operations was $20.2 million, resulting in a pro forma operating margin of 15%. *In December 2007, the Company finalized a contract with Exelon Corporation to decommission two nuclear reactors in Zion, Illinois. This contract successfully launches the Company's licensed stewardship program which enables it to efficiently and cost-effectively decommission nuclear reactors. This paradigm-shifting contract provides long-term revenues, and positions EnergySolutions well to pursue similar arrangements with the remaining 11 reactors that are currently in "SAFESTOR" status around the U.S.*

Logistics, Processing and Disposal pro forma revenues were $262.8 million, and pro forma income from operations was $99.4 million, resulting in a pro forma operating margin of 38%. *In May 2007, EnergySolutions submitted a rulemaking request to the U.S. Nuclear Regulatory Commission ("NRC") requesting that the NRC consider allowing the use of decommissioning funds for the transportation and disposal of large components located at nuclear power sites around the country*. The public comment process was completed in December 2007. *The Company believes this is an important environmental initiative that will allow these components to be safely disposed at its licensed landfill at Clive, Utah, in a much more expeditious timeframe than would otherwise be possible*.

**Outlook for 2008**

"*As we look forward, the nuclear services sector remains robust and we see significant opportunities for us to grow in each of our business segments*," said Mr. Creamer. "We estimate there are $55 billion of DOE contracts coming up for bid in the next three years for maintenance, operation, decontamination and decommissioning. Our services to U.S. commercial nuclear customers will continue to benefit from our provision of recurring on-site services across the active nuclear reactors, *complemented by paradigm changing decommissioning solutions we are able to offer to our customers such as our large components removal services and our license stewardship program*. Internationally, as countries endeavor to expand nuclear power generation, many seek to address the clean-up associated with legacy nuclear infrastructure. With our major presence in the U.S. and Europe we are in an excellent position to benefit from that trend."

*The Company expects full year 2008 revenues to be in the range of $1.8 billion to $1.9 billion and earnings per share to be in the range of $0.69 to $0.74*. Earnings per share before the impact of amortization of intangible assets, which is calculated as earnings per share plus the per share impact of amortization expense of intangible assets, net of related income tax expense, is expected to be in the range of $0.89 to $0.94. When calculating per share amounts, the Company assumes a weighted average fully-diluted share count for the year of 89 million shares. EBITDA for the year ending December 31, 2008 is expected to be between $195 million and $205 million. Amortization expense of intangible assets, net of related income tax

expense, is expected to be $17.8 million for 2008. Compensation expense related to stock option grants is expected to be $9.1 million for 2008. Capital expenditures for the year are expected to be approximately $37 million, primarily relating to the one-time purchases of equipment for the Company's Atlas mill tailings contract awarded in June 2007 as well as the general maintenance of the Company's facilities.

**Based on the expected timing of the license transfer of the Zion license stewardship contract, the large U.S. DOE contract awards and the NRC rulemaking change for major components, the Company expects revenues and earnings for 2008 to be weighted towards the second half of the year**.

185.    The statements referenced above in ¶184 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    Trust funds for decommissioning activities decreased significantly during 2008;

(b)    There were real and substantial risks that adequate decommissioning trust funds would not be available for the Company for the foreseeable future;

(c)    Prior to and during the Class Period, contributions to decommissioning trust funds experienced significant declines;

(d)    The Company's existing customers had substantial shortfalls in decommissioning trust funds of hundreds of millions of dollars;

(e)    Most of the nuclear reactors in shut-down characterized by Defendants as its target market would not produce revenues for the Company in the foreseeable future because they were: (i) under the control of an owner-operator that had deficient trust funds; (ii) were already under the control of an owner-operator that would provide decommissioning services instead of EnergySolutions; or (iii) were numerous years away from likely commencement of any decommissioning activities;

(f)    Economic problems in the United States and internationally were adversely affecting the Company's ability to secure projects which would adversely affect its future results; and

(g)    Energy*Solutions* was not well situated in the near term to benefit from those opportunities.

186.    The statements referenced above in ¶184 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    The Zion Trust Fund balance declined and was less than represented during the Class Period; and

(b)    The Zion Trust Fund was not adequate to fund the cost of decommissioning those facilities, which would prevent the Company from moving forward on the Zion Project or render it much less profitable than anticipated.

187.    The statements referenced above in ¶184 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    The NRC had a longstanding and well entrenched rule preventing access to decommissioning trust funds prior to the shut-down of a nuclear facility that was enacted to protect the health and interests of the public;

(b)    The NRC had rejected proposals similar to the Petition on numerous occasions and it was highly probable that the NRC would reject the Petition;

(c)    The business prospects of the Company was heavily dependent upon a favorable ruling from the NRC on the Petition;

(d)    There were significant risks that the NRC would reject the Petition which would eliminate a significant portion of the Company's growth prospects; and

(e)    There was no reasonable basis to expect that the Petition would be granted by the NRC.

188.    Furthermore, the statements referenced above in ¶184 detailing the Company's forecasts were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    A significant portion of the revenues and earnings forecasted by Defendants were comprised of revenues and earnings from the License Stewardship Program, the Zion Project and the NRC's approval of the Petition; and

(b)    There was no reasonable basis for Defendants to represent that the Company would generate revenues or earnings in 2008 from the License Stewardship Program, the Zion Project or as a result of the NRC's approval of the Petition.

189.    According to the "3/17/08 Press Release," for FY 2007, LP&D and Commercial Services accounted for 54% and 14% of the Company's Gross Profit, respectively.

190.    On March 18, 2008, the Company held a conference call with analysts (the "3/18/08 Conf Call") to discuss the financial results and other information set forth in the 3/17/08 Press Release.  Defendant Creamer discussed the Company's opportunities in decommissioning:

> . . . there are 13 facilities in various stages of shut down that have $2.9 billion of dedicated decommissioning funds available. Our approach of license stewardship is unique in the industry and can accelerate the decommissioning process by several decades. Senior representatives from the NRC have stated in two separate public presentations that this program is industry changing. We estimate there are approximately $55 billion worth of U.S. Department of Energy government prime contracting opportunities coming up for bid over the next three or four years and we

plan to be involved or lead many of them as a prime contractor. We plan to have contracts to dispose of large components from major commercial nuclear utilities.

