United States District Court
Southern District of New York
_____

CITY OF ROSEVILLE EMPLOYEES'
RETIREMENT SYSTEM, ET AL.,

                            **Plaintiffs,**

        - against -

ENERGYSOLUTIONS, INC., ET AL.,

                            **Defendants.**
_____

**09 Civ. 8633 (JGK)**

<u>OPINION AND ORDER</u>

**JOHN G. KOELTL, District Judge:**

    This is a securities action brought on behalf of a proposed class of acquirers of common stock or depository shares of EnergySolutions, Inc. ("ES" or the "Company") in or traceable to a November 14, 2007 initial public offering (the "IPO") or a July 24, 2008 offering (the "July 2008 Offering") (collectively, the "Offerings").  The lead plaintiffs allege causes of action against ES, 12 officers or directors of ES, ES's sole stockholder prior to the public offerings, and three underwriters under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), 77o; under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The

defendants move to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

A claim under Section 10(b) sounds in fraud and must meet
the pleading requirements of Rule 9(b) of the Federal Rules of
Civil Procedure and the Private Securities Litigation Reform Act
of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  Rule 9(b) requires
that the complaint "(1) specify the statements that the
plaintiff contends were fraudulent, (2) identify the speaker,
(3) state where and when the statements were made, and (4)
explain why the statements were fraudulent." ATSI Commc'ns,
Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The
PSLRA similarly requires that the complaint "specify each
statement alleged to have been misleading[ and] the reason or
reasons why the statement is misleading," and it adds the
requirement that "if an allegation regarding the statement or
omission is made on information and belief, the complaint shall
state with particularity all facts on which that belief is
formed."  15 U.S.C. § 78u-4(b)(1); see also ATSI, 493 F.3d at
99.

When claims under sections 11 or 12 of the Exchange Act
"are premised on allegations of fraud," they must also satisfy
Rule 9(b).  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).
If they sound in negligence, however, claims under sections 11
or 12 need only satisfy the less rigorous requirements of
Federal Rule of Civil Procedure 8(a).  See Litwin v. Blackstone
Grp., L.P., 634 F.3d 706, 717-18 (2d Cir. 2011), petition for

cert. filed, 2011 WL 2593465 (U.S. June 28, 2011) (No. 11-15);
see also In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632
(S.D.N.Y. 2007).

When presented with a motion to dismiss pursuant to Rule
12(b)(6), the Court may consider documents that are referenced
in the complaint, documents that the plaintiffs relied on in
bringing suit and that are either in the plaintiffs' possession
or that the plaintiff knew of when bringing suit, or matters of
which judicial notice may be taken. See Chambers v. Time Warner,
Inc., 282 F.3d 147, 153 (2d Cir. 2002); Rorech, 673 F. Supp. 2d
at 221.


## II.

The following facts are undisputed, unless otherwise
indicated.


### A.

ES was established to provide services such as engineering,
spent fuel management, decontamination and decommissioning
("D&D"), and similar services to nuclear power plants and other
commercial facilities.  (Second Am. Compl. ("SAC") ¶ 51.)  A
group of investors at three investment companies -- Lindsay
Goldberg; Peterson Partners L.P.; and Creamer Investments, Inc.
(collectively, the "Sponsors") -- formed ES by purchasing and

integrating existing companies in the radioactive waste disposal business through a company named ENV Holdings, Inc. ("ENV"). (SAC ¶¶ 2, 53-54.)  At the time of the IPO, ENV was the sole stockholder of ES.  (Youngwood Decl. Ex. A ("Nov. 2007 Reg. Stmt."), at 6.)

"Commercial nuclear services primarily consist of specialized nuclear fuel cycle services provided to the 104 operating nuclear reactors in the United States, as well as D&D services provided to the nuclear reactors that have been shut down."  (SAC ¶ 52; Nov. 2007 Reg. Stmt. at 2; Youngwood Decl. Ex. B ("July 2008 Reg. Stmt."), at 2.)  According to ES's Registration Statements, ES held "life-of-plant" ("LOP") contracts with 82 of the country's 104 operating nuclear reactors, under which ES would "process and dispose of substantially all low-level radioactive waste, or LLRW, and mixed low-level waste, or MLLW, generated by their nuclear power plants, and ultimately the waste materials generated from the [D&D] of those plants."  (Nov. 2007 Reg. Stmt. at 1; July 2008 Reg. Stmt. at 1.)

ES stated that one of its primary business strategies was to "[f]ocus on [d]ecommissioning of [s]hut-down U.S. [r]eactors."  (Nov. 2007 Reg. Stmt. at 4; July 2008 Reg. Stmt. at 4; SAC ¶ 87.)  Under Nuclear Regulatory Commission ("NRC") rules, an owner wishing to decommission a nuclear reactor can

5

either (a) immediately dismantle the plant, (b) put the plant in
safe storage while residual radioactivity decays ("SAFSTOR"), or
(c) entomb radioactive material.  (SAC ¶ 68.)  The NRC allows
for completion to span up to 60 years.  (SAC ¶ 69.)  Among other
requirements, decommissioning activities cannot be conducted
without specific prior NRC approval if they would "result in
there being no reasonable assurance that adequate funds will be
available for decommissioning."  (SAC ¶ 73.)

The Registration Statements stated that ES was "actively
marketing [its] D&D services for shut-down reactors to nuclear
power and utility companies."  (Nov. 2007 Reg. Stmt. at 4; July
2008 Reg. Stmt. at 4.)  According to ES, 13 nuclear reactors
were then in "various stages of shut-down" and maintained an
aggregate pool of over $2.9 billion in dedicated decommissioning
funds.  (Nov. 2007 Reg. Stmt. at 4; July 2008 Reg. Stmt. at 4.)
The Company stated that its "unique license stewardship
initiative for shut-down reactors" (the "License Stewardship
Initiative") gave it the potential to "accelerate D&D activities
by several years" by obtaining an NRC license for a given
reactor site, acquiring the site and the associated
decommissioning fund from the owning utility, performing the
necessary D&D work, and then returning the site to its original
owner.  (Nov. 2007 Reg. Stmt. at 4; July 2008 Reg. Stmt. at 4.)
The Registration Statements said: "We believe that we are well-

positioned to compete for this D&D outsourcing work." (Nov. 2007 Reg. Stmt. at 4; July 2008 Reg. Stmt. at 4.)

The Registration Statements identified thirteen nuclear reactors in particular that were "currently shut down and awaiting D&D" at the time of the IPO and the July 28 Offering. (Nov. 2007 Reg. Stmt. at 81; July 2008 Reg. Stmt. at 75.) In December 2007, the Company announced that it had entered into an agreement (the "Zion Agreement") to purchase the Zion power plant, including the assets in Zion's decommissioning trust fund. (Youngwood Decl. Ex. C ("Dec. 2007 Form 8-K"), at 2.) The Zion plant included two of the thirteen reactors on ES' list. (Nov. 2007 Reg. Stmt. at 80; July 2008 Reg. Stmt. at 75.) ES, through a wholly owned subsidiary, would "complete the required decommissioning work according to an established schedule." (Dec. 2007 Form 8-K at 2.) This "Zion Project" was conditioned on ES delivering a $200 million letter of credit. (Dec. 2007 Form 8-K at 2.) In the Registration Statements and a December 2007 Form 8-K, ES represented the trust fund to contain between $858 and $860 million, or "approximately $900 million," in assets. (SAC ¶ 100; Nov. 2007 Reg. Stmt. at 81; July 2008 Reg. Stmt. at 75; Dec. 2007 Form 8-K at 2.)

ES also stated an intention to expand its commercial services business, particularly with companies with which it already had LOP contracts. The Registration Statements noted

that "the NRC is reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for disposal of large components that have been retired from use in nuclear services," and stated a belief that "the adoption of this proposal would be a significant opportunity for [ES] to expand" its commercial services business.  (Nov. 2007 Reg. Stmt. at 5; July 2008 Reg. Stmt. at 5.)

On October 14, 2008, the Company announced that the trust fund for Zion had significantly declined in value and the Company would not move forward with the Zion Project at that time, that the NRC had rejected the proposal for using decommissioning funds for the disposal of large components, and that ES's revenue and earnings estimates would need to be significantly reduced.  (SAC ¶ 6.)  The Company's stock fell 44% that day, and more than 60% overall in the following month. (SAC ¶¶ 6, 183.)


                              **B.**

The lead plaintiffs in this case are City of Roseville Employees' Retirement System ("Roseville"), Building Trades United Pension Trust Fund ("Building Trades"), and New England Carpenters Guaranteed Annuity and Pension Funds ("Carpenters"). (SAC ¶¶ 22-24.)  The lead plaintiffs propose to represent a class of all persons who acquired ES's common stock or

depository shares in or traceable to the IPO or the July 2008
Offering and all purchasers of ES's common stock or depository
shares between the November 14, 2007 IPO and October 14, 2008
announcement (the "Class Period").  (SAC ¶ 1.)

## C.

The plaintiffs allege that the Registration Statements and
other statements made by the defendants contained false or
misleading statements or omitted material facts related to five
topics: (a) the impact of the LOP contracts on waste disposal
opportunities; (b) opportunities in the shut-down nuclear
reactor market; (c) the viability of the Zion Project; (d) the
likelihood that the NRC would allow the use of decommissioning
trust funds for the disposal of large components and that ES
would obtain disposal contracts as a result; and (e) the
potential adverse effects of macro-economic conditions.  (Defs.'
Mem. of Law in Supp. of Defs.' Mot. to Dismiss the SAC ("Defs.'
Mem."), at 6-10.)[1]

---

[1] The Second Amended Complaint is extremely diffuse, covering 117
pages and 311 paragraphs.  At oral argument, however, the
plaintiffs agreed that the defendants' classification of alleged
misrepresentations was appropriate.  (June 16, 2011 Hr'g Tr.
("Tr."), at 37.)

1.

The Registration Statements stated that, under the LOP contracts, ES had "agreed to process and dispose of substantially all [LLRW] and [MLLW] generated by" 82 of the 104 operating nuclear reactors in the United States, along with, "ultimately[,] their D&D waste materials." (Nov. 2007 Reg. Stmt. at 1, 5; July 2008 Reg. Stmt. at 1, 5.) According to the plaintiffs, those contracts "contained various provisions that were detrimental to the business prospects of the Company related to the large components business, including any business related to the NRC's approval of ES' Petition for Rulemaking, and the License Stewardship Initiative." (SAC ¶ 79.) The plaintiffs claim that the LOP contracts in fact "would hinder -- rather than help -- the generation of future revenues and business opportunities." (SAC ¶ 79.)