*     *     *

We have life of plant contracts that cover 82 of the U.S.104 operating reactors. These life of plant contracts can provide us with revenue streams from processing and disposal of substantially all low level radioactive waste generated over the remaining lives of the nuclear power plants and ultimately waste disposal revenues when plants are shut down. This can provide us with long term predictable revenue streams for up to 30 years.

In our commercial services business, we generate revenue mostly from contracts from commercially owned nuclear power plants and to a lesser extent, other sites such as labs and universities. We just signed an agreement for our first licensed stewardship program with Exalon Corporation in which we accelerate the decommissioning clean up by over 20 years of an old reactor site in Zion, Illinois, under a sole source contract that has a potential to provide us with work for 7 to 10 years. This method of decommissioning changes the game in restoring the former nuclear plant sites to beneficial reuse. This opens up a new market for us and we're pursuing similar arrangements with a number of other shut down reactors around the United States that are currently in what we call safe store status.

*     *     *

In our logistics processing and disposal, our LP&D business, we generate revenues from the transportation disposal of low level radioactive waste at our Clive facility in Utah and our recycling and processing facilities in Tennessee and South Carolina. This year, we have made a push to have regulators consider the use of cash from current decommissioning accounts to fund the transportation disposal of large decommissioned components at our facilities. This would be a major opportunity for us and an important environmental initiative for the country. The alternative so leave the U.S. with sites around the country that have large components on site and essentially creating multiple nuclear junkyards.

191.    The statements referenced above in ¶190 were materially false and misleading when made because of the reasons set forth in ¶¶185-87 above.

192.    On the 3/18/08 Conf Call, Defendant Strawbridge discussed the outlook for the Company in 2008:

We expect full year 2008 revenues to be in the range of $1.8 billion to $1.9 billion. Now, the variable here is something that we talked about quite a lot before. It depends on which assumption or which large deal we contract in Hanford that we received, and the issue there is how we account for the revenues that we've talked

- 64 -

about before. EPS is expected to be in the range of $0.69 to $0.74, and EPS, before the impact of amortization of intangible assets, which really is calculated as earnings per share plus the per share impact of the amortization expense of intangible assets net of related income tax expense is expected to be in the range of $0.89 to $0.94. EPS assumes a weighted average fully diluted share count for the year of 89 million shares. EBITDA for the year-ending 2008 is expected to be $195 million to $205 million and again, this does not include any add back that we've talked about in the past for compensation expense related to the stock option grants which is expected to be another $9.1 million. CapEx for the year is approximately $37 million, primarily relating to the one-time purchase of equipment for the Atlas Mill Tailings contract that Steve mentioned earlier, as well as for general maintenance of our facilities.

As far as the outlook, one of the things we do want to communicate to investors is that based on the expected timing of the Zion license stewardship contract, on major components, and on the large DOE contracts, those three things all of which we talked about before, the company expects the revenues and earnings for 2008 to be weighted towards the second half of the year. Now, what I'd like to do is turn it back over to Steve for more on the coming year and concluding remarks.

193.    The statements referenced above in ¶192 were materially false and misleading when made because of the reasons set forth in ¶¶186-88 above.

194.    On the 3/18/08 Conf Call, Defendant Strawbridge responded to questions about the outlook for the Company and discussed the importance of the license transfer to Zion and decommissioning activities for major components as a result of accessing decommissioning trust funds:

**Jaime Cook – Credit Suisse – Analyst**

Hi, good morning and congratulations. I guess my first question, when we look at your 2008 guidance, it looks like you're raising it slightly, Philip, so can you just talk about what areas of business you're seeing greater strength than you initially participated and as we look at the earnings for the year, I appreciate the color that it will be more back end loaded, but can you give us a sense of how much – what percentage of earnings will come from the first half versus the second half?

**Phillip Srawbridge – EnergySolutions, Inc. – CFO**

Yeah, Jamie I'll talk a little bit about that.  I mean, a couple of areas that we see, certainly we think that commercial services as well as federal services are kind of the two big areas that we think that are shaping up a little better than what we anticipated during our original discussion.  And as far as looking at the timing of the earnings, as we mentioned before, it's probably something like 60% or so of the earnings are

going to be in the back end of the year, and really, with Q4 being the largest part and again, those are all related on the three things that we mentioned, the timing of the license transfer for Zion, and the reason for that is again, we're able to start more active decommissioning, even though we're doing decommissioning planning right now, the major components as I mentioned before is a very high margin business, and we anticipate those in Q4 and then as well as the DOE jobs which would start in Q4 right now.  So, that's kind of the idea.

\*        \*        \*

**Al Kaschalk – Wedbush Morgan – Analyst**

And just a follow-up or sort of an add-in if you will, on the commercial side, I believe large component moves for '08 are related to licenses is an opportunity that you expect to realize particularly in the back half. Are those under contract or scheduled in the second half already, or when do you firm up that?

**R. Steve Creamer – EnergySolutions, Inc. – Chairman, CEO**

Well, we're negotiating final contracts right now with three or four different utilities on those right now.  We have engineering in progress moving ahead on those right now, so that we will be ready to execute in the third and fourth quarters of this year and so we're just working with the NRC as Philip mentioned, the rule making process went through and there was no negative comments at all which is pretty unique on any regulatory rule making thing that there's no anti-s, no anyone that comes out opposed to a rule making so we think that that's moving along, but it also helps we think accelerate the exemptions that we have in to help those move this year, so we feel we still have great confidence that we'll be able to achieve our goals in the third and fourth quarter on large components.

195.    On the 3/18/08 Conf Call, Defendants provided additional information about the Zion

Project:

**Phillip Srawbridge – EnergySolutions, Inc. – CFO**

Just as a reminder along those lines, Rudy, you'll remember that our discussion was that our plan was to have Zion this year, have another one by the end of Q1 of 2009, and a third one by the end of Q1, 2010. And so I think the 2009 one, we're running on or ahead of schedule, suffice it to say.