The Second Amended Complaint identifies three ways that the LOP contracts allegedly diminished ES's prospects. First, "ES agreed to charge an initial preferred and low price for certain types of waste materials accompanied by fixed price escalation during the term of the agreement." (SAC ¶ 80.) The LOP contracts required customers "to use ES to dispose of certain limited types of operational waste with ES -- such as Class A operational [LLRW] and a small portion of MLLW -- but [did not require customers] . . . to dispose of most types of MLLW."

10

(SAC ¶ 80.)  Because the price escalation rates in the LOP
contracts were lower than the historic cost increases of waste
disposal services and lower than the average rates of return on
investments, the Second Amended Complaint alleges, "it was
economically advantageous for a customer to invest its funds,
place its waste in storage, and defer the disposal of waste into
the distant future."  (SAC ¶ 81.)  Thus, the plaintiffs contend,
the LOP contracts negatively affected "near-term spending on
disposal . . . which was contrary to Defendants' statements . .
. of an attractive business opportunity for ES for the disposal
of waste."  (SAC ¶ 81.)

     The plaintiffs allege that ES analyzed this issue and
"proved it was more economically advantageous for customers to
invest their capital and put off disposing of their waste at
ES."  (SAC ¶ 82.)  The Second Amended Complaint provides one
specific example of a power plant that "would have saved
$600,000 if it invested its $6.6 million and then disposed of
its waste in 20 years."  (SAC ¶ 83.)

     Additionally, the plaintiffs allege, it was misleading to
state that ES had "agreed to process and dispose of
substantially all . . . MLLW" because ES had agreed only "to
dispose of the small portion of MLLW described as Macro
Exposure" and not "the vast majority of MLLW, including services
for Stabilization, Thermal Treatment and Solidification of

MLLW." (SAC ¶¶ 152-53.) Further, although ES stated that it "typically expect[ed] the duration of these contracts to be approximately 30 years," each LOP contract was set to reopen for renegotiation of price terms and other terms between 2015 and 2017. (SAC ¶ 153.)

2.

The plaintiffs next allege that the shut-down reactor market actually presented few opportunities for D&D. The Registration Statements described a "unique stewardship initiative" for shut-down reactors whereby ES could "potentially accelerate D&D activities by several years." (Nov. 2007 Reg. Stmt. at 4; July 2008 Reg. Stmt. at 4.) The Second Amended Complaint alleges that "most of the potential market for the license stewardship program was non-existent -- at least for many, many years." (SAC ¶ 90.)

The NRC requires a sufficient decommissioning trust fund before major decommissioning activities may proceed. According to the plaintiffs, four of the five companies that the defendants specifically identified as being among its commercial customers had "Trust Fund shortfalls of hundreds of millions of dollars at the time of the IPO and a combined shortfall of approximately $1 billion by the time of the July 2008 Offering." (SAC ¶¶ 90, 92.)

12

The Registration Statements specifically identified thirteen reactors that were "currently shut down and awaiting D&D," and noted that "[a]lthough contracts for the D&D of these reactors have not yet been awarded, we have established relationships with some of the owners of these reactors and believe that we are well-positioned to pursue these contracts when they are made available." (Nov. 2007 Reg. Stmt. at 81; July 2008 Reg. Stmt. at 75.) The Registration Statements stated that their combined trust fund balances were $2,924 billion at the time of the IPO and $3,123 billion at the time of the July 2008 Offering. (Nov. 2007 Reg. Stmt. at 81; July 2008 Reg. Stmt. at 75.)

In reality, the plaintiffs allege, "many of these facilities were a long way from any major decommissioning activities, were under the control of an owner-operator that had deficient trust funds, were already under the control of the existing owner-operator for decommission activities and therefore would not be interested in the License Stewardship Initiative, or would not generate significant decommissioning revenues." (SAC ¶¶ 93-94.) The Second Amended Complaint alleges that two of the companies responsible for reactors with decommissioning trust funds of over $550 million in total had already informed ES that they were not interested in ES's license stewardship initiative; two companies responsible for

reactors with decommissioning trust funds of over $440 million had already begun decommissioning activities without using ES; and many reactors were not likely to begin decommissioning until 2020 or later.  (SAC ¶ 94.)

The plaintiffs further allege that the cumulative decommissioning trust funds rapidly decreased in value during the Class Period.  (SAC ¶ 95.)  They also allege that "ES did not have the manpower to take on more than one License Stewardship at a time."  (SAC ¶ 96.)  In summary, the Second Amended Complaint alleges, "[t]he shut-down reactor market represented by Defendants did not reflect the real near-term or even medium-term business opportunity for the License Stewardship Initiative -- which was close to zero."  (SAC ¶ 96.)


3.

The plaintiffs next allege that the Zion Project could not move forward because "the decommissioning trust fund at Zion (the 'Zion Trust Fund') was not sufficient to fund the cost of decommissioning."  (SAC ¶ 98.)  In a December 11, 2007 press release, ES stated that it "d[id] not expect that conditions to the completion of the transactions [underlying the Zion Project would] be satisfied before the second half of 2008."  (SAC ¶ 226.)  In a March 18, 2008 conference call, the Company's Chief Financial Officer ("CFO"), Phillip O. Strawbridge

14

("Strawbridge"), stated that ES anticipated "more active decommissioning" of Zion to begin in the fourth quarter of 2008. (SAC ¶ 239.)  In an August 11, 2008 conference call, Strawbridge refined that estimate to an "October 1 start date." (SAC ¶ 269.)

The November 2007 Registration Statement said that the Zion Trust Fund was worth $858 million; the December 2007 Form 8-K, "approximately $900 million"; and the July 2008 Registration Statement, $860 million. (SAC ¶ 100; Nov. 2007 Reg. Stmt. at 81; July 2008 Reg. Stmt. at 75; Dec. 2007 Form 8-K at 2.) However, the plaintiffs allege that as of November 30, 2008, over a month after the close of the Class Period, the balance in the trust fund was approximately $727 million. (SAC ¶ 100.) According to a confidential witness who worked for ES "in cost accounting on the decommissioning project for Zion, . . . the Zion Trust Fund had declined in value by May 2008." (SAC ¶ 101.)

Moreover, the plaintiffs allege, even the balances represented in the Registration Statements were inadequate to cover the expenses for the Zion Project.  The Second Amended Complaint states that Exelon, Zion's owner, estimated that decommissioning would cost "approximately $1.091 billion" and that decommissioning could not commence at that time. (SAC ¶

15

103.)  ES similarly estimated that decommissioning would cost $978 million.  (SAC ¶ 104.)

Along with the trust fund issues, the plaintiffs allege, ES could not begin decommissioning Zion "until late 2010 at the earliest, in part due to issues with spent fuel."  (SAC ¶ 105.) And even if decommissioning could proceed, "the terms of the agreement with Zion required that any cost savings achieved by ES would have to be passed back to Exelon."  (SAC ¶ 106.) Nevertheless, the defendants "included revenues from the Zion project in [their] financial outlook for 2008."  (SAC ¶ 105.)

### 4.

The Registration Statements also represented that the NRC was "reviewing a proposal to permit operators of nuclear reactors to access decommissioning funds for disposal of large components that have been retired from use in nuclear reactors" at facilities that remained operational.  (Nov. 2007 Reg. Stmt. at 5; July 2008 Reg. Stmt. at 5.)  They stated that the defendants believed that "the adoption of this proposal would be a significant opportunity for [ES] to expand" its commercial services business.  (Nov. 2007 Reg. Stmt. at 5; July 2008 Reg. Stmt. at 5.)  CFO Strawbridge stated in a conference call on May 13, 2008 that ES "expect[ed] the NRC to change their rule . . . . before the fourth quarter of [2008], or around the fourth

16

quarter." (SAC ¶ 254.) ES's Chief Executive Officer ("CEO")
and the Chairman of its Board of Directors, R. Steve Creamer
("Creamer"), stated at an August 11, 2008 conference call that
he was "comfortable" and "confident" that the petition would be
approved. (SAC ¶ 271.) The plaintiffs allege that these
statements were materially false or misleading because it was
against NRC rules to use decommissioning trust funds to dispose
of large components and the NRC was "virtually certain" to
reject the proposal. (SAC ¶ 110.)

Since 1983, the NRC had prohibited operational facilities
from accessing decommissioning trust funds prior to plant
shutdown. (SAC ¶¶ 109, 117-18.) The costs of removing,
disposing, or storing large components had to come instead from
operating funds. (SAC ¶¶ 112-13.)[2] ES sought to change this
rule by filing a Petition for Rulemaking with the NRC. (SAC ¶
111.)

Since 1983, the NRC had repeatedly reinforced the original
rule or rejected proposals to eliminate it. In 1988, the NRC
tightened restrictions on the use of funds allotted for
decommissioning. (SAC ¶ 122.) The NRC reiterated, clarified,
or strengthened the rule at least six separate times between

---

[2] These costs were subject to the price escalation clauses of the
LOP contracts described above; accordingly, the plaintiffs
allege, it was more economically advantageous to customers to
store large components for an extended period of time than to
dispose of them promptly. (SAC ¶¶ 108, 112-13.)

1988 and 2001.  (SAC ¶¶ 122-33.)  It also rejected a similar proposal in 1995.  (SAC ¶ 128.)  Then, in 2004, the DC Cook Plant filed a petition that was "almost identical" to the one ES would file three years later, only to withdraw the petition to "save face" after being informed by the NRC that the petition "was against longstanding NRC policy and that the NRC would reject the petition."  (SAC ¶ 135.)  The Second Amended complaint alleges that ES had first-hand knowledge of the reason for this withdrawal.  (SAC ¶ 136.)  Moreover, according to the Second Amended Complaint, eight utilities told ES that they "did not believe the Petition would be approved, and that even if the Petition was approved they would not retain ES for disposal of large components."  (SAC ¶ 138.)

The NRC rejected ES's petition sometime prior to October 14, 2008.  (SAC ¶¶ 140-42, 182.)


5.

Finally, the Second Amended Complaint alleges that "declining economic conditions were negatively impacting the Company's Federal contracts side of the business" as early as January and February 2008, leading to "a decline in ES' business in the 2007-08 timeframe."  (SAC ¶ 143.)  Economic conditions also decreased the value of decommissioning trust funds,

negatively impacting the potential of the License Stewardship
Initiative.  (SAC ¶ 144.)