**R. Steve Creamer – EnergySolutions, Inc. – Chairman, CEO**

Yes.  There is a lot of effort that goes into the due diligence before we want to enter into an agreement to make sure that we can match, the amount of money matches the work to be done and that it can be a positive financial opportunity for the company. So we're in that phase right now.

- 66 -

196.  The statements referenced above in ¶¶194-95 were materially false and misleading when made because of the reasons set forth in ¶¶185-88 above.

197.  In response to the Company's announcements on March 17 and 18, shares of the Company's stock increased $1.83 per share, or 10.3%, from a close of $17.72 per share on March 17 to close at $19.55 per share on March 18 on extremely heavy trading volume.  The Company's shares continued to rise on this thereafter, closing at $20 per share on March 19, $21.38 on March 20, $21.7 on March 21, and traded at over $23 per share by the beginning of April 2008.

198.  On March 28, 2008, Energy*Solutions* filed its Form 10-K with the SEC for the fiscal year ended December 31, 2007 ("2007 10-K") and reiterated the Company's financial results that were contained in the 3/17/08 Press Release.  The 2007 10-K described the Company's business and stated in pertinent part as follows:

> *    License Stewardship Program*.   Our license stewardship program is a new, innovative approach to provide decommissioning services. Under this program, we acquire title to substantially all of a client's buildings, facilities and equipment of its non-operating nuclear power plant.  As the owner of the plant and associated permits, licenses and other assets incidental thereto, we are eligible to acquire a license from the NRC to decommission the plant and the rights to the client's decommissioning trust funds associated with the plant, which are overseen by the NRC.  The client retains ownership of the real property and leases the real property to us for the period during which we perform D&D activities. Because of our technology, expertise and assets, this unique structure facilitates the decommissioning of the plant ahead of the schedule that the client would otherwise expect to achieve at a total cost not exceeding the available balance of the decommissioning trust funds (plus investment interest accruing during the decommissioning project).  This structure gives us direct access to the decommissioning trust funds, avoiding several expensive and time consuming levels of administrative oversight.
>
> In December 2007, we entered into a contract with Exelon Generation Company, LLC to decommission its non-operating nuclear plant near Zion, Illinois, under our license stewardship program.  We are currently in the process of seeking NRC approval of the proposed transaction.
>
> *    Large Components*.   Our expertise, personnel and equipment enable us to prepare large components for transport via public highway, waterway, rail or combinations thereof to ensure safety and compliance with regulatory requirements.  Large components include overweight and oversized nuclear components, such as reactor

- 67 -

pressure vessels, steam generators, reactor heads, pressurizers, turbine rotors, reactor coolant pumps and feed water heaters. These components often weigh more than 20,000 pounds and generally require special transportation arrangements, including formal engineering reviews. The transportation, processing and disposal of these large components is often handled through our LP&D segment.

199.   The statements referenced above in ¶198 were each materially false and misleading when made because of the reasons set forth in ¶¶185-88 above.

200.   The 2007 10-K contained a detailed section discussing regulations and the fact that the Company is regulated by the NRC but failed to adequately describe the Petition or the strong regulations prohibiting access to decommissioning trust funds prior to the shut-down of the facility.

201.   The 2007 10-K mentioned that the Company submitted a "proposal" to the NRC to access decommissioning trust funds but failed to adequately disclose the risk that the Petition would not be approved:

In addition, the NRC is reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for transportation and disposal of retired large components. If adopted, this proposal could provide operators of nuclear reactors with an incentive to transport, process and dispose of radioactive materials at an off-site location. Conversely, failure of the proposal to be adopted could have an adverse impact on the prospects for our Commercial and LP&D segments.

202.   The statements referenced above in ¶¶200-01 were each materially false and misleading when made because of the reasons set forth in ¶187, above.

203.   On May 12, 2008, the Company announced its financial results for the first quarter of 2008 for the period ended March 31, 2008 ("1Q08") in a press release (the "5/12/08 Press Release"), which stated in pertinent part as follows:

**First Quarter 2008 Results**

Revenues for the quarter ended March 31, 2008 were $502 million, compared to $114 million for the same quarter in 2007. Gross profit for the first quarter of 2008 was $73.0 million, compared to gross profit of $30.8 million for the quarter ended March 31, 2007. Selling, general and administrative expenses for the current quarter were $28.6 million, compared to $28.3 million in the same quarter last year.

- 68 -

The Company generated cash flow from operations of $25.7 million during the quarter, enabling it to repay $20 million of long-term debt. This repayment, together with repayments of debt from the proceeds of its initial public offering in November 2007, has contributed to the reduction of the Company's interest expense, which was $11.7 million for the quarter ended March 31, 2008, compared to $15.4 million in the same period last year.

Net income for the quarter ended March 31, 2008 was $19.3 million, or $0.22 per share, compared to a loss of $10.3 million for the same quarter in 2007. EBITDA for the quarter was $54.0 million compared to EBITDA of $12.0 million for the prior year, and net income before the non-cash impact of amortization of intangible assets for the quarter ended March 31, 2008 was $23.8 million, or $0.27 per share, based on 88.3 million fully-diluted shares outstanding. The Company defines EBITDA as earnings before interest expense, income taxes, depreciation and amortization. The Company defines net income before the impact of amortization of intangible assets as net income plus amortization expense of intangible assets, net of the related income tax expense. The reconciliation of EBITDA, and net income before the impact of amortization of intangible assets to the most directly comparable GAAP measure is set forth in table 4 in the accompanying tables.

"This has been an excellent start to 2008 for EnergySolutions," said R Steve Creamer, the Company's Chief Executive Officer. "All of our business segments performed well during the quarter. In particular we benefited from early substantial completion of two of our Commercial Services projects and the expected first quarter margin increase from our international operations. We see this strong first quarter largely as a shift in timing of some of our commercial business rather than any change from our original full year expectations."