**D.**

The plaintiffs sue a number of defendants for these alleged
misstatements.  First, they sue ES itself.  Second, they sue
ENV.  ENV held 100% of the shares of the Company prior to the
IPO; during the IPO and the July 2008 Offering, ENV sold
approximately 80% of its shares in return for over $1.2 billion,
and subsequently transferred the remainder of its shares to its
members.  (SAC ¶¶ 2, 55, 66, 284.)

Third, they sue Credit Suisse Securities (USA) LLC, J.P
Morgan Securities Inc., and Morgan Stanley & Co. Incorporated
(collectively, the "Underwriter Defendants"), each of which
allegedly "acted as a lead underwriter . . . and helped to draft
and disseminate the Prospectuses for the two Offerings."  (SAC
¶¶ 39-41.)  The Second Amended Complaint alleges that the
Underwriter Defendants did not "ma[k]e a reasonable
investigation or possess[] reasonable grounds for the belief
that the statements . . . in the Registration Statements and
Prospectuses . . . were true, were without omission of any
material facts, and/or were not misleading."  (SAC ¶ 194.)

Fourth, the plaintiffs sue eleven individuals who served as directors and/or officers of ES.  (SAC ¶¶ 26-38.)[3]  These Individual Defendants are ES's Chairman and CEO Creamer; Strawbridge, Executive Vice President and CFO of ES; Jean I. Everest II ("Everest"), Vice Chairman of ES's Board of Directors; Mark C. McBride ("McBride"), Senior Vice President and Corporate Controller of ES; Lance L. Hirt, a director of ES and, until November 2007, Chairman of the Board; David B. Winder ("Winder"), Jordan W. Clements, and Andrew S. Weinberg, directors of ES; and Alan E. Goldberg, Robert D. Lindsay, and Robert J.S. Roriston ("Roriston"), directors until October 1, 2008.  (SAC ¶¶ 26-37.)  (Except as otherwise noted, the positions listed were held throughout the Class Period.)  In addition, several defendants had relationships with one of the Sponsors: Creamer was a founder of Creamer Investments, Inc., and Everest was "affiliated" with the company; Clements was managing partner of Peterson Partners L.P.; and Lindsay and Goldberg were the cofounders of Lindsay Goldberg, where Hirt, Roriston, and Weinberg were partners.  (SAC ¶¶ 26, 28, 31-35, 37.)

---

[3] The Second Amended Complaint names twelve individual defendants.  However, one of those defendants, E. Gail de Planque, has since passed away and the plaintiffs voluntarily dismissed her from this action.  (Tr. at 45.)  Accordingly, she will not be discussed in this Opinion.

Each of these defendants are alleged to have "signed or authorized the signing of" both Registration Statements.  (SAC ¶¶ 26-37.)[4]  Additionally, each except for McBride and Winder are alleged to have held some interest in ENV, either directly or through membership in Lindsay Goldberg or Peterson Partners. (SAC ¶¶ 26-37.)  The plaintiffs allege that the only members of ENV aside from the Sponsors and Individual Defendants were "certain of the Company's senior employees."  (SAC ¶ 55.) Direct holdings in ENV range from .39% for Strawbridge to 10.29% for Creamer.  (SAC ¶¶ 26-27.)  The Second Amended Complaint alleges that an affiliate of Lindsay Goldberg held 71.4% of the economic interest in ENV prior to the IPO, Peterson Partners held 5.6%, and the Company's senior management team held the remaining 22.9%.  (SAC ¶ 56.)

The Second Amended Complaint also alleges that some of the Individual Defendants specifically knew the information that made the Registration Statements allegedly misleading. According to the Second Amended Complaint, Creamer, Everest, and Strawbridge were told that the price structure of the LOP

---

[4] Roriston and Winder did not sign the November 2007 Registration Statement, although they did sign the July 2008 Registration Statement.  (Nov. 2007 Reg. Stmt. at II-5; July 2008 Reg. Stmt. at S-1 to S-2.)  At the time of the November 2007 Registration Statement and the IPO, Roriston and Winder had been nominated as directors and had given consent to be named as nominees in the Registration Statement, but appear not to have yet become directors.  (Nov. 2007 Reg. Stmt. EX-99.1 to EX-99.3.)

contracts made it more economically beneficial for its customers to store waste, rather than dispose of it with ES.  (SAC ¶¶ 82-83.)  Creamer, nevertheless, "told ES employees that he wanted numerous LOP Contracts in place before the Company's IPO and that it was crucial . . . in order to support the valuation of the Company's shares in the IPO and beyond."  (SAC ¶ 86.)

Creamer, Everest, and Strawbridge also allegedly were told during business development meetings the shut-down reactor market was not in fact the $2.9 to $3.1 billion market represented in the Registration Statements, because the decommissioning of the reactors was not expected for a decade or more, or because the reactors' owners had already rejected a LOP contract with ES.  (SAC ¶ 93-94.)  As to the Zion Project in particular, the Second Amended Complaint alleges that the Company "performed extensive due diligence on Zion" and "monitored the Zion Trust Fund closely"; that "a former employee of ES who worked in cost accounting on the decommissioning project for Zion . . . knew that the Zion Trust Fund had declined in value by May 2008" and discussed the matter with the head of the Zion Project, who is not a defendant; and that the Company "computed its own cost estimates, for the Zion Project," which showed the trust fund to be "more than $100 million deficient since the time of the IPO."  (SAC ¶¶ 99, 101, 104.)

Creamer was also allegedly at meetings "where it was discussed that it was highly probable, if not a virtual certainty, that the NRC would reject the petition" to allow the use of decommissioning funds for disposal of large components. (SAC ¶ 114.)  Unnamed ES executives also allegedly were told of DC Cook's experience and utility owners' disinclination to contract with ES for disposal of large components even if the petition were to be granted.  (SAC ¶¶ 136, 138-39.)

Additionally, Creamer allegedly "sanctioned" the manipulation of cost estimates for the Zion Project, and he and Strawbridge allegedly generated inflated revenue outlooks that they were told by business development teams could not actually be generated.  (SAC ¶¶ 216-24.)

### III.

The Second Amended Complaint contains five causes of action.  Against ES, the Individual Defendants, and ENV, the plaintiffs bring a claim for a violation of section 10(b) of the Exchange Act and Rule 10b-5.  Against all defendants, the plaintiffs bring claims for violations of sections 11 and 12(a)(2) of the Securities Act.  And against the Individual Defendants and ENV, the plaintiffs bring claims of control person liability under section 15 of the Securities Act and

section 20 of the Exchange Act for the primary violations alleged in the other three claims.

The defendants move to dismiss all claims.  As to the section 10(b) claim, they argue that the Second Amended Complaint fails to allege any material misstatement or omission, scienter, or loss causation.  As to the section 11 and 12(a)(2) claims, they argue that the Second Amended Complaint fails to allege either material misstatements or omissions, that it does not adequately plead loss causation, and that the Registration Statements contain all required disclosures.  As to the control person claims, they argue that these necessarily fail because of the deficiencies in the alleged primary violations.

## IV.

Section 10(b), as implemented by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's

action caused injury to the plaintiff.  Ganino v. Citizens
Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

      The defendants argue that the section 10(b) claim fails
because the Second Amended Complaint fails to allege with
particularity any material misstatement or omission or facts
giving rise to a strong inference of scienter, and that it does
not adequately plead loss causation.  After the Court invited
the parties to address the Supreme Court's recent decision in
Janus Capital Group, Inc. v. First Derivative Traders, 131 S.
Ct. 2296 (2011), the defendants also argued that ENV did not
"make" any material misstatements or omissions for purposes of
section 10(b) and Rule 10b-5.


                              A.

      The plaintiffs argue that the Second Amended Complaint
alleges both false statements of material fact and true
statements that are rendered misleading by material omissions.
In determining whether an allegedly false statement or omission
of fact is material, the Court looks at whether there is "a
substantial likelihood that a statement or omission
'significantly altered the 'total mix' of information made
available,' as viewed by the 'reasonable investor.'"  Ellenburg
v. JA Solar Holdings Co., No. 08 Civ. 10475, 2010 WL 1983375, at
*5 (S.D.N.Y. May 17, 2010) (quoting Basic, Inc. v. Levinson, 485

                              25

U.S. 224, 231-32 (1988)).  "Put another way, a fact is to be
considered material if there is a substantial likelihood that a
reasonable person would consider it important in deciding
whether to buy or sell shares of stock."  Operating Local 649
Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86,
92-93 (2d Cir. 2010) (internal quotation marks and brackets
omitted).

     An omission is actionable under federal securities laws
"only when the [defendant] is subject to a duty to disclose the
omitted facts."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259,
267 (2d Cir. 1993).  Even though Rule 10b-5 imposes no duty to
disclose all material, nonpublic information, once a party
chooses to speak, it has a "duty to be both accurate and
complete."  Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331
(2d Cir. 2002).  "[E]ven an entirely truthful statement may
provide a basis for liability if material omissions related to
the content of the statement make it . . . materially
misleading."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F.
Supp. 2d 148, 160 (S.D.N.Y. 2008).

     Even under the strict standards of Rule 9(b) and the PSLRA,
the plaintiffs sufficiently pleaded alleged misrepresentations
as to the LOP contracts, the opportunities in the shut-down
market, and the petition before the NRC.  But the Second Amended

Complaint does not contain sufficient allegations as to the Zion Project or macroeconomic conditions.

### 1.

The Registration Statements described the LOP contracts as arrangements under which ES had "agreed to process and dispose of substantially all [LLRW] and [MLLW] generated by" 82 of the 104 operating nuclear reactors in the United States, along with, "ultimately[,] their D&D waste materials." (Nov. 2007 Reg. Stmt. at 1, 5; July 2008 Reg. Stmt. at 1, 5.) According to specific factual allegations in the Second Amended Complaint, however, this was false in that "the vast majority of MLLW" was outside the scope of the LOP contracts. (SAC ¶ 153.) The plaintiffs also sufficiently plead that the Registration Statements were misleading in light of ES's omission to mention that the terms of the contracts made it highly unlikely that any waste not required to be disposed of by the contracts, including MLLW and D&D waste, would be disposed of until far in the future, due to the economic incentives created by the terms of the contracts. (SAC ¶¶ 80-83); see, e.g., In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 343 (S.D.N.Y. 2004) (denying motion to dismiss a complaint that alleged that the defendants knew that "there would be no increase in demand for [their] products and services"). These well-pleaded

27

allegations must be assumed to be true for the purposes of this motion, and are sufficiently particularized to satisfy Rule 9(b) and the PSLRA.