*    *    *

204.   In the 5/12/08 Press Release, as set forth below, Defendants provided the Outlook for the Company for the rest of 2008 and represented that the Company expects to realized revenues in 2008 from the Zion Project and NRC rulemaking change to permit access to decommissioning trust funds:

Outlook for 2008

The Company affirms its full year guidance of revenues in the range of $1.8 billion to $1.9 billion and earnings per share in the range of $0.69 to $0.74. Earnings per share before the impact of non-cash amortization of intangible assets, which is calculated as earnings per share plus the per share impact of amortization expense of intangible assets, net of related income tax expense, is expected to be in the range of $0.89 to $0.94. When calculating per share amounts, in its guidance, the Company assumes a weighted average fully-diluted share count for the year of 89 million

shares. EBITDA for the year ending December 31, 2008 is expected to be between $195 million and $205 million. Amortization expense of intangible assets, net of related income tax expense, is expected to be $17.8 million. Compensation expense related to stock option grants is expected to be $9.1 million for 2008. Capital expenditures for the year are expected to be approximately $37 million, primarily relating to the one-time purchases of equipment for the Company's Atlas mill tailings contract as well as the general maintenance of the Company's facilities."

Based on the expected timing of key contracts, including the license transfer of the Zion license stewardship contract, the large U.S. DOE contract awards and the NRC rulemaking change for major components, the Company continues to expect revenues and earnings for 2008 to be weighted toward the second half of the year.

205.   The statements referenced above in ¶¶203-04 were materially false and misleading when made because of the reasons set forth in ¶¶185-88 above.

206.   On May 13, 2008, the Company held a conference call with analysts (the "5/13/08 Conf Call") to discuss the financial results and other information set forth in the 5/12/08 Press Release. Defendant Creamer discussed the performance of the Company and the license stewardship program, including the Zion Project:

> We are off to a solid start for the year. Philip will go through the results in more detail for you in a moment, but we had a strong first quarter and we are reaffirming our guidance for the full year.
>
> *    *    *
>
> In our commercial services segment, license stewardship is generally gathering momentum. The latest on Zion is that we have significant engineering and planning activities going on in anticipation of transfer of the license. Community reaction and strong support from the state of Illinois government are helping to keep the project on pace. The transfer of the license is on schedule for Q4. Apart from Zion we continue to make significant inroads on the second license stewardship project with others coming along behind those two.

207.   On the 5/13/08 Conf Call, Defendant Strawbridge reiterated Defendant Creamer's statement that there was strong momentum in the license stewardship project: "As Steve mentioned, momentum continues together in licensed stewardship area and we will report to you when we have some material news on further progress."

208.  The statements referenced above in ¶¶206-07 were materially false and misleading when made because of the reasons set forth in ¶¶185-88 above.

209.  On the 5/13/08 Conf Call, Defendant Strawbridge also discussed the outlook for the Company, the license stewardship program and the expected approval of the rule change from the NRC on the ability to access decommissioning trust funds:

***Philip Strawbridge – EnergySolutions, Inc. – CFO***

\*       \*       \*

Now turning to our outlook.  The results of the first quarter, as Steve and I have said, benefited from early completion of certain projects in our commercial services business and the expected strength of our international segment.  We see this as largely a timing shift, the effect of which has been to move some of the contribution of what we projected in the commercial services segment into Q1.

At this point in time we do not expect a change in our guidance for the year. Accordingly we affirm the guidance that we gave on our last call and, as you recall, what that was full-year revenues in the range of $1.8 billion to $1.9 billion; earnings per share in the range of $0.69 to $0.74; earnings per share before non-cash impact of amortization of intangible assets, which is calculated as earnings per share plus, the first-year non-cash impact of amortization expense of intangible assets net of the related income tax expense is in the range of $0.89 to $0.94. EBITDA for the year is expected to be between $195 million to $205 million.

Non-cash amortization expense of the intangible assets net of the related income tax expense I mentioned is expected to be $17.8 million.  Compensation expense related to stock option grants is expected to be $9.1 million for 2008.  These results assume a weighted average fully diluted share count for the year of 89 million shares.

CapEx for the year is expected to be approximately $37 million which is above what we consider to be our maintenance CapEx level.  We've mentioned before that's about $20 million a year, and the one time issue from 20 to 37 is primarily related to one time purchase up equipment that our Atlas mill tailings contract – the Moab contract as we call it – as well as general maintenance of the Company's facilities.

So results for the year and the spread of the results between the quarters will still be significantly affected by the timing of key initiatives such as -- first, designing a license stewardship contract where, as Steve mentioned, we still expect the NRC to approve the license transfer in the fourth quarter.

***Second, the rulings for the decommissioning of major components, where we've indicated we expect the NRC to change their rule on the use of decommissioning***

- 71 -

*funds to allow their use for the disposal of major components. We expect either this ruling or the exemptions to this ruling to be approved before the fourth quarter of this year, or around the fourth quarter, and that should enable us to take advantage of the high margin work in the latter part of this year*.

And then of course the third key initiative is the award of one or more of the largest DOE contracts in Hanford.

Taking all those initiatives into account and that current view, *we still think the revenues and earnings for 2008 will be weighted towards the second half of the year*. And as I mentioned before, particularly it depends on which of those DOE contracts we win. And with that I'm going to turn it back over to Steve for concluding remarks. Steve?

210.   The statements referenced above in ¶209 were materially false and misleading when made because of the reasons set forth in ¶¶185-88 above. Furthermore, the statements "we expect the NRC to change their rule on the use of decommissioning funds to allow their use for the disposal of major components" and "We expect either this ruling or the exemptions to this ruling to be approved before the fourth quarter of this year, or around the fourth quarter" were materially false and misleading when made because there was no basis for these statements since it was likely that the Petition would be reject by the NRC.