The defendants argue that these allegations are insufficient for three principal reasons.  First, they argue that they are "wholly conclusory and speculative."  (Defs.' Mem. at 17.)  This is incorrect.  The plaintiffs allege specific contract terms and explain a simple and plausible way in which these terms create an economic incentive that would significantly affect the value of those contracts.  A reasonable investor could read the Registration Statements to suggest that ES would be disposing of substantially all MLLW and D&D waste material under the contracts.  If in fact that was highly unlikely at the time of the Registration Statements due to present facts, such information would be material to investors and therefore needed to be disclosed to make the disclosures in the Registration Statements not misleading.

Second, the defendants argue that "MLLW represents only a very, very small portion of a nuclear plant's radioactive waste and therefore an equally small part of potential LOP Contract revenues."  (Defs.' Mem. at 17.)  According to the Registration Statements, "LLRW accounts for more than 90% of the volume but less than 1% of the radioactivity of all radioactive by-products."  (Nov. 2007 Reg. Stmt. at 3; July 2008 Reg. Stmt. at

28

3.)[5]  However, this statement describes only the volume of LLRW,
not the revenues associated with that waste.  There is no basis
on a motion to dismiss to calculate the revenue that would be
generated by the disposal of the dramatically more radioactive
by-products.  Construing the alleged facts in the light most
favorable to the plaintiffs, the Court cannot say as a matter of
law that the amount of revenue in dispute is so small as to be
immaterial to a reasonable investor.  See Litwin, 634 F.3d at
717 ("[W]hen a district court is presented with a Rule 12(b)(6)
motion, a complaint may not properly be dismissed . . . on the
ground that the alleged misstatements or omissions are not
material unless they are so obviously unimportant to a
reasonable investor that reasonable minds could not differ on
the question of their importance." (internal quotation marks
omitted)); Ganino, 228 F.3d at 164 (citing approvingly a case
suggesting that "a 3% to 9% drop [in quarterly revenue] may be
material depending on the circumstances").

---

[5] The defendants also point to an environmental impact statement
issued by the NRC.  (Youngwood Decl. Ex. P.)  This report, which
the plaintiffs did not reference or rely upon in filing the
Second Amended Complaint, cannot be considered on a Rule
12(b)(6) motion for the truth of the matters asserted therein.
See, Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Consol.
Salmonid Cases, 688 F. Supp. 2d 1013, 1017 (E.D. Cal. 2010)
(taking judicial notice of an environmental impact statement but
"only for the existence of [its] content, not for the truth of
disputed matters asserted in the [document]").  Moreover, as
discussed above, it would not affect the resolution of this
motion even if it were considered.

Third, the defendants argue that the Registration Statements contained adequate warnings.  They stated that ES's operations "may be affected by the decisions of . . . commercial customers to store radioactive materials on-site.  There has been little . . . economic pressure for commercial utilities and power companies to dispose of radioactive materials at off-site facilities."  (Nov. 2007 Reg. Stmt. at 20; July 2008 Reg. Stmt. at 19.)  This warning cannot be determined to be sufficient as a matter of law on this motion.  The Second Amended Complaint alleges that the LOP contracts supplement then-existing economic pressures by creating additional incentives to delay waste disposal, which a jury might conclude goes beyond the scope of the warning in the Registration Statements.

Accordingly, the plaintiffs have sufficiently alleged that the statements asserting that the LOP contracts would lead to the disposal of MLLW and D&D waste were false or omitted facts necessary to make the disclosures not materially misleading.

2.

The plaintiffs next allege that the Registration Statements made misrepresentations about the opportunities in the shut-down reactor market.  The Registration Statements identified thirteen specific reactors with combined trust fund balances of approximately three billion dollars and expressed the belief

that ES "ha[d] established relationships with some of the owners
of these reactors and . . . [was] well-positioned to pursue" D&D
contracts with them.  (Nov. 2007 Reg. Stmt. at 81; July 2008
Reg. Stmt. at 75.)  The Second Amended Complaint alleges that ES
did not actually possess these views because (a) it knew that
the trust funds were declining rapidly and would be insufficient
to fund decommissioning, (b) it knew that some of the reactors'
owners were not interested in outsourcing their work to ES, (c)
ES lacked the manpower to take on more than one decommissioning
at a time, and (d) most reactors were not expected to begin
decommissioning for a decade or more.

     The Second Amended Complaint has sufficiently alleged
misrepresentations and omissions on this subject.  If ES did, in
fact, know that the owners of at least two reactors --
accounting for roughly $550 million of the market identified in
the Registration Statements -- had no interest in entering into
a decommissioning contract with ES, then disclosure of this fact
may have been necessary to accurately convey ES's chances of
obtaining these contracts.  It may well have been misleading to
include these reactors in a list of prospects.  Moreover, if
reactors with decommissioning trust funds of over $440 million
were in fact not using ES, a jury could find that it was
materially misleading to include them in a list of prospects
that ES "believe[d] we are well-positioned to pursue . . . ."

(Nov. 2007 Reg. Stmt. at 81; July 2008 Reg. Stmt. at 75.)
Similarly, a reasonable jury could find that ES's inability to
execute more than one decommissioning project at a time (if
true) materially changed the size of the actual market for ES.

However, nothing in the Registration Statements stated or
suggested that the shut-down reactor market presented near-term
opportunities.  Instead, they presented that market in a list of
"near- and long-term growth opportunities," without specifying
which category it fell into.  (Nov. 2007 Reg. Stmt. at 4; July
2008 Reg. Stmt. at 4.)  Additionally, they acknowledged that
reactors could wait "a period of several decades before
undergoing final D&D," which a reasonable investor would have
understood to mean that any given D&D opportunity might not
materialize until sometime far in the future.  (Nov. 2007 Reg.
Stmt. at 4; July 2008 Reg. Stmt. at 4.)  Nowhere did the
defendants suggest that the full market, beyond the Zion
Project, was a near-term opportunity.  By contrast, other
opportunities were described as coming "within the next five
years," constituting "substantial near-term opportunities," or
involving existing, active contracts. (Nov. 2007 Reg. Stmt. at
4-5; July 2008 Reg. Stmt. at 4-5.)  Accordingly, the plaintiffs
have not alleged any material misrepresentations of the timing
of the shut-down reactor market or when any given project would
begin.

Similarly, the plaintiffs have not adequately alleged that the Registration Statements misstated the value of the trust funds.  Although the trust funds may have been inadequate to begin decommissioning immediately, this does not affect ES's ability to pursue contracts related to those trust funds "when they are made available," which is all ES represented.  (Nov. 2007 Reg. Stmt. at 81.)  The plaintiffs do not allege that the actual values reported by the Registration Statements, other than for the Zion project, were inaccurate.

Accordingly, the plaintiffs have sufficiently alleged that the statements asserting that ES believed itself to be well-positioned to obtain and perform decommissioning contracts with shut-down reactors were false or omitted facts necessary to make the disclosures not materially misleading.


3.

The plaintiffs next allege that the Registration Statements and Strawbridge's comments during conference calls falsely represented that the Zion Project could begin decommissioning in late 2008 and that its trust fund contained $858 million as of the IPO and $860 million as of the July 2008 Offering, and that the Registration Statements falsely included revenues from the Zion Project in the Company's financial outlook for 2008.

33

To the extent that these allegations depend on the
projected start date for Zion being inaccurate at the time of
the defendants' statements, the document referenced in the
Second Amended Complaint contradicts the plaintiffs'
allegations.  The plaintiffs rely on a December 17, 2008
presentation by Exelon, Zion's owner, stating that "[a]dditional
time [was] required for funds to grow before decommissioning can
commence."  (Youngwood Decl. Ex. O at 3.)  As the defendants
point out, however, this refers to decommissioning if carried
out by Exelon, not decommissioning if carried out by ES.  Under
the contract with ES, the presentation stated, the difference
between the cost of decommissioning and the current trust fund
balance was "narrow enough to begin decommissioning today."
(Youngwood Decl. Ex. O at 5.)  The plaintiffs argue that this
concedes that the trust fund balance was not at that time
sufficient to cover all costs of decommissioning.  But the
plaintiffs do not allege why such an amount was required,
particularly in the face of Exelon's statement two months after
the close of the Class Period that the funds were sufficient to
"begin decommissioning today."  Moreover, the plaintiffs allege
elsewhere in their Second Amended Complaint that, after a post-
shutdown decommissioning activities report has been filed with
the NRC, which Exelon filed in February, 2000, the NRC only
requires "reasonable assurance that adequate funds <u>will be</u>

available for decommissioning." (SAC ¶ 73 (emphasis added);
Youngwood Decl. Ex. O at 2.) Therefore, the Second Amended
Complaint's conclusion that Zion could not begin in late 2008 at
the time of the defendants' statements is not plausible because
it is contradicted by the document on which the plaintiffs rely.

To the extent that these allegations depend on the supposed
misvaluing of the Zion trust fund, they are too vague and
conclusory to support a claim. The plaintiffs claim only that a
confidential witness stated that the value in the trust fund had
declined by May 2008, and that the trust fund had declined to
$727 million by November 2008. These allegations do not
contradict the representations in the Registration Statement and
are too speculative to serve as the only basis for an inference
that the trust fund was overstated. Although a confidential
witness said that the trust fund had declined by May 2008, this
is consistent with the Company's statements: the December 2007
Form 8-K estimated a balance of "approximately $900 million,"
while the July 2008 Registration Statement estimated a balance
of $868 million. (SAC ¶ 101; Dec. 2007 Form 8-K at 2; July 2008
Reg. Stmt. at 75.) The confidential witness's allegation does
not say anything about the period over which the balance
declined, the amount of the decline, or the accuracy of the
estimates in the Registration Statements or the Form 8-K. See
Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 411 n.10

35

(S.D.N.Y. 2007) ("The statements . . . fail, for example, to specify the amount by which the containers were overvalued, and at what times."); Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 522 (S.D.N.Y. 1977) ("[D]efendants are also entitled to be apprised of the approximate amount of overstatement involved."). Although the plaintiffs may not have needed to allege precise dollar values and dates, they were required to plead something more than a broad statement that was consistent with the Company's actual disclosures.