211.   On the 5/13/08 Conf Call, Defendant Creamer responded to a question about the rule change and accessing decommissioning trust funds for large component jobs:

*Jamie Cook – Credit Suisse – Analyst*

Okay. And then just last Steve I guess, or Philip, if you could comment. There were a number of large component jobs that you guys were bidding on. Has there been any change in the timing or size of those awards?

*R. Steve Creamer – EnergySolutions, Inc. – CEO*

No, we're just working through them right now; still waiting on the NRC and everything seems to be moving along just as we expected it would be.

212.   The statements referenced above in ¶211 that "everything seems to be moving along just as we expected it would be [with respect to the Petition]" were materially false and misleading

- 72 -

when made because Defendants knew, or recklessly disregarded, that it was likely that the Petition would be rejected and that the Petition was not moving along well.

213.    In response to the Company's announcements on May 12 and 13, shares of the Company's stock increased $.91 per share, or nearly 4%, from a close of $23.24 per share on May 12 to close at $24.15 per share on May 13 on extremely heavy trading volume.

214.    On May 13, 2008, the Company filed its quarterly report for 1Q08 on form 10-Q ("1Q08 10-Q") and reiterated the financial results contained in the 5/12/08 Press Release and 5/13/08 Conf Call. The 1Q08 10-Q represented that the Company is "not currently involved in any material legal proceedings."

215.    The statement in ¶214 referenced above that the Company is "not involved in any material legal proceedings" was materially false and misleading when made because Defendants knew, or recklessly disregarded, that the Petition was a material legal proceeding.

216.    An analyst report from JP Morgan, dated May 13, 2008, reiterated its "Overweight" rating on the Company and commented:

**Several Catalysts Loom on the Horizon**

Several catalysts are coming into sharper focus over the next few months, including new DOE awards, ***regulatory developments that will impact the Commercial business, and new license stewardship opportunities***. ***Management expects*** to win one of two upcoming DOE contracts at Hanford (Plateau & Tank Farm) expected to be awarded in June/July, and ***to receive final approval for the license transfer for Zion's Exelon plant in Q4***. Discussions with prospects for additional license stewardship contracts are progressing, and we think ES could announce a second such arrangement by YE08, slightly ahead of initial expectations. ***Additionally, sentiment regarding regulatory approval for the use decommissioning trusts to fund disposal of large components remains positive***. Longer-term, we think spent fuel reprocessing could be an attractive opportunity for ES, which is working on design programs for the Global Nuclear Energy Partnership (GNEP).

217.    The Company had applied for a private letter ruling that the decommissioning trust fund for the Zion Project being transferred from Exelon to the Company would not trigger any

adverse tax consequences. On July 22, 2008, three days before the July 2008 Offering, Defendants

issued a press release titled *EnergySolutions Receives Private Letter Ruling Clearing Key Tax Issue*

*for Zion Decommissioning*, that represented that the Zion Project was moving forward and things

were going very well.  The press release was issued the same day that the Company received the

favorable ruling from the IRS, and Defendant Creamer stated:

> The IRS ruling represents a significant milestone in the development of our license
> stewardship strategy," said Steve Creamer, Energy*Solutions* CEO and Chairman.
> "*We are pleased that the Zion decommissioning project continues its orderly*
> *progress toward start-up.*"

218.   The statements referenced in ¶217 were materially false and misleading when made for

the reasons set forth in ¶186 above.  Furthermore, the statements were materially false and

misleading when made because Defendants knew, or recklessly disregarded, that the shortfall in the

Zion Trust Fund would prevent the "orderly progress toward start-up."  Less than three months after

these statements, later the Company announced that the Zion Trust Fund was not adequate to go

forward with the Zion Project.

219.   Shares of the Company rose after the July 2008 offering, from an offering price of $19

per share on July 25, 2008 and traded as high as $21.46 per share on July 31, 2008.

220.   On August 11, 2008, the Company announced its financial results for the second

quarter of 2008 for the period ended June 30, 2008 ("2Q08") in a press release (the "8/11/08 Press

Release"), which stated in pertinent part as follows:

**Second Quarter 2008 Results**

> Revenues for the quarter ended June 30, 2008, were $460 million, compared
> to $162 million for the same quarter in 2007. Gross profit was $61.1 million,
> compared to gross profit of $45.7 million for the quarter ended June 30, 2007.
> Selling, general and administrative expenses were $29.9 million, compared to $23.0
> million in the same quarter of the prior year. Included in these expenses was $0.5
> million related to the Company's secondary offering of 40.25 million shares, on
> behalf of its majority shareholder, which was completed in July. It is estimated that

an additional $1.1 million of expenses related to the secondary offering will be incurred in the third quarter.

The Company generated cash flow from operations of $20.8 million during the quarter, which enabled it to repay $10 million of long-term debt. This repayment, together with the effect of lower interest rates and repayments of debt from the proceeds of the Company's initial public offering in November 2007, have contributed to the reduction of interest expense, which was $11.2 million in the second quarter of 2008, compared to $15.3 million in the same quarter of last year.

Net income for the quarter ended June 30, 2008 was $12.6 million, or $0.14 per diluted share, compared to $6.0 million for the same quarter a year ago. EBITDA during the quarter was $41.9 million, up from $32.3 million for the same quarter in the prior year, and net income before the non-cash impact of amortization of intangible assets was $17.2 million, or $0.19 per diluted share, based on 88.3 million fully diluted shares outstanding.

"In this, our second full quarter as a public company, I am very pleased with the performance of each of our business units and the progress each has made in executing our long-term strategic goals," said R Steve Creamer, the Company's Chief Executive Officer. "We had a strong second quarter, particularly in our international operations, where we exceeded our performance targets on our Magnox contracts in the United Kingdom, resulting in increased efficiency fees earned by the Company during the quarter."

\*        \*        \*

**Outlook for 2008**

"Stronger than expected performance this quarter, together with accelerated performance of commercial service contracts during the first quarter, will level out our earnings between the first half and second half of the year," Mr. Creamer added. "This is contrary to our forecasts at the beginning of the year, when we expected greater sales and earnings in the second half. *We still estimate our full year revenues should be in the range of $1.8 billion to $1.9 billion and earnings per share should be in the range of $0.69 to $0.74, excluding approximately $1.6 million of expenses related to the Company's secondary offering completed on July 31, 2008. We expect earnings per share before the impact of non-cash amortization of intangible assets should be in the range of $0.89 to $0.94, excluding offering expenses*," concluded Mr. Creamer. . . .