Similarly, the allegation that the value of the trust fund was $141 million lower in November 2008 than the Company reported it to be in July 2008 is an insufficient basis to conclude that the value of the trust fund in July 2008 was overstated given the tumultuous drop in the markets between July and November 2008. See, e.g., Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 839 (S.D.N.Y. 2010) ("The fact . . . that ING was 'forced' to accept a government bailout in October and November 2008 because of allegedly unreported impairments and understatements does not say anything about whether the same thing would have been the case in March or June 2008, particularly in light of the 'distinctively unique financial crisis' that was particularly turbulent in the later period."); Yu v. State St. Corp., 686 F. Supp. 2d 369, 380 (S.D.N.Y. 2010) ("[T]he simple fact of a write-down does not stand for the

36

proposition that values stated before the write-down were
inaccurate, and the write-downs certainly do not substitute for
facts about the supposedly false valuations themselves."),
vacated on other grounds, No. 08 Civ. 8235, 2010 WL 2816259
(S.D.N.Y. July 14, 2010).

Accordingly, the plaintiffs have not sufficiently alleged
that the statements related to the Zion Project were false or
omitted facts necessary to make the disclosures not materially
misleading.


                                    4.

The plaintiffs next allege that the defendants' statements
were misleading because they portrayed an expectation that the
petition before the NRC would be approved, which was not
sincerely held.  These allegations plainly survive the motion to
dismiss.  Strawbridge and Creamer both stated in unmistakable
language that they "expect[ed] the NRC to change their rule" and
that they were "comfortable" and "confident" in the chance of
approval of their petition.  (SAC ¶¶ 254, 271.)  The plaintiffs
have alleged sufficient facts to show that Creamer and
Strawbridge were informed that the chances of NRC approval were
minimal.  Therefore, a reasonable jury could find that Creamer
and Strawbridge did not actually hold the beliefs they espoused
at the time of their statements, and that the statements of

                                    37

those beliefs were misstatements of present fact.  See Va.
Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1094 (1991) ("An
opinion is a fact . . . .  When the parties are so situated that
the buyer may reasonably rely upon the expression of the
seller's opinion, it is no excuse to give a false one." (quoting
Vulcan Metals Co. v. Simmons Mfg. Co., 248 F. 853, 856 (2d Cir.
1918) (L. Hand, J.)) (alteration in original)); Podany v.
Robertson Stephens, Inc., 318 F. Supp. 2d 146, 153-54 (S.D.N.Y.
2004) ("The sine qua non of a securities fraud claim based on
false opinion is that defendants deliberately misrepresented a
truly held opinion.").

Even without these explicit statements of confidence from
Creamer and Strawbridge, the allegations about the Registration
Statements themselves would survive the motion to dismiss.  The
defendants argue that they adequately warned that the rejection
of the proposal could harm the Company's prospects and that all
relevant statements were forward-looking and protected by the
"bespeaks caution" doctrine or the statutory safe-harbor of the
PSLRA.  However, if historical facts "pose[] a serious obstacle
to obtaining the requisite regulatory approvals . . .
boilerplate language in the Registration Statement warning
investors that the [business opportunity] was subject to
regulatory approval [may be] inadequate."  In re WorldCom, Inc.

Sec. Litig., 346 F. Supp. 2d 628, 688 (S.D.N.Y. 2004).[6]  Here,
the Registration Statements gave no indication that the NRC had
consistently rejected the exact policy change sought by ES and
was, allegedly, virtually certain to reject the change again.
The plaintiffs may be able to show that this history would be
material to a reasonable investor.[7]

The defendants argue that the history of the NRC's actions
was publicly available and therefore could not constitute a
material omission.  However, "[t]here are serious limitations on

---

[6] Halperin v. eBanker USA.com, Inc., 295 F.3d 352 (2d Cir. 2002),
is not to the contrary.  The plaintiffs in Halperin alleged that
"the offering memoranda fraudulently omitted any mention of the
substantial impediments to registration," id. at 361, much as
the plaintiffs do in this case.  However, in Halperin, "[t]he
allegedly omitted facts were either disclosed or implied in the
offering memoranda."  Id.  Here, the defendants did not disclose
the impediments to the proposed rule change, and there is, at a
minimum, a question of fact as to whether the disclosure that
the proposal was subject to NRC approval implied that there were
such impediments.

[7] At argument, the defendants appeared to argue that
"forward-looking statements that contain precedent [sic] of
historical elements are fundamentally forward looking
nonetheless" and therefore necessarily shielded by the "bespeaks
caution" doctrine.  (Tr. at 7.)  The defendants misread Iowa
Public Employees' Retirement System v. MF Global, Ltd., 620 F.3d
137 (2d Cir. 2010), on which they rely.  The Court of Appeals
for the Second Circuit clearly held that, "while it is true that
predictions about the future can represent interpretations of
present facts (and vice versa), there is a discernible
difference between a forecast and a fact, and courts are
competent to distinguish between the two."  Id. at 143.
Therefore, the Court held, the "non-forward-looking" elements of
forecasts that "extrapolate present or historical facts into the
future" are "severable" from forward-looking elements.  Id. at
144.

a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 736 (2d Cir. 1987). The history of the NRC's treatment of such petitions may have been publicly discoverable, but it cannot be said to be so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors. See, e.g., Klein v. PDG Remediation, Inc., 937 F. Supp. 323, 327 (S.D.N.Y. 1996) (denying a motion to dismiss where, "[a]lthough the documents had been published, they were not widely available").

Accordingly, the plaintiffs have sufficiently alleged that the statements related to the NRC petition were false or omitted facts necessary to make the disclosures not materially misleading.

5.

Finally, the Second Amended Complaint alleges that declining economic conditions negatively impacted the Company's Federal contracts side of the business as early as January and February 2008. However, this allegation is altogether lacking in specificity and cannot support a claim of securities fraud.

40

The plaintiffs do not suggest how the deteriorating economic conditions affected Federal contracts or the scope of the impact, nor do they allege that any particular statements were false.  To the extent that the plaintiffs allege that macroeconomic trends hurt ES generally, as they hurt any other company, "[t]he omission of generally known macro-economic conditions is not material because such matters are already part of the 'total mix' of information available to investors." Landmen Partners Inc. v. Blackstone Grp., L.P., 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009), rev'd on other grounds sub nom. Litwin, 634 F.3d 706.  Moreover, the Registration Statements warned investors of the risks of general economic conditions: "Economic downturns and reductions in government funding could have a negative impact on our businesses.  Demand for our services has been, and we expect that demand will continue to be, subject to significant fluctuations due to a variety of factors beyond our control, including economic conditions." (Nov. 2007 Reg. Stmt. at 19; July 2008 Reg. Stmt. at 19.)

Accordingly, the plaintiffs have not sufficiently alleged that the statements related to macroeconomic conditions were

false or omitted facts necessary to make the disclosures not
materially misleading.[8]

### B.

The next consideration is who "made" the statements above
for purposes of Rule 10b-5 and section 10(b).  See ATSI, 493
F.3d at 99.  This analysis is guided by the Supreme Court's
recent decision in Janus.

The plaintiffs in Janus sued Janus Capital Group ("JCG")
and Janus Capital Management ("JCM") over alleged misstatements
contained in prospectuses issued by Janus Investment Fund
("JIF"), a fund created by JCG.  131 S. Ct. at 2299.  JIF was a
separate legal entity owned entirely by mutual fund investors.
See id.  JCM was JIF's "investment adviser and administrator"
and a wholly owned subsidiary of JCG.  Id.  The Supreme Court
considered solely whether JCM could be held primarily liable
under Rule 10b-5.  Id. at 2301.  Although all of the officers of
JIF were also officers of JCM, id. at 2299, and JCM may have
"assisted Janus Investment Fund with crafting what Janus
Investment Fund said in the prospectuses," id. at 2305, the
Court found that JCM was not subject to suit.  The Court
interpreted Rule 10b-5's prohibition on "mak[ing] any untrue

---

[8] The plaintiffs did not respond to that part of the defendants'
motion that asserted that there was no material misstatement or
omission relating to macroeconomic conditions.

statement of a material fact or . . . omit[ting] to state a

material fact necessary in order to make the statements made . .

. not misleading," 17 C.F.R. § 240.10b-5(b), to require that a

person have "ultimate authority over the statement, including

its content and whether and how to communicate it," to be liable

under Rule 10b-5.  <u>Janus</u>, 131 S. Ct. at 2302.  Furthermore, the

Supreme Court wrote, "in the ordinary case, attribution within a

statement or implicit from surrounding circumstances is strong

evidence that a statement was made by -- and only by -- the

party to whom it is attributed."  <u>Id.</u>[9]

    There is no dispute that ES and each of the Individual

Defendants who signed the Registration Statements "made" the

statements under <u>Janus</u>.  <u>See id.</u> at 2302.  Because all of the

Individual Defendants signed the July 2008 Registration

Statement, all are proper defendants on the claims regarding

alleged misstatements in that document.  However, two Individual

Defendants, Roriston and Winder, did not sign the November 2007

---

[9] The Supreme Court's statement does not imply that there can be
only one "maker" of a statement in the case of express or
implicit attribution.  The Supreme Court's statement was couched
in terms of the "ordinary case," and arose in the context of one
speaker who actually made the alleged misrepresentation and
another possible defendant who did not have authority over the
content of the statement.  In this case, there are undisputedly
several "makers" of the statements – ES, who issued the
Registration Statements, and the various actual signatories.
The question with respect to ENV is whether a reasonable jury
could find that it also had authority over the content of the
Registration Statements.

Registration Statement.  Neither Roriston nor Winder was a
director at the time of the IPO; rather, as the November 2007
Registration Statement expressly states, each would "become a
member of [ES's] board of directors upon the completion of [the
IPO]." (Nov. 2007 Reg. Stmt. at 113.)  There is no indication
anywhere within the November 2007 Registration Statement that
Roriston or Winder had any authority over its contents, aside
from consenting to being listed as director-nominees.
Accordingly, Roriston and Winder cannot be held liable for any
alleged misstatements in the November 2007 Registration
Statement.  However, all remaining Individual Defendants did
sign that document and so can be sued for any misstatements it
may contain.

     The defendants do challenge ENV's susceptibility to suit.
As was the case with JCM and the Janus Investment Fund, ENV and
ES are legally distinct entities despite having the same
individuals in key positions.  And the Registration Statements
issued by ES are most prominently attributed to ES and the
Individual Defendants, not to ENV.