221.  The statements referenced in ¶220 above were materially false and misleading when made for the reasons set forth in ¶¶185-88 above.

222.  On August 11, 2008, the Company held a conference call with analysts (the "8/11/08 Conf Call") to discuss the financial results and other information set forth in the 8/11/08 Press Release.  Defendant Creamer discussed the license stewardship program:

> In our Commercial Services segment, license stewardship generally and design in particular continue to excite us. Design is still on schedule for license transfer in late Q3.  Two tasks that needed to be completed, the clarification of the tax status of the transfer of the trust fund without tax consequence and the amendments to our banking facilities to allow letters of credits to be issued for this project are both in place.
>
> A second project, while not as far along as Zion, has an internal target date for signing in Q1 of 2009 and a third project is behind that.

223.  The statements referenced in ¶222 above were materially false and misleading when made for the reasons set forth in ¶¶185-86 above.  Furthermore, the statement that the Zion Project "is still on schedule for license transfer in late Q3" was materially false and misleading when made because the Zion Trust Fund was not adequate to cover the costs of the Zion Project, which would delay the project and negatively impact its profitability to the Company.

224.  On the 8/11/08 Conf Call, Defendant Strawbridge discussed the outlook for the Company:

> Now I'm going to talk a little bit about our outlook that Steve's already alluded to before. The results of second quarter, as Steve and I have both discussed, benefited from strong earnings in our International operations. And this, along with the revenues and earnings that were pulled forward in the first quarter in our Commercial group, have served to level out our earnings for the year. We now expect our earnings in the second half of the year to be similar to the first half, with the fourth quarter being stronger than the third.
>
> **For the year we still expect full year revenues in the range of $1.8 billion to $1.9 billion, earnings per share in the range of $0.69 to $0.74, earnings per share** before non-cash impact of amortization of intangible assets, which is calculated as the earnings per share plus the per share non-cash impact of the amortization expense of intangible assets net of the related income tax expense, is in the range of $0.89 and $0.94. EPS assumes a weighted average fully diluted share count for the year of 89 million shares.

- 76 -

EBITDA for the year is expected to be between $195 million and $205 million. Non-cash amortization expense of the intangible assets, net of the related income tax expense, is expected to be $17.8 million. Compensation expense related to stock option grants is expected to be $9.1 million for 2008.

All the above numbers, as I stated before, does not include the impact of approximately $1.6 million of expenses related to the secondary offering.

CapEx for the year is expected to be approximately $37 million, which is above what we consider to be our maintenance CapEx level of about $20 million a year, primarily related to the one-time purchase of equipment at our Atlas Mill Trailings contracts that we've talked about before, and Moab.

***Results for the year and for the remaining two quarters will still be significantly affected by a number of key items. First Zion, following a second quarter decision on tax treatment, visibility of Zion is considerably improved and we're confident of an October 1 start date. We now await NRC approval of license transfer in the late third quarter***.

In order for us to issue the $200 million letter of credit connection with Zion, we had to amend our credit facilities with our banks to accommodate the increased exposure on their part. As a result of this amendment and the cost of obtaining the letter of credit, we expect interest expense in the second half for these costs to increase by about $3.5 million.

***Second, we still expect revenue from the movement of major components or from of the other large projects in our Commercial Services segment in the last quarter***. Our best current view of the business overall, together with these specific items, leads us to confirm our existing guidance for the year and to note that third and fourth quarters will be negatively impacted by significant amounts of earnings having been accelerated into the first and second quarters. This will effect the third quarter much more than the fourth.

225.   The statements referenced in ¶224 above were materially false and misleading when made for the reasons set forth in ¶¶185-86 above.  The statement that "we still expect full year revenues in the range of $1.8 billion to $1.9 billion, earnings per share in the range of $0.69 to $0.74, earnings per share" was materially false and misleading when made because there was no reasonable basis to maintain those forecasts.  Furthermore, there was no reasonable basis for Defendant Strawbridge to state that he is "confident of an October 1 start date [for the Zion Project]" or that "we still expect revenue from the movement of major components or from of the other large projects

in our Commercial Services segment in the last quarter" because revenue for major components was dependent upon a favorable ruling on the Petition, which was likely to be denied.

226.  On the 8/11/08 Conf Call, Defendant Creamer indicated that based in part on his conversations with people at the NRC, he is "confident" and "very comfortable" that the NRC would approve the rule making change and permit the Company to access decommissioning trust funds even though facilities were not shut-down:

*Scott Levine – JPMorgan – Analyst*

Good morning. **With regard to the NRC's view on component removal and your perspective on it now versus say six months ago, nine months ago, what level of conviction to you have with regard to their views being in line with yours in terms of the funding of these types of projects?** And if you could think of maybe like a bear caves versus a bull caves in terms of the timing on that, that would be helpful.

*Steve Creamer – EnergySolutions Inc.*

There was just a letter that came out over the weekend – it might have been Friday, with Chairman Klein formally requesting the rule making on the to-go vote situation. **I feel comfortable that it's going to get done. I think everyone out there does not want 104 nuclear junk yards around the country, they think things should be taken care of. And every indication we have is strong that way.**

I think there are issues with individual plants and individual fundings on some of the decommissioning plants, we're hearing rumblings back through the staff. **I mean bullish wise, I think we would have something, we'd hear something toward the end of third quarter. Bearish wise it could be out as far as Q1 or Q2 of next year.**

**I still feel confident that it will get done because we've had a lot of conversations at all levels in the NRC and we feel bullish that this is something that's important,** that the utilities – NEI, is strongly supporting and actually sent another letter to the NRC last week. We think there's a lot of support out there all the way through to get done.