     However, there are important distinctions between the role
of ENV in this case and JCM in Janus.  First, as disclosed in
the Registration Statements, ENV was the sole owner of
outstanding stock in ES at the time of the IPO and was the
selling stockholder in both Offerings.  (Nov. 2007 Reg. Stmt. at

44

6; July 2008 Reg. Stmt. at 6.)  The November 2007 Registration Statement contained a corporate structure chart showing that ES was wholly owned by ENV, which in turn was wholly owned by the "Sponsors and Management." (Nov. 2007 Reg. Stmt. at 33.)  It also explained that ENV would retain a controlling interest in ES after the IPO, with the Sponsors and Management continuing to own 100% of ENV.  (Nov. 2007 Reg. Stmt. at 34.)  Moreover, the November 2007 Registration Statement expressly noted the Sponsors' control of ES, stating that ES would be a "controlled company" once it went public and that "the Sponsors will have the ability to effectively control all matters requiring stockholder approval, including . . . the determination of the outcome of any corporate transaction." (Nov. 2007 Reg. Stmt. at 28.)  Indeed, it stated that the Sponsors could "cause [the Company] to . . . issue additional shares of common stock." (Nov. 2007 Reg. Stmt. at 29.)  The July 2008 Registration Statement repeated that ENV "control[led] more than 50% of [the Company's] voting power." (July 2008 Reg. Stmt. at 135.)  And both Registration Statements referenced an agreement "indemnify[ing] ENV Holdings LLC for material misstatements or omissions in the registration statement." (Nov. 2007 Reg. Stmt. at 129; July 2008 Reg. Stmt. at 135.)

These statements create significant differences between the plaintiffs' claim against ENV and the claim rejected in Janus.

45

Here, the Registration Statements made clear that the Sponsors
controlled the actions of ES -- including its sale of stock --
and that the Sponsors exerted their control through ENV.  ENV
therefore had "ultimate authority" over the two Offerings, as
required by Janus.  131 S. Ct. at 2302.  Moreover, ENV
unquestionably had control over the stock being sold pursuant to
the Registration Statement for the IPO and in the July 2008
Offering.  (Nov. 2007 Reg. Stmt. at 6; July 2008 Reg. Stmt. at
6.)

     The defendants argue that the plaintiffs' claim is
"precisely the kind of claim that the Supreme Court rejected in
Janus," and that the Second Amended Complaint alleges no more
than control of the Company's management and a causal role in
the issuance of the Registration Statements.  (Angiolillo Aug.
15, 2011 Ltr. at 3.)  This argument overlooks ENV's ownership of
ES, its direct control over all corporate transactions, and its
authority to determine when and whether to sell the shares being
sold.  Although the Registration Statements did speak in the
voice of ES and were signed by the Individual Defendants in
their capacities as directors or officers of ES, these explicit
attributions do not preclude attribution to ENV as well.
Indeed, Janus recognized that attribution could be "implicit
from surrounding circumstances."  Janus, 131 S. Ct. at 2302.
Here, where the Registration Statements contain so many indicia

46

of control, the lack of an explicit statement that ENV was
speaking through the Registration Statements does not control
the answer to the question of whether it made those statements.
A reasonable jury could find that, on the facts alleged here,
ENV's role went well beyond that of "a speechwriter draft[ing] a
speech," id., because, with regard to ES's sales of shares owned
by ENV, ENV had control over the content of the message, the
underlying subject matter of the message, and the ultimate
decision of whether to communicate the message.

Accordingly, the plaintiffs have sufficiently pleaded that
ES and ENV made the Registration Statements; that all Individual
Defendants made the July 2008 Registration Statement; and that
all Individual Defendants except for Roriston and Winder made
the November 2007 Registration Statement.  As to other
statements, such as those made at press conferences or in press
releases, there is no allegation that anyone other than ES and
the direct issuers of those statements had authority over their
content.

## c.

The defendants next argue that the plaintiffs have failed
to allege facts giving rise to a strong inference of scienter.
The scienter required to support a securities fraud claim can be
"intent to deceive, manipulate, or defraud, or at least knowing

misconduct." AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC, No. 01 Civ. 11448, 2005 WL 2385854, at *8 (S.D.N.Y. Sept. 26, 2005) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)).   The PSLRA requires that a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."   ATSI, 493 F.3d at 99. The facts must give rise to a strong inference with regard to each defendant.   See Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2008).   Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007).   A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   Id. at 324; see also ATSI, 493 F.3d at 99.

The plaintiffs allege scienter on both a "conscious misbehavior or recklessness" theory and a "motive and opportunity" theory.  The Court will take each of these theories in turn.

1.

To make out a claim of scienter based on a claim of conscious misbehavior or recklessness, the plaintiffs must allege sufficient facts to constitute strong circumstantial evidence of such behavior.  This is typically done by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).  Where motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).

The Court of Appeals has explained that "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation marks omitted); Kalnit, 264 F.3d at 142.  In some cases, recklessness can be inferred from "[a]n

49

egregious refusal to see the obvious, or to investigate the doubtful." Chill, 101 F.3d at 269 (internal quotation marks omitted).

With regard to Creamer, Everest, and Strawbridge, the Second Amended Complaint readily satisfies this requirement. The Second Amended Complaint alleges the existence of specific revenue and business development meetings at which these defendants -- the CEO and chairman, vice-chairman, and CFO and executive vice-president, respectively -- were briefed on the allegedly misrepresented or omitted facts about the LOP contracts and the shut-down reactor market. (SAC ¶¶ 82-83, 94.) Additionally, Creamer allegedly attended meetings at which it was discussed that the NRC was virtually certain to reject ES's petition. (SAC ¶ 114.) These allegations are sufficiently specific to support a strong inference that Creamer, Everest, and Strawbridge either consciously misbehaved or were reckless in signing the Registration Statements and, in the case of Creamer and Strawbridge, making statements to the contrary of the information that they allegedly knew. (See SAC ¶¶ 254, 269, 271.)

The defendants argue that the Court should heavily discount, if not ignore altogether, allegations that refer to knowledge gleaned from confidential witnesses. This is neither required by Second Circuit caselaw nor advisable. "Information

presented through Confidential Witnesses in a complaint is allowed as long as the witnesses 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possesses the information alleged.'"   Cornwell v. Credit Suisse Grp., 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (quoting Novak, 216 F.3d at 314).   In this case, the Second Amended Complaint explains the confidential witnesses' roles, responsibilities, involvement with the subject matter of the relevant allegations, and, in some cases, interaction with some of the Individual Defendants, in sufficient detail to allow the Court to weigh the plaintiffs' suggested inferences against competing inferences.   (See SAC ¶¶ 13-21); cf. Campo v. Sears Holdings Corp., 371 F. App'x 212, 216 n.4 (2d Cir. 2010) (summary order) (finding no error in a district court's decision to depose confidential witnesses before deciding a motion to dismiss to determine whether they "acknowledged the statements attributed to them in the complaint").

Because the Second Amended Complaint properly alleges scienter against three key officers of ES who can also be found to be principals of ENV, it necessarily alleges scienter against ES and ENV itself.   See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an

inference of scienter] for a corporate defendant will be to
plead it for an individual defendant."); <u>Arbitron</u>, 741 F. Supp.
2d at 491 ("Because the plaintiffs have successfully pleaded
scienter as to . . . Arbitron's then-president, CEO, and
chairman, they have also pleaded corporate scienter as to
Arbitron.").

However, as to the other Individual Defendants, the
plaintiffs have not sufficiently alleged conscious misbehavior
or recklessness.  There are no specific allegations of knowledge
on the part of any other Individual Defendants; they are not
alleged to have attended the meetings discussed above or
otherwise been specifically informed of the alleged unfavorable
facts.  <u>See</u> <u>Arbitron</u>, 741 F. Supp. 2d at 488.

2.

Next, the plaintiffs argue that they have alleged scienter
under a "motive and opportunity" theory.  To make out a claim on
this theory, plaintiffs "must assert a concrete and personal
benefit to the individual defendants resulting from the fraud."
<u>Kalnit</u>, 264 F.3d at 139 (internal quotation marks omitted).
Motives generally possessed by most corporate directors and
officers do not suffice.  <u>Id.</u>

A complaint that seeks to base scienter on a corporate
insider's sale of his or her own stock must show "unusual"

52

insider sales.  See In re Scholastic Corp. Secs. Litig., 252
F.3d 63, 74 (2d Cir. 2001); Acito v. IMCERA Group, Inc., 47 F.3d
47, 54 (2d Cir. 1995).  "Factors considered in determining
whether insider trading activity is unusual include the amount
of profit from the sales, the portion of stockholdings sold, the
change in volume of insider sales, and the number of insiders
selling."  In re Scholastic, 252 F.3d at 74-75.  Motive is not
adequately pleaded where the plaintiffs merely allege that the
defendant had a desire for the corporation to appear profitable
or a desire to keep stock prices high in order to increase
officer compensation.  Novak, 216 F.3d at 307 (collecting
cases).  By contrast, the Court of Appeals for the Second
Circuit has held that motive is adequately pleaded where
plaintiffs allege that a defendant sold its own shares while at
the same time misrepresenting corporate performance in order to
inflate stock prices.  See Kalnit, 264 F.3d at 141-42
(collecting cases).

The defendants do not appear to dispute the allegation that
ENV and the Individual Defendants had an opportunity to commit
fraud through the Registration Statements and other
representations made during the Class Period.  Instead, they
argue that the plaintiffs have failed to allege motive as
defined by the caselaw.

The plaintiffs principally rely on the sale of more than
$1.2 billion by ENV in the two offerings as evidence of motive
to defraud investors.  The plaintiffs allege that the economic
interests of ENV were entirely held by the Sponsors and senior
employees of the Company, including Creamer and Strawbridge.

The defendants argue that such incentives do not constitute
"concrete and personal" benefits cognizable in a claim under
section 10(b).   See Kalnit, 264 F.3d at 139.  The defendants
assert that the Second Amended Complaint's failure to "identify
specifically how and by how much each Individual Defendant would
benefit from the alleged scheme." (Defs.' Mem. at 32.)  They
also argue that the plaintiffs do not allege "that the IPO and
2008 Offering involved 'unusual' or 'suspicious' stock sales."
(Id. (citing Acito, 47 F.3d at 54.)

Contrary to the defendants' arguments, the plaintiffs'
allegations do describe concrete, personal motives with
sufficient specificity to survive a motion to dismiss.  Prior to
the IPO, ENV owned 100% of the 75.15 million shares of ES.  The
plaintiffs allege that ES, ENV, and the Individual Defendants
made misrepresentations and omissions so that they could sell
more than 20 million shares of stock in the IPO for $463
million.  Thereafter, they allegedly made further
misrepresentations and omissions so that ENV could sell over 40
million additional shares in the July 2008 Offering for an

additional $764 million.  The total proceeds to ENV exceeded
$1.2 billion which was then distributed to the Individual
Defendants through their interests in ENV.  (SAC ¶¶ 284, 285.)
Prior to the IPO, ENV owned 100% of the shares of ES, and
following the July 2008 Offering, its share ownership was
reduced to 20%.  (SAC ¶ 286.)