The question is it is regulatory and it's hard to tell exactly when it going to actually come. We would have hoped it would have been earlier than this, but you know it's obviously going through a lot of review. And there are a lot of things going on in the NRC and new plants and everything else that can delay things.

*Scott Levine – JPMorgan – Analyst*

But in terms of your conviction around – you know that speaks to a timing issue, but in terms of your level of conviction there's no real change there?

- 78 -

*Steve Creamer – EnergySolutions Inc.*

*No I feel very comfortable we will get the rule change done.*

227.   Defendant Creamer's very positive statements in ¶226 above that the Petition would be approved by the NRC were materially false and misleading when made due to the reasons set forth in ¶187. Furthermore, the statements were materially false and misleading when made because there was no reasonable basis for Defendant Creamer to make those positive statements and all objective facts indicated that the NRC would reject – and not approve – the Petition. Indeed, CW4, the NRC employee responsible for the Petition expressed the NRC's strong views against the Petition.

228.   As a result of Defendants' positive statements about the rulemaking change for access to decommissioning trust funds, analysts covering the Company's stock viewed the rulemaking change as a certainty with the issue not being *if* the rule is changed but *when*. An analyst report from Credit Suisse dated August 13, 2008 maintained its "Outperform" rating on the Company and stated in pertinent part:

> **Project Timing**: First and foremost, there is still a probability the rulemaking for the large components business is changed in the Sept/Oct time period whereas early 2009 should be viewed as the worst case scenario.

### ADDITIONAL SCIENTER ALLEGATIONS

229.   As alleged herein, the Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Energy*Solutions*, their control

over, and/or receipt and/or modification of Energy*Solutions'* allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

230.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

231.    As alleged herein, at the time of the IPO, the July 2008 Offering and other statements alleged herein made during the Class Period, each of the Individual Defendants was aware of the true financial condition and prospects of the Company, including the problems with the License Stewardship Program and accessing the $2.9 to $3.1 billion D&D Market for shutdown reactors, the problems with the Zion Project (including the fact that the Zion Trust Fund had a substantial deficit), and the likelihood that the Petition would be rejected. Furthermore, each of the Defendants were aware of the negative impact that the slowing economy was having on Energy*Solutions'* business and potential projects. Furthermore, each of the Defendants were aware that the Company's earnings estimates and other forecasts for the remainder of 2008 and beyond were dependent upon generating revenues and earnings from the Zion project (which was underfunded so it could not proceed without a significant capital contribution from the Company) and the success of the Petition (which the Individual Defendants knew, or should have known, would likely be rejected by the NRC).

232.    According to CW8, who was personally involved with preparing accounting information for the IPO Prospectus, Defendants did not have a reasonable basis to discuss the future business opportunities of the Company in the IPO Prospectus due to its lack of operating experience

since the Company was cobbled together just a year before the IPO. The integration of the newly acquired companies into the EnergySolutions corporate entity faced important adjustments and inefficiencies developed in connection with the integration.

233.    According to CW8, EnergySolutions put its positive "spin" on the numbers in the IPO Prospectus when discussing the outlook for the Company. According to CW8, these disclosures in the IPO Prospectus were handled by the Company's senior executives, including Defendant Creamer, and the top management in the Business Development/Sales and Regulatory Departments.

234.    CW8 added that forecasts provided by Defendants during the Class Period were not realistic and based on inaccurate assumptions about revenues and earnings. According to CW8, EnergySolutions' "highest level" of management, including Defendants Creamer and Strawbridge and senior business development employees, including Rafati, took a "hands-on" approach to preparing the budget and its updates and the Company's forecasts.

235.    CW8 stated that sales revenue forecasts were overly optimistic. This information was based on conversations CW8 witnessed as an observer at weekly business development meetings, in which Defendant Creamer participated in and Rafati ran. The meetings covered existing and upcoming projects and about 20 people regularly attended these meetings – mostly from the Business Development department. According to CW8, the meetings began about the time the Company took the name EnergySolutions (before the IPO); were held on Monday mornings in the Board Conference Room of the Salt Lake City headquarters; and were "lengthy," lasting for a period of about two-to-three hours. The cost estimates for the Zion Project were set at these meetings.

236.    A major purpose of the weekly meetings was to update expected sales- revenue flows from current and future projects for the next upcoming 12-month period. Defendant Creamer and Rafati took a very hands-on approach to this effort, exercising their influence to make the numbers

appear better than they actually were and pressured other employees to follow along. According to CW8, the dollar amounts and time-line of expected sales revenue were inaccurate and did not reflect what was going on at the Company at the time. According to CW8, as time passed, the Company did not generate the revenues or earnings and projects were pushed out further in time, as revealed at the end of the Class Period.

237.   Additionally, the fraud alleged herein relates to the core business of Energy*Solutions* and its primary growth prospects so knowledge of the fraud may be imputed to Defendants. Given Defendants' knowledge of the truth concerning the License Stewardship Program, the problems with the Zion Project (and inadequate size of the Zion Trust Fund and related expenses) and probable rejection of the Petition, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

238.   Defendants' materially false and misleading statements and material omissions caused Energy*Solutions*' stock to be artificially inflated.

239.   Additionally, Defendants possessed substantial motives for misrepresenting Energy*Solutions*' financial status, operations, and prospects throughout the Class Period.

240.   Prior to the IPO, ENV Holdings owned 75.15 million shares of the Company. The Individual Defendants and ENV Holdings misrepresented the nature and size of the Company's growth prospects so that they could sell more than 20 million shares of stock to investors in the IPO at $23 per share for $463 million. Defendants misrepresented other statements after the IPO to artificially inflate the Company's stock price, and then merely 8 months after the IPO, when the Company's stock was artificially inflated as a result of Defendants' materially false and misleading statements, sold 40.25 million shares of the Company at $19 per share for another $764 million in

the July 2008 Offering. In total, the Individual Defendants, through ENV Holdings, sold more than 60 million shares of the Company for more than $1.2 billion.