The Court of Appeals has previously reversed the dismissal
of a complaint alleging that a corporation's CEO sold 40% of his
stock and other insiders sold an undisclosed amount.  See
Stevelman v. Alias Research Inc., 174 F.3d 79, 82, 85-86 (2d
Cir. 1999); see also In re Scholastic, 252 F.3d at 74-76
(finding allegation of a sale of 80% of a defendant's holdings
sufficient to plead scienter); compare Acito, 47 F.3d at 54
(finding that an allegation that one outside director selling
less than 11% of his stock was insufficient to plead scienter
where no other insiders sold shares).  Here, the plaintiffs
allege that the defendants sold more than 80% of their holdings
in ES through the IPO and the July 2008 Offering.  Moreover, the
plaintiffs have alleged a concrete and massive economic benefit
that accrued to the defendants by reason of the IPO and July
2008 Offering that was allegedly increased by misleading
potential investors.  This is hardly on the same scale as the
potential for economic benefit "generally possessed by most
corporate directors and officers" in keeping a corporation

profitable or keeping stock prices high.  <u>Kalnit</u>, 264 F.3d at
139.

Contrary to the defendants' view, such sales "could clearly
be characterized as 'unusual insider trading activity during the
class period.' which may permit an inference of . . . scienter."
<u>Stevelman</u>, 174 F.3d at 85 (quoting <u>Acito</u>, 47 F.3d at 54)).  The
defendants argue that the motive alleged here cannot be
distinguished from "every successful initial public offering."
(Defs.' Mem. at 31-32.)  However, the fact that the Individual
Defendants' sales were the result of an IPO is not dispositive
of the question whether all the facts and circumstances are
sufficient for purposes of alleging sufficient motive.  Whether
there are sufficient allegations for scienter turns on all of
the facts and circumstances of the sales, including their
magnitude, the percentage of shares sold and retained, the
timing of the sale and the disclosure of the allegedly material
adverse information, and any other circumstances that may
indicate that defendants had a motive to conceal adverse
information in order to profit from their sales.

The only case within the Second Circuit that defendants
identify involving an IPO concerned a sale in which the selling
stockholder was a "major investor" in the corporation being made
public, rather than its sole owner, and where that stockholder
"retained over 18 million shares."  <u>In re Prestige Brands</u>

<u>Holding, Inc.</u>, No. 05 Civ. 6924, 2006 WL 2147719, at *1, 7

(S.D.N.Y. July 10, 2006).  Moreover, the plaintiffs in <u>Prestige</u>

<u>Brands</u> alleged only that the individual defendants were

"principals" of the stockholder, and "fail[ed] to explain how or

why [the stockholder's] sale of Prestige stock in the IPO should

be deemed to be sales of [the individual defendants]."  <u>Id.</u> at

*7.  <u>Prestige Brands</u> therefore reinforces the plaintiffs'

allegation that this was an "unusual" sale even in the context

of an IPO.[10]  The defendants' argument essentially amounts to a

claim that an interest in stock sold in an IPO or significant

public offering could <u>never</u> qualify as motive for purposes of

scienter.  This is plainly incompatible with the holding by the

Court of Appeals that "motive [can be] sufficiently pleaded

where plaintiff allege[s] that defendants misrepresented

corporate performance to inflate stock prices while they sold

their own shares."  <u>Kalnit</u>, 264 F.3d at 139.

ENV possessed the same interest as the Individual

Defendants, and therefore scienter is adequately pleaded on this

ground against it, too.  Additionally, as discussed above,

scienter has been adequately pleaded against both ES and ENV by

---

[10] <u>In re AFC Enterprises, Inc. Securities Litigation</u>, 348 F.
Supp. 2d 1363 (N.D. Ga. 2004), the other IPO case that the
defendants cite, is also distinguishable.  In <u>In re AFC</u>, most
defendants sold between 19.78% and 46.67% of their holdings,
although one defendants sold 100% of its holdings.  <u>Id.</u> at 1373
n.4.

virtue of the adequate allegations against their individual
officers and principals.

However, two of the Individual Defendants, McBride and
Winder, are not alleged to have any interest in ENV.  Because
the Second Amended Complaint does not allege any concrete and
personal benefit that could inure to these defendants or, as
discussed above, any facts that give rise to a strong inference
of conscious misbehavior or recklessness on their part, the
section 10(b) claims against them must be dismissed.

Accordingly, the claim under section 10(b) and Rule 10b-5
must be dismissed against McBride and Winder, but may proceed
against the other Individual Defendants, ES, and ENV.  The
plaintiffs may proceed against Roriston only as to the July 2008
Registration Statement, the only registration statement he
signed.  Statements not contained in the Registration Statements
can only be attributed to the direct speakers or signers.

### D.

The defendants' final argument in support of the dismissal
of the section 10(b) claim is that the plaintiffs have not
alleged loss causation.  This argument is without merit.  To
establish loss causation, as required by section 10(b) and Rule
10b–5, a plaintiff need only plead economic loss and "that the
loss was foreseeable and caused by the materialization of the

risk concealed by the fraudulent statement," <u>ATSI</u>, 493 F.3d at 107, or "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005).

The defendants argue that the Company's October 14, 2008 announcement contained only disclosures of intervening events, rather than corrections of prior disclosures. However, the plaintiffs are not required to show a correction of a previous misstatement, but only a loss that was foreseeable and that was caused by the materialization of the risk concealed by the fraudulent statement or omission. <u>See</u> <u>ATSI</u>, 493 F.3d at 107. The October, 2008 announcement reported, among other things, that the NRC had denied ES's petition, and that the company's financial outlook had deteriorated. (SAC ¶¶ 182-83.)  To the extent that the defendants argue that the intervening economic crisis was the cause of the drop in stock price, rather than the realization of any adverse facts withheld or misrepresented by the defendants, this "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.</u>, 343 F.3d 189, 197 (2d Cir. 2003).

**V.**

The plaintiffs also allege that the Individual Defendants and ENV are liable under section 20(a) of the Exchange Act as control persons of ES.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108.

Because the defendants' only argument for dismissal of the section 20(a) claims is that the plaintiffs have not shown a primary violation, the motion to dismiss those claims is denied.[11]

**VI.**

The defendants next argue that the plaintiffs' causes of actions under sections 11 and 12(a) of the Securities Act must be dismissed because the plaintiffs failed to allege any actionable false statements or omissions of material fact, any failures to make required disclosures under Regulation S-K, or loss causation.

---

[11] There may well be arguments why some or all of the Individual Defendants should not be subject to control person liability under Section 20(a), but those arguments were not made on the pending motion, and the Court therefore expresses no opinion on such arguments.

60

Section 11(a) of the Securities Act provides that any signatory to a registration statement, director of the issuer of securities, or underwriter with respect to such securities, among others, may be held liable to purchasers of registered securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 12(a)(2) of the Act imposes liability for selling or offering securities by using a prospectus "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ."  15 U.S.C. § 77 l(a)(2).

Section 11 imposes "'a stringent standard of liability on the parties who play a direct role in a registered offering.'" In re Flag Telecom Holdings, Ltd. Secs. Litig., 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009) (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).  To establish a prima facie claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement."  In re Flag Telecom Holdings, Ltd. Secs. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), abrogated on other grounds, 574 F.3d 29 (2d Cir. 2009).  Under Section 11,

61

"[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." Herman & MacLean, 459 U.S. at 382.

Neither Section 11 nor Section 12(a)(2) requires pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made.  See Rombach, 355 F.3d at 169 n.4 ("Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action."); In re Turkcell Iletisim Hizmetler A.S. Secs. Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001).  Loss causation is not an element of a Section 11 or Section 12(a)(2) claim and need not be pleaded to sufficiently state a claim.  See 15 U.S.C. §§ 77k, 77l; see also In re Giant Interactive Grp., Inc. Secs. Litig., 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) ("[L]oss causation is not an element of a claim under either Section 11 or 12.") (collecting cases); Briarwood Invs. Inc. v. Care Inv. Trust Inc., No. 07 Civ. 8159, 2009 WL 536517, at *3 (S.D.N.Y. March 4, 2009) ("A plaintiff is not required to plead 'loss causation' . . . to establish a prima facie claim under §§ 11 or 12(a)(2) of the Securities Act.").  Instead, these statutory claims provide for a loss causation affirmative defense to liability.  See Levine v. AtricCure, Inc., 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007).

**A.**

1.

Motions to dismiss Securities Act claims relying on misrepresentations are analyzed under Rule 9(b) to the extent that they rely on allegations of fraud, but under Rule 8 otherwise.  See Litwin, 634 F.3d at 715; Rombach, 355 F.3d at 171; In re Refco, 503 F. Supp. 2d at 632.

In the Second Amended Complaint, the plaintiffs explicitly disclaim any intent to allege "intentional or reckless misconduct or . . . scienter or fraudulent intent." (SAC ¶¶ 189, 198.)  On their own, such disclaimers are insufficient to subject a complaint to Rule 8, because "[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness." In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005); accord In re Refco, 503 F. Supp. 2d at 632.  As in In re Refco, however, the plaintiffs here have gone beyond the mere inclusion of a pro forma repudiation of a fraud theory.  They have framed their allegations with regard to the Securities Act counts in terms of negligence, claiming that the various defendants had a duty to investigate and ensure the truth of the statements in the Registration Statements.  (SAC ¶¶ 192, 194, 204.)  And they have provided additional scienter allegations limited to the

Exchange Act claims in a separate section after the Securities
Act claims. (SAC ¶¶ 275-88.)[12]

Thus, the plaintiffs have "specifically pled alternate
theories of fraud and negligence." In re Refco, 503 F. Supp. 2d
at 633. They have made it "easy to distinguish between the two,
and the substance of the allegations keeps the distinction as
clear as does the complaint's structure." Id. at 632. This
sets them apart from the Rombach plaintiffs, who "[did] not
assert any claim of negligence . . . nor . . . specify any basis
for such a claim." Rombach v. Chang, No. 00 Civ. 0958, 2002 WL
1396986, at *4 (E.D.N.Y. June 7, 2002), aff'd, Rombach, 355 F.3d
164. Accordingly, the Securities Act claims must only satisfy
Rule 8, rather than Rule 9(b). See In re Refco, 503 F. Supp. 2d
at 632-33; see also In re Suprema Specialties, Inc. Secs.
Litig., 438 F.3d 256, 272 (3d Cir. 2006).