241. Following the July 2008 Offering, cash distributions from the sale of shares of Company's common stock were made to ENV Holdings' members, on a *pro rata* basis. After the end of the Class Period, ENV Holdings liquidated its remaining position in the Company and ENV Holdings was liquidated. Distributions of ENV Holdings' remaining shares of Company common stock were distributed to Defendants on a *pro rata* basis. As of February 13, 2009, ENV Holdings was no longer a shareholder of the Company. ENV Holdings' sales of the Company's stock during the Class Period are reflected in the below chart:

| ENV Holdings LLC | Date | Shares | Price | Proceeds | Percent of Holdings Remaining |
|---|---|---|---|---|---|
| | 11/20/07 | 18,150,000 | $23.00 | $417,450,000 | 75.85% |
| | 12/12/07 | 1,996,500 | $23.00 | $45,919,500 | 73.19% |
| | 07/30/08 | 35,000,000 | $19.00 | $665,000,000 | 26.62% |
| | 08/04/08 | 5,250,000 | $19.00 | $99,750,000 | 19.63% |
| | | 60,396,500 | | $1,228,119,500.00 | |

242. Thus, prior to the IPO, Defendants through their holdings in ENV Holdings owned 100% of the shares in the Company. Defendants reduced ENV Holdings' ownership from 100% to 73% as a result of the IPO and then reduced ENV Holdings' ownership from 73% to 20% as a result of the July 2008 Offering.

243. According to CW7, Energy*Solutions'* senior executives, including the Individual Defendants, used the Zion Project to "pimp the Company's stock [*i.e.*, pump up the stock price] and then sold the stock" through ENV Holdings.

244. Finally, the Company used $6.9 million of the net proceeds of the IPO to make payments to members of the Company's management pursuant to provisions in their employment agreements, including payments to Defendants Creamer and Everest of $2.3 million and $2.1

million, respectively. Five other members of the Company's management who were not executive officers received an aggregate of $2.5 million.

## LOSS CAUSATION/ECONOMIC LOSS

245.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Energy*Solutions*' common stock and operated as a fraud or deceit on Class Period purchasers of Energy*Solutions*' common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Energy*Solutions*' common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Energy*Solutions*' common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

246.   Defendants' false and misleading statements had the intended effect and caused Energy*Solutions*' common stock to trade at artificially inflated levels throughout the Class Period.

247.   As a direct result of Defendants' disclosures set forth above, the price of Energy*Solutions*' common stock fell precipitously. These drops removed the inflation from the price of ES common stock, causing real economic loss to investors who had purchased Energy*Solutions*' common stock during the Class Period.

248.   On October 14, 2008, Energy*Solutions* announced that there was a delay in the Zion Project, that the NRC denied its Petition, and that the Company was reducing its revenues and earnings, as set forth in ¶146 above. In response to the Company's announcement on October 14, 2008, shares of the Company's stock fell $4.50 per share, or 44%, from a close of $10.14 per share before the announcement, to close at $5.64 per share, on extremely heavy trading volume of 9.4 million shares.

249.   The decline in the price of Energy*Solutions*' common stock after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of the price decline in Energy*Solutions*' common stock negates any inference that the loss suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Energy*Solutions*' common stock and the subsequent significant decline in the value of Energy*Solutions*' common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

250.   At all relevant times, the market for Energy*Solutions*' common stock was an efficient market for the following reasons, among others:

(a)    Energy*Solutions*' common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Energy*Solutions* filed periodic public reports with the SEC and the NYSE;

(c)    Energy*Solutions* regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Energy*Solutions* was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

251.    As a result of the foregoing, the market for EnergySolutions' common stock promptly digested current information regarding EnergySolutions from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of EnergySolutions' common stock during the Class Period suffered similar injury through their purchase of ES common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

252.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of EnergySolutions who knew that those statements were false when made.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against EnergySolutions, the Individual Defendants and ENV Holdings

253.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

254. This Count is asserted against Energy*Solutions*, the Individual Defendants, and ENV Holdings for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

255. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

256. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

257. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below

258. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and

activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, and/or projections; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and liabilities at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

259.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with the growth opportunities presented by the Company, the problems with the License Stewardship Program and the Zion Project, and the significant risks and likelihood that the Petition would be rejected by the NRC from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

260.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Energy*Solutions*' shares were artificially inflated during the Class Period.  In ignorance of the fact that market prices of

Energy*Solutions*' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Energy*Solutions* securities during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

261.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Energy*Solutions* shares, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

262.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

263.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Energy*Solutions*' common stock during the Class Period.

**COUNT V**

**Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants and ENV Holdings**

264.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.   This Count is asserted against the Individual Defendants and ENV Holdings for violation of Section 20(a) of the Exchange Act.

265.   The Individual Defendants and ENV Holdings acted as controlling persons of Energy*Solutions* within the meaning of Section 20(a) of the Exchange Act.   ENV Holdings controlled a majority of the shares of the Company during most of the Class Period and controlled the Company's board of directors and management.

266.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants and ENV Holdings had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.   The Individual Defendants and ENV Holdings were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

267.   As set forth above, Energy*Solutions*, ENV Holdings and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants and ENV Holdings are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of

Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.    with respect to Count II, Ordering that the IPO and the July 2008 Offering be rescinded;

D.    awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.    awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  April 20, 2010                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          EVAN J. KAUFMAN


                                          EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Attorneys for Lead Plaintiffs*

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Evan J. Kaufman, hereby certify that on April 20, 2010, I caused a true and correct copy of the attached:

Consolidated Amended Complaint for Violation of the Federal Securities Laws to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

Evan J. Kaufman

ENERGYSOLUTIONS

Service List - 4/20/2010    (09-0185)

Page 1 of 1

**Counsel For Defendant(s)**

Adam S. Hakki
Daniel C. Lewis
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-4676
  212/848-4000
  212/848-7179(Fax)

Bruce D. Angiolillo
Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017-3954
  212/455-2000
  212/455-2502(Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173(Fax)

Michael J. VanOverbeke
Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI  48201
  313/578-1200
  313/578-1201(Fax)