---

[12] While the Second Amended Complaint does include some
allegations of knowing falsehoods -- that is, fraud -- in the
sections that lay out the facts relevant to all claims,
including the Securities Act counts, complete isolation of
Securities Act claims is not necessary to allow plaintiffs to
plead a theory of negligence. The plaintiffs must be allowed
leeway to draft their complaint in a comprehensible narrative
form, which would be drastically impeded by a rule that heavily
discouraged including any scienter allegations in the course of
factual expositions.

2.

Under Rule 8, all allegations that survive Rule 9(b) necessarily survive as well. Accordingly, the only allegations that require additional consideration under Rule 8 are the allegations concerning the Zion Project and general macroeconomic conditions.

The Zion Project allegations, insufficient to satisfy Rule 9(b), fare no better under the plausibility test of Iqbal and Twombly. 129 S. Ct. at 1949; 550 U.S. at 570. As discussed in detail above, the document on which the plaintiffs rely for the substance of their allegations that there were insufficient funds for the Zion Project to proceed in 2008 does not support the allegation. When the plaintiff's allegation is refuted by the document on which it relies, it cannot be considered plausible. See Koncelik v. Savient Pharmaceuticals, Inc., No. 08 Civ. 10262, 2010 WL 3910307, at *5 (S.D.N.Y. Sept. 29, 2010).

As to claims concerning general macroeconomic conditions, the plaintiffs have also failed to state a claim under Rule 8. The sole allegation in the Second Amended Complaint directed at macroeconomic conditions as a general matter is the claim that "[s]hortly after the IPO, declining economic conditions were negatively impacting the Company's Federal contracts side of the business." (SAC ¶ 143.) First, this supposed decline is

65

alleged to occur _after_ the IPO, and so cannot support a claim related to the November 2007 Registration Statement.  Nor does the allegation contradict the disclosures in the July 2008 Registration Statement.  Indeed, the Second Amended Complaint does not in any way allege that Federal contracts were misrepresented in any statements issued during the Class Period. To the extent that the plaintiffs allege that the defendants failed to include warnings about broader macroeconomic conditions, such a claim is belied by the Registration Statements.  (Nov. 2007 Reg. Stmt. at 19; July 2008 Reg. Stmt. at 19.)

Accordingly, the plaintiffs have failed to alleged material misstatements or omissions with regard to the Zion Project or general macroeconomic conditions, but have alleged material misstatements or omissions with regard to the three other categories of statements.  Because the plaintiffs were not required to plead loss causation with respect to their claims under Section 11 and Section 12(a)(2) of the Securities Act, the defendants' argument that there is an insufficient allegation of loss causation is misplaced.  In any event, as explained above with respect to the Section 10(b) claims, the plaintiffs have sufficiently alleged loss causation

**B.**

The plaintiffs also claim that the Registration Statements omitted disclosures required under three sections of SEC Regulation S-K: 17 C.F.R. §§ 229.303(a)(3)(ii) ("Item 303"), 229.503 ("Item 503"), and 229.103 ("Item 103").  The Court will take each Item in turn.

1.

Item 303 requires a description of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  The plaintiffs identify four categories of information that they claim was required by Item 303 and omitted from the Registration Statements:

> (i) that it was probable that the NRC would reject the Petition and ES would not generate meaningful large component disposal revenues; (ii) the Zion Trust Fund was not adequate to cover costs and would not move forward as planned; (iii) the market for the License Stewardship program was not as represented; and (iv) the LOP contracts were detrimental to future business opportunities.

(Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the SAC ("Pls.' Mem.") at 19.)

However, most of these allegations are not "trends" or "uncertainties."  The plaintiffs do not allege that the Zion

67

Trust Fund was trending toward inadequacy, but rather that it was already inadequate and remained so.  Similarly, they do not allege that the negative incentives of the LOP contracts or the infirmities in the market for the License Stewardship Initiative were uncertain or changed over time, but rather that they were always present.  Only the claim regarding the NRC petition relates to an actual uncertainty, but the Registration Statements disclosed that the proposed change might be rejected and that this would impact large component disposal revenues. The Second Amended Complaint alleges that the defendants misrepresented their own belief in the likelihood that the change would be approved, not that they failed to disclose that the NRC might not act on it.  All of these claims sound in misrepresentation under Rule 10b-5, not failure to disclose known trends or uncertainties under Item 303.

Accordingly, the plaintiffs have failed to allege a failure to make disclosures required by Item 303.

2.

Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c).  Although there is scant caselaw on Item 503, courts have generally found Item 503 violations to track Rule

10b-5 violations.  That is, courts typically analyze the
sufficiency of Item 503 disclosures with the familiar
materiality standard.  See Hutchison v. Deutsche Bank Secs.
Inc., 647 F.3d 479, 484 n.4 (2d Cir. 2011); Citiline Holdings,
Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 514-15 (S.D.N.Y.
2010); In re Adams Golf, Inc. Secs. Litig., 618 F. Supp. 2d 343,
348-49 (D. Del. 2009); see also Lin v. Interactive Brokers Grp.,
Inc., 574 F. Supp. 2d 408, 419 (S.D.N.Y. 2008).  As one Judge of
this Court put it, the inquiry involves "whether the Offering
Documents were accurate and sufficiently candid."  Lin, 574 F.
Supp. 2d at 417.

     The plaintiffs point to the same categories of disclosures
that they cite in relation to Item 303.  As the defendants note,
the "Risk Factors" section of each Registration Statement does
include discussions of each of these topics.  (Nov. 2007 Reg.
Stmt. at 17-22; July 2008 Reg. Stmt. at 15-22.)  However, as
discussed above, the plaintiffs have sufficiently alleged facts
that, if true, would allow a jury to find that the Registration
Statements contained material misstatements of the risks or
omitted material facts in each area.

     These allegations also suffice to plead violations of Item
503.  For example, if that the NRC had consistently rejected
proposals similar to ES's petition, a jury could find that the
ventures dependent on that proposal were speculative in a way

not identified by the disclosure that "failure of the proposal

to be adopted could have an adverse impact on the prospects for

[ES's] Commercial and LP&D segments." (Nov. 2007 Reg. Stmt. at

20; July 2008 Reg. Stmt. at 20.)  Similarly, if the owners of

one-fifth of the supposed shut-down reactor market had told ES

that they would not outsource their services to ES, the ventures

might have been too speculative to be accompanied by the simple

disclaimer that the Company "may not be successful in entering

into license stewardship arrangements with owners and operators

of shut-down nuclear reactors." (Nov. 2007 Reg. Stmt. at 20;

July 2008 Reg. Stmt. at 20.)

Accordingly, the plaintiffs have adequately alleged a

failure to make disclosures required by Item 503.


3.

Item 103 requires that offering documents "[d]escribe

briefly any material pending legal proceedings, other than

ordinary routine litigation incidental to the business, to which

the registrant or any of its subsidiaries is a party or of which

any of their property is the subject."  17 C.F.R. § 229.103.

Administrative proceedings "arising under any Federal . . .

provisions that have been enacted or adopted regulating the

discharge of materials into the environment or primary [sic] for

the purpose of protecting the environment" must be disclosed if

they are "material to the business or financial condition of the registrant."  Id. Instr. 5(A).

The plaintiffs argue that the NRC petition was a legal proceeding that needed to be identified as such under Item 103. The defendants do not argue that a petition of this type does not constitute a "legal proceeding" under Item 503.  Instead they argue only that "[t]he NRC's granting of the Petition was not necessary for ES to conduct its business" and that the Registration Statements "adequately disclosed the facts about the NRC Petition that would be material to a reasonable investor."  (Def.'s Mem. at 43-44.)  The defendants present no authority for applying a "necessity" standard to Item 103, and the text of Item 103 makes clear that such a standard is too high: the inquiry is whether a proceeding is "material," not whether it is "necessary for [a company] to conduct its business."  As to the disclosures actually contained in the Registration Statements, a jury could find that they did not disclose all material facts, for the reasons already discussed. Additionally, the fact that the Registration Statements contained sections captioned "Legal Proceedings" that omitted mention of the petition could support a finding that the disclosures were insufficient to inform a reasonable investor that the "proposal" being considered by the NRC was in fact a petition that required formal administrative action.

Accordingly, the plaintiffs have adequately alleged a failure to make disclosures required by Item 103.

## VII.

The plaintiffs also allege that the Individual Defendants and ENV are liable under section 15 of the Securities Act as control persons of ES.  As with the section 20(a) claim discussed above, the defendants' sole argument for dismissal of this claim is that the plaintiffs have not shown a primary violation.  As discussed above, however, the plaintiffs have made that showing.  Accordingly, the defendants' motion to dismiss this claim is denied.

### CONCLUSION

For the foregoing reasons, the Court:

(a)   dismisses defendant de Planque from the suit;

(b)   dismisses the section 10(b) and Rule 10b-5 claim against
      defendants McBride and Winder;

(c)   dismisses the section 10(b) and Rule 10b-5 claim against
      defendant Roriston to the extent that it alleges
      misrepresentations in the November 2007 Registration
      Statement;

(d)   dismisses all claims to the extent that they allege
      misrepresentations or omissions related to the state of

the Zion Project or failures to disclose general

macroeconomic conditions;

(e)   dismisses the section 11 and 12(a)(2) claim to the extent

that it alleges failures to make disclosures required by

Item 303;

(f)   denies the defendants' motion in all other respects.[13]

The Clerk is directed to close Docket No. 34.


SO ORDERED.

Dated:      New York, New York
            Sept. 30, 2011

                                        John G. Koeltl
                                  United States District Judge


---

[13] As the plaintiffs acknowledge in their brief, all dismissals
are with prejudice, because they had the opportunity to amend
their complaint in response to a previous motion to dismiss.
(Pls.' Mem. at 45 n.30.)   See, e.g., Abu Dhabi Commercial Bank
v. Morgan Stanley & Co., No. 08 Civ. 7508, 2009 WL 3346674, at
*2 (S.D.N.Y. Oct. 15, 2009)  ("[A] dismissal with prejudice is
generally appropriate where a court puts a plaintiff on notice
of a complaint's deficiencies and the plaintiff fails to correct
those deficiencies after amendment.").